UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| HERMAN WALLACE, | ) | CIVIL ACTION |
| | ) | NUMBER 03-09-1027 |
| Petitioner, | ) | |
| | ) | |
| VS. | ) | JUDGE |
| | ) | MAGISTRATE JUDGE |
| HOWARD PRINCE, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## STATEMENT REGARDING LOCAL RULE 3.1

MAY IT PLEASE THE COURT:

The attached Petition for Writ of Habeas Corpus by Prisoner in State Custody is being filed by Petitioner Herman Wallace. In compliance with Local Rule 3.1, undersigned counsel states the following: This civil action involves a challenge to Mr. Wallace's conviction for murder. This Court has previously adjudicated a habeas corpus action filed on behalf of Albert Woodfox in the case entitled *Woodfox v. Cain*, No. 06-789. Final judgment on Mr. Woodfox's case was entered on September 25, 2008.

Mr. Woodfox and Mr. Wallace were both indicted and convicted for the same offense; they were tried separately. Many of the issues and operative facts presented in Mr. Wallace's Petition involve the same and similar issues and facts presented in Mr. Woodfox's Petition for Writ of Habeas Corpus.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| HERMAN WALLACE, | ) | CIVIL ACTION |
| | ) | NUMBER 03-09-1027 |
| Petitioner, | ) | |
| | ) | |
| VS. | ) | JUDGE |
| | ) | MAGISTRATE JUDGE |
| HOWARD  PRINCE, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**PETITION FOR WRIT OF HABEAS CORPUS BY PRISONER IN STATE CUSTODY**

Petitioner Herman Joshua Wallace, a 68-year-old Angola prisoner, petitions this

Honorable Court for relief from his wrongful conviction, pursuant to 28 U.S.C. § 2254 *et. seq.*

Petitioner Wallace so moves by and through undersigned counsel.

The allegations in this petition are in the form dictated by the Model Rules for Use in

Application for Habeas Corpus under the Habeas Corpus statute, prescribed by the Rules

Governing Section 2254 Cases in the United States District Courts.

## I.    PROCEDURAL HISTORY

1.    On April 17, 1972, a white correctional officer named Brent Miller was stabbed to death

at the Louisiana State Penitentiary (hereinafter, "LSP," or "Angola") in Angola, Louisiana.  On

May 5, 1972, Petitioner Wallace was indicted for that murder, as were three co-defendants,

Albert Woodfox; Gilbert Montegut and Chester Jackson, by a West Feliciana Parish Grand Jury.

All four co-defendants, each black, were represented by the same trial counsel.

2.    Albert Woodfox was tried separately and convicted by an all-white, male jury on March

7, 1973.  He was sentenced to life in prison.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| HERMAN WALLACE, | ) | CIVIL ACTION |
| | ) | NUMBER 03-09-1027 |
| | ) | |
| Petitioner, | ) | |
| VS. | ) | JUDGE |
| | ) | MAGISTRATE JUDGE |
| HOWARD PRINCE, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## PETITION FOR WRIT OF HABEAS CORPUS BY PRISONER IN STATE CUSTODY

Petitioner Herman Joshua Wallace, a 68-year-old Angola prisoner, petitions this Honorable Court for relief from his wrongful conviction, pursuant to 28 U.S.C. § 2254 *et. seq.* Petitioner Wallace so moves by and through undersigned counsel.

The allegations in this petition are in the form dictated by the Model Rules for Use in Application for Habeas Corpus under the Habeas Corpus statute, prescribed by the Rules Governing Section 2254 Cases in the United States District Courts.

## I.    PROCEDURAL HISTORY

1.    On April 17, 1972, a white correctional officer named Brent Miller was stabbed to death at the Louisiana State Penitentiary (hereinafter, "LSP," or "Angola") in Angola, Louisiana. On May 5, 1972, Petitioner Wallace was indicted for that murder, as were three co-defendants, Albert Woodfox; Gilbert Montegut and Chester Jackson, by a West Feliciana Parish Grand Jury. All four co-defendants, each black, were represented by the same trial counsel.

2.    Albert Woodfox was tried separately and convicted by an all-white, male jury on March 7, 1973. He was sentenced to life in prison.

3.      On April 27, 1973, Petitioner Wallace moved to quash the indictment on the grounds that women and blacks were systematically excluded from the lists from which grand juries were selected. This motion was granted May 7, 1973. Mr. Wallace and his remaining co-defendants were subsequently re-indicted by a West Feliciana Parish Grand Jury that used the same or substantially the same grand jury selection procedures.

4.      Pursuant to a change of venue, the case against Mr. Wallace, Mr. Montegut and Mr. Jackson was transferred to the 19th Judicial District Court in East Baton Rouge Parish.

5.      Mr. Wallace's motion to quash his second indictment was heard and denied from the bench the day before his trial began, on January 7, 1974.

6.      Mr. Wallace was convicted of Officer Miller's murder after a three-day trial heard by an all-white, all-male jury. He did not testify at trial. Chester Jackson abandoned the defense midtrial, testified for the prosecution and subsequently pleaded guilty to manslaughter. Mr. Wallace and Gilbert Montegut each presented several disinterested alibi witnesses. One alibi witness for Mr. Montegut was a prison official. Gilbert Montegut was acquitted. On January 10, 1974, Mr. Wallace was convicted and sentenced to life in prison.

7.      Mr. Wallace's trial counsel failed to appeal his conviction. On March 15, 1990, Mr. Wallace sought permission to file an out-of-time appeal. This application was granted. Subsequently, on direct appeal, his conviction and sentence were affirmed. *State v. Wallace*, No. 91-0916 (La. App. 1st Cir. 1992). The state Supreme court denied review. *State v. Wallace*, 616 So.2d 679 (La. 1993).

8.      On May 12, 1993, Mr. Wallace sought post-conviction relief in the 19th Judicial District Court. After his pro se application was dismissed, the First Circuit Court of Appeals reversed and remanded, and directed the district court to hold an evidentiary hearing on two claims. After

this hearing, the district court again denied relief. The First Circuit, by a 2-1 vote, summarily denied his application for a supervisory writ. Judge Guidry dissented and would have granted the writ because, regarding co-defendant Jackson's mid-trial switch to state witness: (1) "[Mr. Wallace's] attorney should have filed a motion for a mistrial or sought other counsel for defendants"; and, (2) "it appears there was a deal not disclosed to the jury." *State ex. rel. Wallace v. State*, No. 99-KW-0275 (La. App. 1st Cir. March 19, 1999). On November 19, 1999, the Louisiana Supreme Court denied review. *State ex. rel. Wallace v. State*, 749 So.2d. 668 (La. 1999).

9.     Mr. Wallace filed another Application for Post-Conviction Relief September 19, 2000, in the wake of the State's disclosure of a voluminous amount of previously suppressed exculpatory and impeachment material for co-defendant Albert Woodfox's 1998 retrial. On September 10, 2001, State Court Commissioner Morgan concluded that Mr. Wallace's claim with respect to the prosecution's suppression of promises made by the State to its key witness Hezekiah Brown should be set for an evidentiary hearing. Commissioner Morgan also recommended that all remaining claims be dismissed. On June 28, 2004, the 19th Judicial District Court summarily held that a hearing on Mr. Wallace's claim with respect to Hezekiah Brown was unwarranted, and adopted the remainder of the Recommendation. The First Circuit reversed with respect to a need for a hearing on the allegations concerning Mr. Brown. *State v. Wallace*, No. 2005 KW 0150 (La. App. 1st Cir, 2005).

10.     The State's writ application to the Louisiana State Supreme Court to review the First Circuit's decision was denied. *State v. Wallace*, 925 So.2d 535, 2005-1733 (La. 2006).

11.     Pursuant to the First Circuit's decision, the Commissioner held an evidentiary hearing on September 19, 2006. Mr. Wallace introduced various documents and the testimony of one

witness, Bobby Oliveaux, a former Angola guard, without objection from the state.  The state did not introduce any evidence.

12.    On November 7, 2006, the Commissioner issued a 27-page Recommendation, finding that Mr. Wallace's conviction was fundamentally unfair because the State suppressed material impeachment evidence.  Specifically, the Commissioner found that the State suppressed promises by law enforcement officials to Hezekiah Brown that he would receive the Warden's assistance in securing a pardon, as well as extensive favors while in prison—including, *inter alia*, weekly deliveries of a carton of cigarettes until his release—in exchange for inculpating Wallace and his co-defendants.  The Commissioner recommended that Mr. Wallace's conviction be overturned.

13.    On October 9, 2007, the 19th Judicial District Court denied post-conviction relief.  That Court stated simply, without analysis, "[t]his Court does not agree with the Commissioner's Recommendation that a valid *Brady* claim exists."

14.    Mr. Wallace's writ application was summarily denied review by a sharply-split First Circuit panel on May 12, 2008.  The two deciding judges provided no reasons for their ruling.  Dissenting, Judge Welch explained that the evidence concerning Hezekiah Brown warranted a new trial.

15.    On October 9, 2009, the Louisiana Supreme Court summarily denied Mr. Wallace's application for review.

16.    The instant application is Mr. Wallace's first petition for a writ of habeas corpus in federal court and is timely filed. Mr. Wallace has resolutely and consistently maintained his innocence of the murder of Officer Miller, and has been held in near solitary confinement conditions at Louisiana State Prison, except for brief, uneventful interludes, since April, 1972.

4

## II.    STATEMENT OF THE CASE

### A.    Contextual Backdrop of this Case

17.    Understanding the instant case requires familiarity with LSP at Angola in the early 1970's.  Conditions at LSP in that time were appalling, inmates were pushing for basic reforms, and considerable tension existed between LSP administrators who played key roles in the investigation of the Miller killing. These circumstances explain why state officials immediately targeted Mr. Wallace despite the lack of evidence against him and the existence of several disinterested alibi witnesses, and further clarify why inmates, who feared for their lives on a daily basis, found it difficult to resist the State's incentives for testifying falsely against Mr. Wallace.    For these reasons, Mr. Wallace briefly recounts the conditions prevailing at LSP in the months preceding Officer Brent Miller's murder.

18.    In 1972, as today, roughly three fourths of Angola's prisoners were African-American. The prison was racially segregated and there were no black employees, or "free men" as LSP staff were called.

19.    Violence at LSP was a constant, perpetuated by LSP staff, inmate guards and inmates themselves.  LSP staff readily resorted to violence to manage and control prisoners.  Hilton Butler, a correctional officer who helped investigate the murder of Officer Miller before rising to become a Warden of Angola, once boasted, "I've got just about every finger broke on both hands from punching [prisoners]."  In addition, the prison was patrolled largely by a force of armed inmate guards; then-warden C. Murray Henderson has recalled, "all too often… [inmate guards] blazed away at each other from watchtowers or 'accidentally' settled old scores with bullets." LSP's official website today acknowledges that, "[d]uring the late 1960's Angola became known as 'The Bloodiest Prison in the South' due to the number of inmate assaults." *See*

http://angolamuseum.org/?q=History#history. From 1972 to 1975 over 270 stabbings of inmates by inmates were reported, and over 20 deaths resulted. *Williams v. Hayes*, 547 F. 2d 1206 (5th Cir. 1977).

20.     Corruption among LSP staff was similarly pervasive. For example, LSP officials grossly mismanaged the inmate canteen for personal profit. Angola's inmate sex-market—a violence in and of itself that was characterized by widespread prostitution and sexual slavery—was knowingly overlooked by prison administrators.

21.     Physical conditions at LSP were also notoriously deplorable. Prison grounds wereunsanitary, full of roaches and rats; water stagnated on cratered concrete floors for weeks at a time; sewers malfunctioned and laundry hung from exposed wires. Prisoners returning from their work assignments were jammed in dormitories without window screens or ventilation, triple and quadruple bunked; summer nights sweltered and swelled with mosquitoes while winter nights were warmed only by a small stove.

22.     Nascent reform efforts exacerbated these tensions. In 1968, Louisiana Governor John J. McKeithen hired out-of-state penologists C. Murray Henderson and Lloyd W. Hoyle, Jr. to clean up LSP. Their arrival at Angola disrupted LSP's existing leadership, most of whom had worked their way up the ranks at Angola. Associate Warden Hayden Dees and the old-guard leadership notably resisted their reform efforts, particularly those aimed at ending racial segregation and those directed at according inmates in extended lockdown, known as CCR (closed cell restriction), with due process. (AW 1998 1920-21; *see* AW 1998 2366-67.)[1] Associate Warden Dees in particular believed that "a certain type of militant or revolutionary inmate, maybe even a

---

[1] Citations to the records are noted as follows: "R." refers to the transcript of Mr. Wallace's trial; "HT" refers to transcripts of evidentiary hearings held during Mr. Wallace's post-conviction proceedings; "AW 1973" refers to Mr. Woodfox's 1973 trial transcript; "AW 1998" refers to Mr. Woodfox's 1998 trial transcript.

*communist* type," should remain under lockdown conditions at all times; he wanted nothing to do with documenting decisions about who went into lockdown and for how long in compliance with federal court requirements. Both Warden Henderson and Deputy Warden Hoyle described him as persistently insubordinate, refusing to take orders and flouting federal court decisions regarding the treatment of prisoners. (AW 1998 1918, 1920-21, 2029, 2032-33, 2037-38.)

23.    Some of the so-called "militant" inmates targeted by Associate Warden Dees were in fact engaged in their own non-violent reform efforts, aimed at improving working and living conditions in Angola. Inmate reformers sought an end to racial segregation, better medical care, the employment of African-Americans in high-ranking administration and staff positions, an end to the use of armed inmate guards, the hiring of qualified personnel, and freedom from physical and sexual abuse. Inmate reformers advocated for the improvement of prison conditions through petitions, hunger strikes and lawsuits.

24.    In the early 1970's, Mr. Wallace was among those prisoners working to end the appalling conditions of LSP. He and another inmate, Mr. Woodfox, organized an Angola chapter of the Black Panther Party. In particular, they sought to reduce the incidence of prison rape. Mr. Wallace and other reform-minded inmates would work with new prisoners—who were particularly vulnerable to being abused and forced into sex slavery—to try to keep them safe. These efforts involved escorting new inmates to their dorms and advising on how to avoid being victimized, for example, by avoiding gambling, borrowing money or clothes, or doing anything that could be viewed as incurring a "debt" that required repayment.

25.    In the time period leading up to Officer Miller's murder, a dispute between Warden Dees and the new leadership, over using the extended lockdown facilities to keep "revolutionary" or "militant" inmates under permanent isolation reached a standoff. Warden Hoyle had ordered

Warden Dees to either document records "so that when the reviews are made or the guy files

suit, we've got something administratively so that we can say he was locked up and had a

rehearing and was put back in because he was a threat to security," or the locked-down inmates

would be released. Warden Dees refused to fill out the appropriate paperwork. As a result,

Hoyle ordered the release of many of the inmates held in lockdown conditions. Both Mr.

Wallace and Mr. Montegut were perceived militants who had previously been held in lockdown.

**B.     The Morning of April 17, 1972**

26.     At around 7:00 am on April 17, 1972, inmates at Angola's main prison exited their

dormitories and headed, as they did every day, to breakfast. (AW 1973 at 264.) Inmates

proceeded down "the walk," an elevated pathway connecting the Main Prison's four sets of

dormitories with the rest of the institution, including the dining hall. A security checkpoint stood

between the dorm area, or the "big yard," and the rest of the prison. The "snitcher gate," as the

checkpoint was known, was manned by an officer who generally kept the gate locked. (R. at

299.)

27.     That morning, when inmates reached the snitcher gate, they were not allowed to pass. A

kitchen work stoppage, or "buck" in Angola parlance, was taking place. The inmate workers,

protesting six-days-a-week, 16-hours-a-day work shifts, refused to serve breakfast until Warden

Henderson would speak with them about their grievances. (R. 240.) After several minutes the

inmates held up at the snitcher gate were ordered to return to their dormitories. (AW 1973 at

264.) Meanwhile, after brief negotiations, the warden and kitchen workers resolved the

disturbance and the kitchen workers agreed to serve breakfast. (AW 1998 at 1338.) About 15-

20 minutes after inmates had returned to their dorms, they were again summoned to the dining

hall and breakfast was served without incident. (AW 1973 at 264.) After breakfast, inmates either reported to their work assignments or returned to their dorms.

28.    Returning down the walk from the dining hall, one would pass through the snitcher gate and pass the Oak, Pine, Walnut, and Hickory dorm areas, in that order. Each dorm area consisted of four buildings, identified one through four. Two buildings stood on either side of the walk, with buildings one and two situated directly across the walk from buildings three and four, respectively. Two corrections officers were assigned to each dormitory area. During meal times, one officer remained in the dorm area while the other escorted inmates to the dining hall. (AW 1998 at 542.)

29.    The morning of April 17, 1972, Officer Brent Miller and Officer Lemuel Paul Hunter were assigned to the Pine dormitories. Officer Miller stayed at Pine while Officer Hunter accompanied inmates to breakfast. When Officer Hunter returned from breakfast—he estimated the time was around 7:30 am or 8:00 am—he entered Pine 1 dormitory looking for Officer Miller and hoping to get coffee from Hezekiah Brown, the Pine 1 dorm orderly who regularly made coffee for officers. (R. 267.) Officer Hunter found Officer Miller's body lying on the floor of the lobby in the front of the building. (R. 265.) Officer Miller had been stabbed to death. There was nobody else in the dorm. (R. 271.) The coroner testified that Officer Miller's 32 stab wounds were inflicted at 7:45 am and placed Officer Miller's time of death at 7:49 pm. (R. 201-204.)

## C.    The Investigation

30.    Angola officials secured the Pine 1 dormitory, summoned the West Feliciana Parish Sheriff's Office, the Louisiana State Police and the coroner. The snitcher gate was locked and all movement between the dorm area and the rest of the Main Prison was halted. (AW 1998 at 638.)

31.    Investigators searched in and around the Pine 1 dormitory for physical evidence, looking in trash cans and underneath the buildings. (AW 1998 at 579.) At the same time, officials began interrogating all of the inmates who were now locked into the dorm area. From the start, Associate Warden Dees played a central role in the investigation of Officer Miller's murder. Even early on, Warden Henderson was concerned that Dees seemed to have made up his mind about who committed the murder before any evidence was in, forcing Warden Henderson to admonish him. Despite this admonition, Dees continued to push his own secret investigation, refusing to "compromise his sources," even to Warden Henderson. (AW 1965-66.)

32.    Officials began interrogating all the inmates who were in the dormitory area when Officer Miller's body was discovered by Officer Hunter. Six hundred or more inmates were lined up in the walk. (AW 1998 at 636.) Interrogation rooms were set up in at least two locations. (AW 1973 at 182.) Chief Sheriff's Deputy Willis M. Daniel and Deputy Thomas Guerin led interrogations in a clothing room just inside the snitcher gate. Another interrogation room was set up in the office of Colonel Robert Bryan. Deputy Daniel testified that he and Guerin interrogated approximately 200 inmates, and the officials in Col. Bryan's office interrogated "at least that many." (AW 973 at 183.) Deputies Guerin and Daniel took notes of each session. (AW 1998 at 638.) At some point, Associate Warden Dees told Deputy Daniel to be on the lookout for certain inmates deemed agitators. (AW 1998 at 1305.)

33.    Officials continuously interrogated inmates for approximately 24 hours, until the morning of April 18th. Some inmates were interrogated more clandestinely. For example, without Warden Henderson's knowledge, Associate Warden Dees unilaterally decided to transfer at least two inmates, Paul Fobb and Joseph Richey, to better confines, conduct Warden Henderson

10

described as "outside the scope of the legitimate investigation."  (AW 1998 at 1965-66, 1979-81.)

34.    Deputy Daniel testified that none of the inmates interrogated on April 17th or April 18th provided any information about the murder.  (AW 1998 at 741.)   Mr. Wallace's co-defendant-turned-State's-witness, Mr. Jackson, testified that during his interrogation he was beaten, and that he informed lawyer of this, "to go to the hospital, try to get me a doctor… I told you how the people harassing me."  (R. 166-167.)

35.    On April 17th, Mr. Wallace was removed from his dormitory (Mr. Wallace resided in Pine 3), and placed into solitary confinement, even though no evidence linked him to the crime.

36.    On the night of April 18th, Warden Henderson spoke with Leonard Turner, an inmate scheduled to be paroled from Angola the next morning.  After Warden Henderson threatened to have Mr. Turner's parole revoked, he claimed he had been in Pine 1 during the murder but could not see anything.  (AW 1998 at 1347.)  Mr. Turner also allegedly said that the Pine 1 dorm orderly, Hezekiah Brown, had been in the dorm and in a position to see the murder.  Armed with this information, Warden Henderson testified that he went to see Mr. Brown.  (AW 1998 at 1371.)  Warden Henderson informed Mr. Brown that he believed Mr. Brown witnessed the murder, after which Mr. Brown said that he had.  (AW 1998 at 1371.)  Mr. Brown then signed a written statement alleging that Mr. Wallace had participated in the murder of Officer Miller, along with Mr. Woodfox, Mr. Jackson and Mr. Montegut.  That statement, dated April 19, 1972 at 11:15 am, was the first piece of information acquired by investigators which implicated Mr. Wallace and his co-defendants.

37.    None of the physical evidence recovered by investigators supported Mr. Brown's claims. The physical evidence included only prints and a knife.  Louisiana State Police Bureau of

Identification Investigators Stephen Ledell and Alton Baxter, Jr., testified at trial that they located a bloody fingerprint on the door to Pine 1 and a set of four latent fingerprints on a wall near Officer Miller's body. (R. 252-53.) None of these prints belonged to Mr. Wallace or his co-defendants. (R. 253.) The person or people that left these prints almost surely had something to do with Officer Miller's murder.

38.     Nevertheless, investigators made little effort to match the prints. Baxter testified that the Bureau of Identification had the fingerprints of every Angola inmate on file. (R. 248.) Baxter also testified that the Pine 1 prints were checked against "numerous people," (R. 246A), but Ledell testified that, "[w]e only checked them against suspects." (AW 1973 at 96.) According to Louisiana State Police latent fingerprint analyst Carol Richard, in a report prepared for Mr. Woodfox's 1998 trial, on May 2, 1972, investigators compared the Pine 1 fingerprints to those of 12 people beside the defendants; at least 4 of the 12 were inmate workers who moved Officer Miller's body and another was Officer Hunter.

39.     A prison-made knife was the only other physical evidence introduced at Mr. Wallace's trial. Officer Gerald Rheams testified that he found the knife in a ventilation hole underneath the Pine 1 dormitory, shortly after the murder. (R. 253.) Paul Cobb, Jr., the State Police crime lab supervisor, testified that blood on the knife was human, but there was not enough to type it, even though the knife was covered in blood. (R. 258.) Officer Baxter testified that no fingerprints were found on the knife. (R. 244.) No evidence connected Mr. Wallace, or any of his co-defendants, to the knife.

40.     Three days into the investigation, Deputy Warden Hoyle was called from home to attend a meeting of correctional officers who were upset about unsafe working conditions. Some

officers loyal to Assistant Warden Dees accused Hoyle of being responsible for Miller's death because, over Dees' objections, Hoyle had released some of the so-called militant inmates from lockdown. The meeting concluded when Hoyle was physically assaulted, and sustained deeps cut wounds after being pushed through a plate glass door. Hoyle nearly bled to death before one officer rushed him to a hospital in Baton Rouge for treatment.

### D.    The Trial

#### i. *The State's Case*

41.    The State's case against Mr. Wallace was based solely on the testimony of four LSP inmates—two inmates who claimed they witnessed the crime and two other inmates who placed Mr. Wallace near the scene. Each witness gave an account that wildly contradicted the others about important facts. Each of these witnesses also had compelling incentives for falsely testifying against Mr. Wallace and Mr. Montegut, although details about these incentives were unknown to defendants and to the jury at the time of trial. No other evidence connected Mr. Wallace to the murder of Brent Miller.

42.    The other prosecution witnesses were "investigation" witnesses: law enforcement and correctional officers who testified about the circumstances surrounding the investigation of the crime, and the coroner who described the injuries and cause of death. None of these witnesses implicated Mr. Wallace, or his co-defendants.

### a. Hezekiah Brown's Testimony

43.    The prosecution's star witness, Hezekiah Brown, testified first. He testified that on the day of the murder, about five or ten minutes after inmates had gone to breakfast the second time, Officer Miller entered Pine 1 and asked for coffee. (R. 18.) As Mr. Brown began heating up his

coffee pot, Officer Miller sat on his bed, the first in a row of beds lined up along the wall of the building.  The bed was nearest to the doorway, between the sleeping quarters and the lobby at the front of the building.  (R. 17.)  Officer Miller sat with his back facing the entrance to the dorm. (R. 24.)  Mr. Brown did not know whether Officer Miller wore plain clothes or a uniform.  (R. 43.)  According to Mr. Brown, there was no one else in the dormitory.  (R. 23, 27, 40.)

44.    Mr. Brown claimed that Mr. Woodfox, Mr. Wallace, Mr. Jackson and Mr. Montegut entered the room wearing bandanas over their faces.  (R. 25, 57.)  Brown testified that all of the defendants were wearing "penitentiary clothes… blue jeans and blue shorts."  (R. 58.)

45.    Allegedly, Mr. Woodfox approached Officer Miller from behind, grabbed him around the neck and stabbed him in the back.  The other three men joined in, stabbing Officer Miller with four separate knives.  (R. 26, 29.)  Mr. Brown testified that the attack supposedly left blood on his bed.  Although an inmate's bed is a rare domain of personal space, implausibly, Mr. Brown misremembered this important fact.  (R. 26, 29.)  Investigators never reported finding blood, or any evidence of a struggle, on Mr. Brown's bed.  In crime scene photographs, the bed appears neatly made and unruffled.

46.    Mr. Brown testified that the four men lifted Officer Miller off his bed, carried him through the adjacent doorway and into the lobby, and then threw him down and continued to stab him, "there by the water fountain."  (R. 26-28, 37.)  Contradicting himself, Mr. Brown later said that the attackers had actually thrown Officer Miller down "right at the foot of my bed."  (R. 27.)  The bed, in fact, was in a different room and many feet away from the water fountain.

47.    Mr. Brown remained near his bed, and claimed he could not see into the lobby from this point on.  According to his testimony, he saw no more of the attack.  (R. 45.)  One or two minutes after they entered, the attackers left and Mr. Brown was left alone with Officer Miller's

14

body. (R. 40.) Mr. Brown said the attackers, "didn't say nar' a word," and "Miller didn't say nar' a word. He just say uhhhhhhh." (R. 35.)

48.     Mr. Brown stated that he did not leave the dormitory until all of the attackers left, at which point he ran out of the dorm in his pajamas, then ran back into Pine 1 to get dressed. (R. 27-29, 40.) Mr. Brown then went to the blood plasma center to give himself an alibi. (R. 29.)

49.     Later that day, Brown was interrogated by Warden Butler in the laundry room. (R. 33.) Brown was dismissed after he said he had been in the blood plasma plant at the time of the murder and had no information about the killing. (R. 33.) Two or three nights later, after speaking with Associate Warden Dees, he testified he was awakened near midnight and summoned to the administration building. (R. 33.) "The whole administration," he said, was present, including Associate Warden Dees, Captain Hilton Butler, Deputy Daniel and Deputy Guerin. (AW 1281-84.) LSP officials arrayed the institutional files of particular Angola inmates on the table in front of Mr. Brown. (R. 65.) Fearing he would be charged with the murder himself if he refused to cooperate, and offered extraordinary favorable treatment that the jury never learned about, Mr. Brown pulled the files of Mr. Wallace and his co-defendants and told officials that he had witnessed them kill Officer Miller. (R. 34, 65.)

### b. Chester Jackson's Testimony

50.     Formerly one of the defendants in the courtroom, Chester Jackson was the second inmate witness to testify for the State. Neither defense counsel, Mr. Wallace nor Mr. Montegut had advanced notice that the State intended to call Mr. Jackson as a witness. Mr. Jackson had maintained his innocence to his co-defendants and to counsel. The defense first learned that

Jackson would change his plea and testify for the prosecution after a recess the second day of trial, when Mr. Jackson walked into the courtroom, accompanied by the district attorney, and sat down at the prosecution's table.[2]

51.    Much of Mr. Jackson's testimony was inconsistent and incredible.  According to Mr. Jackson, on the morning of Officer Miller's murder, Mr. Woodfox, with whom he lived in Hickory 4, wore a gray, hooded sweatshirt, and jeans and wore a distinctive hat, a "hunting cap." (R. 105, 160.)  Mr. Jackson said that just before inmates were summoned a second time for breakfast, on April 17, 1972, Mr. Woodfox concealed a knife under his sweatshirt and asked Mr. Jackson if he was "ready."  (R. 102-3.)  He said he understood what Mr. Woodfox meant because the two had discussed "throwing a free man away" about a week prior to the killing.  (R. 105.)

52.    Mr. Jackson testified he and Mr. Woodfox left for breakfast at around 7:20 am.  (R. 101.) They walked toward the dining hall, but stopped near the clothing room to wait for Mr. Wallace. (R. 107-8.)  Mr. Jackson testified that Mr. Wallace lived in Pine 1.  (R. 108.)  In fact, Mr. Wallace lived in Pine 3.

53.    According to Mr. Jackson, after about 10 minutes, Mr. Wallace appeared.  He said Mr. Wallace asked Mr. Woodfox whether he had "the weapons."  (R. 109.)  Apparently dissatisfied with that response, the prosecutor, Mr. Ralph Roy, then prompted Mr. Jackson to agree that Mr. Wallace had actually asked whether Mr. Woodfox had "the weapon," in the singular.  (R. 109.)

54.    Mr. Jackson testified that he did not see a weapon in Mr. Wallace's possession, and that he himself did not have a knife.  (R. 109, 113.)  The three men then walked back down the walk

---

[2] Defense counsel Garretson later testified, "I was in a complete state of shock… it took everything I could glean together to maintain professionalism and sanity and intelligence to go forward after this lunch break."  The trial court granted him less than 30 minutes to regroup, after which he was forced to cross-examine Mr. Jackson, formerly his own client.

toward the dormitories. (R. 112.) Mr. Jackson and Mr. Woodfox waited between Oak 1 and

Oak 2 while Mr. Wallace, "scouted for a free man to kill." (R. 111.) Mr. Wallace then returned,

after about 15 minutes, and stated that there was a man sitting on a bed in Pine 1. The three men

walked to Pine 1. At this point, according to Mr. Jackson, Mr. Wallace had somehow concealed

a knife in his sleeve. (R. 109.) There was no one else around the Pine or Oak dormitories. (R.

114, 167.)

55.    According to Mr. Jackson, in order, Mr. Woodfox, Mr. Wallace and Mr. Jackson entered

Pine 1; in the lobby all three placed handkerchiefs over their faces. (R. 120-21.) Jackson stated

that Mr. Wallace had his sweatshirt hood over his head, and that Mr. Woodfox also had his

sweatshirt hood over his head, even though he was wearing a distinctive "hunting cap." (R. 120,

160.) There were "five or six" other men in the back of the dorm, including an inmate named

"Specs."[1] (R. 122, 125.)

56.    Mr. Jackson testified that Officer Miller was sitting on Hezekiah Brown's bed, facing the

entrance of the building, talking to Mr. Brown. (R. 124.) Mr. Woodfox was the first to attack

Officer Miller. Somehow Mr. Woodfox—who was supposedly wearing a handkerchief over his

face, a distinctive hunting cap and a sweatshirt hood, and who was supposedly wielding a

knife—was able to walk right past Officer Miller—who was facing the door—and approach him

from behind. Mr. Jackson claimed that Mr. Woodfox grabbed Officer Miller around the throat,

and began stabbing him in the front of his body. (R. 127.) After Officer Miller was stabbed

approximately twice, he jumped up and asked, "Why?" (R. 130.) Officer Miller then tried to

walk out the door, but Mr. Wallace allegedly pushed him back into the sleeping quarters. (R.

130.) Then, according to Mr. Jackson, "everybody" started stabbing Officer Miller. (R. 130.)

---

[1] "Specs" was the prison nickname of Leonard Turner.

Mr. Jackson stated Officer Miller did not fall. He testified, inconsistently with Mr. Brown's testimony, that Officer Miller was "hollering." (R. 131.)

57.    Mr. Jackson further testified that he then entered the sleeping quarters and, "the first knife I got was from Woodfox." (R. 131.) He began stabbing Officer Miller, who was still standing. (R. 132.) He did not know how many times he stabbed Officer Miller, but recalled that Officer Miller, "fell after it was over with." (R. 132, 133.) Mr. Jackson testified that the attack began on Brown's bed (as noted, however, crime scene photos showed Brown's bed was neatly made and unruffled), and then moved to the doorway of the lobby. (R. 132-33.) According to Mr. Jackson, and inconsistent with Mr. Brown's testimony, Mr. Brown walked out of the front door of the dorm while Mr. Jackson was stabbing Officer Miller. (R. 132, 172.) Mr. Brown did not return while Mr. Jackson was in Pine 1. (R. 172.) Mr. Jackson could not describe the clothing worn by Mr. Brown. Asked if any of the men in the back of the dorm participated in the attack, he said he did not know. (R. 134.)

58.    According to Mr. Jackson, after Officer Miller fell, Mr. Woodfox and Mr. Wallace stabbed Officer Miller about twice more. (R. 134.) Jackson stated that when the attack ended, Mr. Woodfox and Mr. Wallace ran out of the building, but Mr. Jackson lingered over Officer Miller's body for "about three seconds," apologized and ran out. (R. 134, 135.) Mr. Jackson estimated that the "struggle," as he described it, lasted ten or eleven minutes. (R. 135.)

59.    Mr. Jackson's testimony recounting the physical placement of people present during the attack was not believable. Mr. Jackson testified that, while he watched Mr. Woodfox stab Officer Miller in the sleeping quarters, he himself was "still in the lobby," hiding behind the wall separating the two rooms because he did not want Hezekiah Brown, with whom he had long been friends, to see him. (R. 127, 129.) Asked if he was peering through the doorway rather

18

than standing behind the wall, he testified that he was not looking through the doorway, but instead, "[t]hey are on one side of the partition and I'm on the other side." (R. 169.) He acknowledged the partition was "[s]olid concrete… [a]ll the way up to the ceiling," and, "I can't see through it." (R. 169.) Somehow, nevertheless, Mr. Jackson claimed he was able to witness the stabbing from this vantage point.

60.    Mr. Jackson also testified that Mr. Wallace was standing in the doorway separating the sleeping quarters from the lobby. (R. 129.) Specs, (Leonard Turner), who had been in the back of the dorm, allegedly walked out of the dorm when the attack began, which would have taken him through Mr. Wallace. (R. 128.) As for the other "five or six" men in the back of the dormitory, Mr. Jackson "believed" they stayed put, but, "I wasn't looking at them… I wasn't paying no 'tention." (R. 173.) As described in more detail below, Mr. Jackson said he could not remember if Mr. Montegut was present while Officer Miller was being murdered. (R. 151, 153, 157.)

61.    When Mr. Jackson left the dormitory, he testified, "that's when all the people from the other dormitories can in Pine 1 and I just left and went and changed clothes." (R. 135.) Mr. Woodfox allegedly ran down the side of Pine 1, while Mr. Jackson and Mr. Wallace went to Pine 3 to change clothes. (R. 136, 137.) Asked if there were people in Pine 3, Mr. Jackson testified that, "[t]hey had some people in there, you know, cleaning up, and some guys waiting to go to work or to school, something like that." (R. 139.) Mr. Jackson, who said he had blood on his kneecap, took off his clothes and threw them in the trash in the corner of that dorm. (R. 137.) He found a pair of pants on a bed and put them on.

62.    Meanwhile, Mr. Wallace allegedly found fresh clothes behind a bed. (R. 138.) Asked if Mr. Wallace's clothes had blood on them, Jackson said they did, but could not identify where,

"'cause he could have blood anywheres on him." (R. 139.) Asked what Mr. Wallace did with his bloody clothes, Jackson stated, "[h]e left them there," then, "I can't say exactly what he did with them." (R. 138.) Finally, responding to the prosecutor's prompt of "[h]e left with them?" Jackson replied, "he left with them, out the door, you know, towards the door. Now what he did with them, I don't know… he had them in a bundle." (R. 139.) Allegedly, Mr. Wallace exited Pine 3 before Mr. Jackson, and when Mr. Jackson exited the building, Mr. Wallace, "wasn't nowheres around." (R. 177.)

63.     Mr. Jackson testified that he was interrogated at about 8:15 am or 8:30 am that morning, at which point he told officials he had no knowledge about the murder. (R. 142.) After the interrogation, he said he walked out onto the yard and spoke with Hezekiah Brown and the two did not mention the murder. (R. 142.) Mr. Jackson testified that he was interrogated twice more, on April 18th, but did not provide any information. (R. 143.) Mr. Jackson stated he was questioned on the night of April 19th, at which time he confessed. (R. 143.)

64.     Mr. Jackson acknowledged signing a written statement; he testified before the jury that this statement was identical to his trial testimony, "word for word." (R. 179.) The prosecutor referred to the statement in Court, noting that it was "dated 8:50 pm, April 19 of '72," but failed to introduce it into evidence.

65.     Defense counsel Garretson asked for the production of this written statement, but the court ruled, "I can't order the D.A. to produce his evidence." (R. 181.) During jury deliberations, a juror also sent a note to the Judge, requesting that the Court provide the statement for review; the Judge refused. The State has never produced this document to Mr. Wallace.

66.     Mr. Jackson's testimony with regards to Mr. Montegut was highly equivocal.  Asked if

Mr. Montegut had been involved in the murder, he replied, "[h]e could have been in the

dormitory and I didn't see him probably… or he could have came in the dormitory when the

struggle was going on… I wasn't paying no 'tention about who was coming in or who was going

out."  (R. 150.)  Asked if Montegut stabbed Officer Miller, he stated, "[w]ell I can't say definite.

I can't give you no definite answer on that."  (R. 151.)  Mr. Montegut had not been present when

Mr. Jackson and Mr. Woodfox were allegedly waiting on the walk for Mr. Wallace, or when the

men were walking to Pine 1, and "not during the struggle."  (R. 152, 157.)

67.     Mr. Jackson testified that he had decided to testify for the State on the second day of the

trial, but denied that he had received an offer of leniency from the prosecutor and said that he

expected to be tried for murder.  (R. 184-186.)

### c. <u>Joseph Richey's Testimony</u>

68.     Joseph Richey was the final inmate to testify for the State in its case-in-chief.  Mr. Richey

did not claim to have witnessed the murder.  (R. 209-211.)  He testified that he lived in Pine 4,

which was directly across the walk from Pine 1.  (R. 204-05.)  The morning of April 17, 1972, he

returned from his first trip to breakfast and went to sleep.  He estimated he slept between 45

minutes and an hour.  (R. 226.)  When he awoke, most inmates had returned to breakfast,

although a few "stragglers" were still heading down the walk.  (R. 206.)  He rose from bed,

brushed his teeth, and then walked toward Pine 4's door.  (R. 207.)  Mr. Richey claimed that, as

he stood in the doorway, he saw Specs exit Pine 1, "at a trot."  (R. 207.)  When Specs opened the

door to exit Pine 1, Mr. Richey claimed he could see inside, and that he saw a body lying in the

lobby of the building.  (R. 208.)

69.    "A few minutes later," Mr. Richey testified, he saw Mr. Woodfox leave Pine 1, followed about a half-minute later by Mr. Montegut, then Mr. Jackson, and then Mr. Wallace. (R. 208-211.) None of the men had anything covering his face, and none had a weapon. Contrary to the testimony of both Mr. Jackson and Mr. Brown, Mr. Richey testified that Mr. Woodfox was wearing a blue, button-up shirt, and was not wearing a jacket or hooded sweatshirt. (R. 234.) Contrary to the testimony of the State's rebuttal witness, he stated that he did not see any blood on Mr. Wallace, or on any of his co-defendants. (R. 211, 212.) About a half-minute after Mr. Wallace exited the dormitory, Mr. Richey testified that he saw Hezekiah Brown emerge from the building; Mr. Brown ran a short distance and then returned to Pine 1. (R. 213-14.) About "a quarter of a minute" later, Mr. Brown re-emerged, wearing dungarees and putting on a shirt. (R. 213-14.)

70.    Again contrary to Mr. Jackson's testimony, Mr. Richey testified that Mr. Woodfox, Mr. Wallace, Mr. Jackson, Mr. Montegut and Mr. Brown all turned right and walked toward the dining hall. (R. 214-15.) Mr. Wallace and Mr. Jackson did not turn left and go into Pine 3. (R. 235.) Mr. Richey did not know how far down the walk the men went. (R. 236.)

71.    After everyone left, Mr. Richey supposedly crossed the walk and entered Pine 1. He walked into the lobby, near the entrance to the sleeping quarters, and recognized the body of Officer Miller lying on the floor. (R. 215-16.) Mr. Richey claimed he stayed in Pine 1 for another minute and a half; he then walked outside; stood near Pine 2; lit a cigarette, and "waited." (R. 218.) He watched from a few feet away as Officer Hunter approached, entered Pine 1, and discovered Officer Miller. (R. 218.) Officer Hunter never reported seeing any inmates in the vicinity of Pine 1 at the time he discovered Officer Miller.

72.    Mr. Richey testified that he did not inform prison officials of his story until three weeks after the murder.  At that time, he gave LSP officials a statement, which was not disclosed to the defense.  (R. 219.)

### d. **Howard Devon Baker's Rebuttal Testimony**

73.    The extent of the evidence presented by the State in its case-in-chief seeking to link Mr. Wallace to Officer Miller's death was the testimony of Mr. Brown, Mr. Jackson, and Mr. Richey.

74.    After the defense presented its case, the State presented the rebuttal testimony of Mr. Baker, a convicted forger.  He testified that he was a "runner" for an inmate gambling operation. (R. 375.)  The morning of April 17, at 6:00 am, he left his dorm with a sick call pass even though he was not sick.  (R. 375.)  He went to sick call, got money from an inmate, and then hid in a conference room while he sewed the money into the lining of his blazer.  (R. 375.)

75.    At around 8:00 am, after finishing his task, Mr. Baker proceeded down the walk toward Hickory dormitories, which were past the Pine area.  After he passed Pine, he heard the sound of the guard's whistle from the direction of Hickory.  R. 376.  The whistle call frightened him because he had money in his jacket, so he turned and headed the opposite direction, which led him back towards the Pine dorms again.

76.    Mr. Baker testified that, as he reached the snitcher gate—which he erroneously claimed, "sets [sic] between Pine 1 and Pine 2"—the door to Pine 1 opened and Mr. Wallace allegedly ran out of the building.  (R. 378.)  Mr. Baker alleged that Mr. Wallace had blood on "his sweatshirt and down the front of his pants," and it was, "enough to become, you know, readily visible of you would look at it." (R. 379.)  The blood splotches were the size of quarters, or fifty cent pieces.  (R. 393.)  Mr. Wallace had nothing covering his face or hands.

23

77.      According to Mr. Baker, Mr. Wallace turned right and headed down the side of Pine 1.

At this point, an inmate named "Pedro," or Abraham Thomas, allegedly emerged from Pine 1.

(R. 324, 381.)  Pedro also had blood on his clothing, and followed Mr. Wallace down the side of

Pine 1.  (R. 382, 94.)  In contradiction with the testimony of Mr. Jackson, according to Mr.

Baker, Mr. Wallace never entered Pine 3.  (R. 399.)  Mr. Baker did not see Mr. Woodfox, Mr.

Jackson, Mr. Montegut, Hezekiah Brown or Officer Miller.  (R. 402-03.)  None of the State's

other witnesses reported seeing Pedro at any time.

78.      Mr. Baker continued down the walk and, as he reached Oak 4, he claimed he saw Mr.

Wallace return to the walk, go through the security gate (manned by an officer), walk around the

laundry, go through another security gate (also manned by an officer), and then proceed to the

license tag plant.  (R. 383.)  At the entrance to the tag plant, Mr. Wallace would have been

required to check in with an officer.  When questioned by defense counsel, Mr. Baker insisted

that Mr. Wallace, covered in blood, "could have walked past several security officers and then

checked in with the tag plant officer without arousing suspicion."  (R. 395.)

79.      Mr. Baker said that he also went to the tag plant.  "About six minutes" after Mr. Baker

arrived at the tag plant, he saw Mr. Wallace, allegedly still wearing bloody clothes.  (R. 383.)

Mr. Baker testified that Mr. Wallace approached him and asked for the key to a box containing

work clothes.  (R. 384.)  Mr. Wallace opened the box, changed clothes and placed his bloody

clothes on top of the box.  (R. 384.)  Pedro then appeared, also still wearing his bloody clothes,

and engaged in conversation with Mr. Wallace.  (R. 398.)  Mr. Baker claim that Mr. Wallace

then picked up his bloody clothes, carried them to a furnace in the front of the plant, and burned

them.  (R. 385.)  Mr. Baker never saw Pedro remove his bloody clothes.  (R. 398.)

80.    Mr. Baker did not inform prison officials of any of this information until four or five months after the murder, at which point, he testified, he came forward to tell his story, "because of my conscience." (R. 373-389.)

81.    Mr. Baker provided a written statement to prison officials October 16, 1972. The statement, which indicated that was held in lock-down at the time, was referred to at trial, but was not introduced into evidence, or shown to the defense.

82.    Mr. Baker further testified that sometime after the murder of Officer Miller, but before he came forward with information, he was put in lock-down because he had been "involved in a killing… [and] a gang fight" within the prison. (R. 402.) Then, at some point thereafter, he was moved from the cell blocks to Camp A, where he served as a "clerk of security," and then to the dog pen, a low-security/highly privileged area. (R. 402.)

### ii. *The Defense*

83.    Seven witnesses testified for the defense; four testified for Mr. Wallace.[2] Their testimony established that Mr. Wallace could not have been in the Pine 1 dormitory at or near 7:45 am, when Officer Miller had been stabbed to death. On the morning of the murder, Mr. Wallace went to breakfast in the dining hall, received some books from another inmate, and then went to work at the tag plant.

### a. <u>Henry Cage's Testimony</u>

84.    Henry Cage testified that he saw Mr. Wallace and Mr. Montegut in the dining hall at 7:30 am (R. at 297.) After breakfast he left the dining room alone to go to the tag plant where he

---

[2]   Gary Knox, Jimmy Pelts, and Captain Wyman Beck, an LSP security officer, testified on behalf of Gilbert Montegut; each stated that Montegut was not in the area of the murder when it occurred.

worked.  When he arrived at work at the tag plant at about 7:55 or 8:00 a.m., Mr. Wallace was already there, working.  (R. at 300.)  Mr. Wallace ran one of the license plate machines.  (*Id.*)

85.     Mr. Cage identified Defense Exhibit 2 as a roster of the names, dates and hours of the tag plant workers.  (R. at 306.)  He testified that a security officer stood at a gate leading to the tag plant and the officer checked in the workers.  (R. at 306.)  The roster was later published to the jury and it showed that Mr. Wallace's name was on the roster, indicating he was present the morning of Officer Miller's murder.  (*Id.*)

### b.  Abraham "Pedro" Thomas' Testimony

86.     Abraham "Pedro" Thomas testified that he ate breakfast with Wallace in the dining room on the morning of the murder.  (R. at 328.)  He recalled that Wallace had some books with him.  (R. at 330.)  After finishing breakfast, he and Wallace left the dining hall together and went directly to the tag plant, where they both worked.  (R. 330.)  Mr. Thomas explained that before starting work at the tag plant they had to check in with a guard and give the guard their names and inmate numbers so they could be recorded on the roster.  (R. at 327.)

### c.  Clarence Jones' Testimony

87.     Clarence Jones testified that he ate breakfast with Wallace, "Pedro" Thomas and Irving Braud on the morning of the murder.  (R. at 341-342.)  During breakfast, a person nicknamed "Slick," who worked in the kitchen, approached Mr. Wallace.  Slick gave Mr. Wallace three or four books.  (R. at 345.)  After breakfast, Mr. Jones left with Mr. Thomas and Mr. Wallace to go to the tag plant, where he also worked.  (R. at 343.)  Mr. Jones testified that they left for the tag plant at about 7:50 am, and that it took about eight to ten minutes to walk from the dining hall to the tag plant.  (R. at 344.)

### d.  Gerald Wayne Bryant

88.    The final defense witness on Mr. Wallace's behalf was Gerald Wayne Bryant.  He testified that his nickname was "Slick" and that he was working in the kitchen area on the morning of April 17th.  (R. at 351-352.)  Mr. Bryant served Mr. Wallace and Thomas food at around 7:30 or 7:45 am.  (R. at 353.)  Bryant stated that he brought some books to Wallace at the table where Wallace was eating.  (*Id.*)

### E.    The Verdict

89.    After hearing the three day case, the jury convicted Mr. Wallace of the murder of Officer Miller, and acquitted Mr. Montegut of all charges.

### F.    Direct Appeal

90.    Mr. Wallace's trial counsel failed to appeal his conviction.  On March 15, 1990, Mr. Wallace sought permission to file an out-of-time appeal.

91.    Mr. Wallace's application for permission to file an out-of-time appeal was granted.

92.    On direct appeal, his conviction and sentence were affirmed.  *State v. Wallace*, No. 91-0916 (La. App. 1st Cir. 1992).  The Louisiana Supreme Court denied review. *State v. Wallace*, 616 So.2d 679 (La. 1993).

### G.    Post-Conviction Proceedings

93.    The factual scenario presented to Mr. Wallace's jury in 1974 was entirely different than it would have been if the State had honored its constitutional obligation to disclose materially favorable evidence to the defense.  Post-conviction proceedings have revealed that—in a case where the prosecution relied *exclusively* on inmate testimony to secure a conviction—the State purposefully withheld evidence of deals, perjured testimony, and prior inconsistent statements. This evidence would have discredited each and every one of the State's witnesses.

94.    In Mr. Wallace's original challenge to his conviction, the May 12, 1993 application for post-conviction relief, he raised, *inter alia*, a claim concerning co-defendant Chester Jackson. Mr. Wallace asserted that he was denied fundamental due process of law because Mr. Jackson's deal with the prosecutor was not disclosed to the jury for their evaluation of his credibility.   In support of that allegation, Mr. Wallace included the affidavit of an inmate named Littel Harris. Mr. Harris swore that in 1985 he had asked Chester Jackson why he was abusing prescription drugs.  Jackson told Mr. Harris that it was because, several years before, he had testified in Court to things that were absolutely untrue.  According to Mr. Harris, Mr. Jackson said Associate Warden Dees had threatened his life, forcing him to sign a statement implicating himself, Mr. Wallace and the other co-defendants.  He still was not planning on testifying, but the prosecutor collaborated with Angola officials and promised him leniency on the charges against him, while Angola officials promised to take care of him with special favors if he testified against Mr. Wallace and Mr. Montegut.

95.    On May 13, 1993, Mr. Wallace, representing himself while confined twenty-three hours a day in a call alone, began trying to ferret out the suppressed evidence in his case by filing a *pro se* Public Records Act request, asking for "all documents… pertaining in any manner to the arrest, investigation, and prosecution of Herman Joshua Wallace."  On May 27, 1993 he filed another records request with the Twentieth Judicial District.  In both cases, the State refused to provide Mr. Wallace with any public records.  Mr. Wallace subsequently petitioned the courts to compel the State to furnish him with records pertaining to his case.  Both the Nineteenth and Twentieth Judicial District Courts thereafter ordered the State to provide the records requested. The State insisted that it had no documents pertaining Mr. Wallace's case.  Mr. Wallace also attempted to subpoena LSP, asking for "the entire investigative file… concerning the death of

Brent Miller." In response, Angola claimed, "there are no record [sic] at the Louisiana State Penitentiary regarding the Investigation into the [sic] Brent Miller's death."

96.    The issues of whether the State wrongfully withheld evidence of a deal and whether Mr. Wallace was denied effective assistance of counsel because of the dire conflict of interest created when his co-defendant turned State's witness went before 19th Judicial District Court Commissioner Bergeron in 1998. The facts developed in that hearing show that Mr. Jackson testified pursuant to a deal, and that defense counsel's resulting conflict of interests rendered counsel ineffective.

97.    At the 1998 hearing, Mr. Wallace's trial counsel, Charles C. Garretson, testified as to information he believed indicated the existence of a deal between Mr. Jackson and the state. Mr. Garretson describes being completely blindsided by the State on the second day of trial, when he returned from lunch to find he was "missing a defendant." (HT Mar. 27, 1998 at 5.)  At that point the prosecutor, Ossie Brown, informed him that his client "had decided to make a deal with the State." (*Id.*)  Mr. Brown, for his part, testified that, "I want to tell the truth... I just don't remember this." (HT April 28, 1998 at 7, 9.)  All information about this deal had been withheld from Mr. Garretson: "I felt that I was the only one in the courthouse that didn't know this. I felt that—I know all the deputies knew it. I felt the Judge knew it, you know, and I felt I was the only one who did not know this." (HT Mar. 27, 1998 at 5.)

98.    Asked whether the prosecutor had requested permission to speak with his client, Mr. Jackson, Mr. Garretson testified unequivocally, "[a]bsolutely not. Nobody approached me at all, period." After being provided less than 30 minutes to regroup, Mr. Garretson was required to cross-examine his own former client." (HT Mar. 27, 1998 at 8.)  Mr. Garretson withdrew as counsel for Mr. Jackson and attorney Stacy Moak, conveniently waiting in the courthouse, was

immediately appointed to represent Mr. Garretson's former client. Mr. Garreston had absolutely

no consultations with Mr. Moak, and had never seen him before. (HT Mar. 27, 1998 at 20-21.)

99.     Mr. Garretson testified that, prior to cross examing his former client, he spoke with Mr.

Jackson's mother, who informed him that there was a "done deal." (HT Mar. 27, 1998 at 30.) If

her son testified, he would "get manslaughter," and, "he would get a much lesser sentence" than

he was then serving; in addition, her son would "get moved out of the Angola facility and put in

a camp." Nevertheless, when confronted on the stand with questions about a deal was to deny,

Jackson denied one existed. (R. at 184.)

100.    Commissioner Bergeron, who heard the evidence at the 1998 hearing, described the

State's conduct at trial as "outrageous... the most disgusting thing I've ever seen." (HT 1998 at

20; *see also* HT 1998 at 21, "does anybody have any idea how distasteful this transcript is? I

mean can you imagine anything like this occurring? I can because I've lived through it before;

but, I mean, just—go ahead. It's just incredible.")

101.    Although during the hearing Commissioner Bergeron repeatedly decried that the State's

conduct at Mr. Wallace's trial was reprehensible, he misapplied relevant law. Commissioner

Bergeron summarily concluded that no relief was warranted with respect to Mr. Garretson's

representation. With respect to Mr. Jackson, Commissioner Bergeron determined that when Mr.

Jackson took the stand and denied that he had been promised anything, he "spoke the truth in the

most narrow sense." On that basis, Commissioner Bergeron recommended the denial relief.

*Wallace v. Whitley*, No. 10-73-6820 (19th JDC E. Baton Rouge, Sept. 1, 1998).

102.    While State officials had asserted for years that they had no records pertaining to the

murder of Officer Miller, the discovery process preceding the 1998 re-trial of Mr. Wallace's co-

defendant, Mr. Woodfox, revealed these representations were flat out untrue. During that

process, Mr. Woodfox obtained suppressed witness statements, audiotapes of interviews with

prison officials, documents pertaining to previously undisclosed agreements between the State

and the prosecution's inmate witnesses, as well as evidence showing that the State had additional

suspects in the murder of Officer Miller beside Mr. Wallace and his co-defendants.

103.    Most importantly, during the trial, testimonial evidence was provided detailing the

existence of a deal, and establishing that State officials believed at least one of their witnesses

had offered perjurious testimony at trial.  Among other things, former Warden Henderson

confirmed on the witness stand that before linchpin witness Hezekiah Brown testified against

Mr. Wallace, Mr. Brown had been promised that the State would work on his behalf to secure his

pardon.  Mr. Henderson also testified that he believed the testimony of Joseph Richey had been

completely fabricated.

104.    Based on the disclosure of this long suppressed evidence, on September 14, 2000, Mr.

Wallace filed a new application for post-conviction relief.   That petition alleged that the

following items of exculpatory and impeachment evidence were withheld:  (1) evidence

regarding a deal with Hezekiah Brown that involved favorable treatment of the highest

magnitude—including a transfer in housing from Main Prison to his own house with TV and

weekly payments of a carton of cigarettes—and the promise that Wardens would secure his

pardon, a promise which was ultimately fulfilled; (2) evidence that State officials believed

Hezekiah Brown's testimony as to Mr. Montegut's participation in Officer Miller's murder was

perjurious; (3) a prior written statement from Hezekiah Brown that showed evidence of being

altered by Deputy Sheriff Guerin and which contained material impeachment evidence; (4) a

prior written statement from Chester Jackson that materially contradicts his trial testimony; (5) a

prior written statement from Joseph Richey that materially contradicted his trial testimony; (6)

evidence that Mr. Richey had been offered a deal to testify in exchange for a transfer out of

Angola to a minimum security prison elsewhere, where he was awarded trustee status, allowed to

work in the Governor's mansion and granted weekend furloughs; (7) evidence that at least one

State official believed Joseph Richey's testimony, concerning seeing Mr. Wallace and his co-

defendants leaving the scene of the crime, was fabricated; (8) evidence that Howard Devon

Baker had been a suspect in the Officer Miller murder and that he came forward only after facing

murder charges in another case; (9) evidence of a written statement made prior to Mr. Wallace's

trial by an inmate named Clarence Clark who claimed to have seen four inmates *not* including

Mr. Wallace, enter Pine 1 and threaten Officer Miller; and (10) evidence of another statement

made prior to Mr. Wallace's trial by an inmate named Charles Evans which provided an account

of the morning of April 17, 1972 near Pine dormitories that was inconsistent with the State's

theory of the case. This evidence discredited every single inculpating witness who testified

against Mr. Wallace, and demonstrates how trial counsel's capacity to challenge those witnesses'

accounts was fatally handicapped.  Mr. Wallace reviews briefly the evidence as to each State's

witness below.

### *Hezekiah Brown*

105.    In his September 2000 post-conviction petition, Mr. Wallace alleged, *inter alia*, that

reversal of his conviction was required on the basis of newly discovered evidence with respect to

Hezekiah Brown's deal with the State.  The 19th Judicial District Court recommended a hearing

on this allegation; that hearing was held September 20, 2006.[3]

---

[3] The Commissioner determined that other aspects of Mr. Wallace's *Brady* claim did not require
a hearing because each aspect singularly did not rise to the level of materiality.  The trial court
adopted the Commissioner's recommendation except for the part recommending a hearing on the
Hezekiah Brown allegations, which the trial court reversed.  That ruling was in turn reversed by

106.    Mr. Wallace proffered various documents in his original post-conviction application

establishing beyond dispute that Warden Henderson had promised Hezekiah Brown, before

Wallace's trial, that he would do everything he could to obtain a pardon for Mr. Brown in

exchange for Mr. Brown's testimony against Mr. Wallace and the other defendants.  Those

documents were admitted into evidence at the hearing.  Mr. Wallace also presented the live

testimony of Bobby Oliveaux, a former security officer at Angola who worked at the dog pen

prior to trial and was familiar with Hezekiah Brown.  Mr. Oliveaux confirmed that he personally

provided Mr.Brown with his weekly allotment of cigarettes, as promised by Warden Henderson,

for at least eighteen months before trial.  The state did not introduce any evidence, nor did it

cross-examine Mr.  Oliveaux.

107.    The following documents were admitted without objection at the evidentiary hearing,

which was held September 20, 2006:

> ▪ **The transcript of C. Murray Henderson's testimony in December 1998 in**
> ***State v. Woodfox*, No. 68933, 21st Judicial District Court.**  In his testimony at
> Woodfox's retrial, former Warden C. Murray Henderson testified that he made an
> agreement with Mr. Brown while interrogating Mr. Brown about Miller's murder.
> He said that he explained to Mr. Brown that he would help obtain a pardon for
> Mr. Brown if he testified against Mr. Wallace and co-defendants.  This promise
> was made before Mr. Brown testified at Wallace's trial—
>
>> Q    [Mr. Brown] also indicated in his [testimony at
>> Woodfox's original trial] that nothing was promised to him.
>> Absolutely nothing was promised to him to secure his
>> testimony.  That statement by Hezekiah Brown is - - is not
>> true, it it?
>>
>> A    Well, nothing was promised to him to begin with,
>> but we told him, you know, we would protect him and try
>> to help him any way we could after he, you know, cracked
>> the case for us.

the First Circuit Court of Appeal on the Brown allegations, and after the Supreme Court denied
the state's writ application, a hearing was held in September 2006.

> **Q**    *And that if he testified, you promised him that you*
> *would do whatever you could to support his pardon?*
>
> **A**    *Right.*
>
> **Q**    *-- Did you not?*
>
> **A**    *Absolutely.*
>
> **Q**    *And those promises were – were made to him by*
> *you?*
>
> **A**    *Yeah.*
>
> **Q**    *Before he testified?*
>
> **A**    *That's right.*

(AW 1998 at 1363 (emphasis added).) Mr. Henderson further acknowledged that he wrote letters, described below, to Secretary Elayn Hunt and Judge Shea seeking a pardon for Mr. Brown, that he personally wrote Mr. Brown's letter to the Pardon Board regarding who would testify on his behalf at the pardon board hearing, and that he requested George Lee, Angola's Assistant Business Manager, to pay for Mr. Brown's clemency advertising costs. (AW 1998 at 1349-1360.)

Warden Henderson's testimony was not challenged by the state. It was supported by numerous documents which Mr. Wallace also introduced at the hearing. These documents reflect that prison officials went to extraordinary lengths to "fulfill commitments made to [Mr. Brown] with respect to his testimony on the State's behalf in the Brent Miller case." These efforts resulted in Mr. Brown—who had previously been sentenced to death for aggravated rape and was serving a life sentence in 1972—receiving a pardon.

- **A letter dated 2/15/74 from Warden Murray Henderson to Judge Frank Shea requesting Judge Shea's assistance in obtaining a pardon for Hezekiah Brown.** Warden Henderson wrote, "Mr. Brown's case is scheduled to be heard by the next Pardon Board and I appreciate any consideration that you would give him."

34

- **A letter dated 4/22/74 from Warden Murray Henderson to Elayn Hunt, Director of the Department of Corrections.** In the letter, Henderson asks Hunt to support the pardon board's tentative recommendation for a pardon for Hezekiah Brown. Henderson wrote: "It is my understanding that [Hezekiah Brown] was considered by the Pardon Board during its last session and that favorable consideration has tentatively been given depending upon a favorable recommendation from you . . . I personally appreciate any consideration you would give him. It is my opinion that at his age and general physical condition, he is not going to be in conflict with the law and his release I believe is well deserved."
- **A letter dated 9/18/75 from Warden Murray Henderson to Judge Frank Shea.** Henderson again requested assistance from Judge Shea to obtain a pardon from Hezekiah Brown. The Warden wrote, "It is my personal opinion that the State has an obligation to try to help this individual in some way . . . Any consideration given him will be greatly appreciated. When he appeared before, you helped him but the Lieutenant Governor and the Attorney General, as I remember, did not go along."
- **A letter dated 11/4/75 from Hezekiah Brown to William Carroll, Board of Pardons.** Brown states that Warden Murray Henderson, Associate Warden Hilton Butler, District Attorney Leon Picou, Deputy Sheriff Billy Travis, Correctional Officer Bobby Oliveaux, and Correctional Officer Bert Dixon would be appearing on his behalf at his pardon board hearing set for 11/13/75.
- **A letter dated 11/13/75 from Warden Murray Henderson to George Lee.** Henderson states that he "feel[s] that it would be appropriate for the institution to pay the cost of the advertisement to be used for Clemency request."
- **A memo dated 4/7/78 from Warden Frank Blackburn to C. Paul Phelps, Secretary of Corrections.** Blackburn wrote, "As discussed with you, I would like to have issued to the above named inmate [Hezekiah Brown] one (1) carton of cigarettes per week. This, I feel, would partially fulfill commitments made to him in the past with respect to his testimony in the state's behalf in the Brent Miller murder case." The memo also contains a handwritten response from C. Paul Phelps to Warden Blackburn on 4/25/78. Secretary Phelps states, "I concur. Warden Henderson made the original agreement with Brown . . . I think we should honor the agreement."
- **A letter dated 12/10/84 from Howard Marsellus, Chairman of the Pardon Board, to Gov. Edwin Edwards recommending clemency for Hezekiah Brown.** Marsellus wrote that even though Brown's request for clemency was opposed by the New Orleans Police Department and the Orleans District Attorney, "We… recommend that Your Excellency grant applicant a commutation of sentence to time served."
- **A copy of Hezekiah Brown's pardon.**
- **Various documents from Hezekiah Brown's prison file.**

108.    In addition, at the 2006 evidentiary hearing, Mr. Wallace presented the testimony of

Bobby Oliveaux, who worked as a corrections officer at Angola for 26 years. Mr. Oliveaux was

familiar with Hezekiah Brown because Mr. Brown came to live at the minimum-security dog pen

where he worked in 1972. (HT 2006 at 32.)   Mr. Brown, who occasionally made coffee and

cleaned, and cooked once a week, was paid regularly, whether he worked or not. (HT 2006 at

39-40.) Mr. Oliveaux explained that about 12 inmates lived in one house at the dog pen. Mr.

Brown had his own quarters with his own TV. (HT 2006 at 39, 43.)   On more than one

occassion, Mr. Oliveaux gave a birthday cake to Mr. Brown. (HT 2006 at 49.)

109.    Asked about weekly provisions of a carton of cigarettes to Mr. Brown, starting the

moment he arrived at the dog pen, Mr. Oliveaux was clear that the warden approved of the

cigarette ration and that Mr. Oliveaux delivered them to Brown each week:  "From the date I got

to the dog pen, 1972, I went every week to sign [Mr. Brown's] carton of cigarettes out of the

canteen." (HT 2006 at 45); "I was told by higher ups, go get the cigarettes. I went and got the

cigarettes." (HT 2006 at 48); "I didn't pay for [the cigarettes]. The State paid for them

evidently." (HT 2006 at 36.) Mr. Oliveaux also testified that if Mr. Brown would run out of his

weekly allotment of cigarettes, he would personally buy more for Mr. Brown. (HT 2006 at 35.)

Brown also had his own quarters at the dog pen. None of the other inmates received free

cigarettes or had quarters of his own. (HT 2006 at 49.) Mr. Oliveaux stated that cigarettes were

used as currency in the prison, to gamble and to buy alcohol, drugs, and sex, but he did not know

if Mr. Brown was involved in any of those activities. (HT 2006 at 41-43.)

### Chester Jackson

110.    As discussed *supra*, Mr. Wallace was aware that Chester Jackson gave LSP officials a

written statement at 8:50 pm on April 19, 1972, since that statement was referenced at trial,

although the trial court refused to allow Mr. Wallace to see it. That statement has still never been disclosed.

111.    Mr. Woodfox's 1998 pretrial discovery revealed the existence of another statement, time stamped 6:20 pm, April 19, 1972, which contradicts Mr. Jackson's trial testimony on key facts. According to Mr. Jackson's previously undisclosed 6:20 pm statement, on the morning of April 17th, 1972 Mr. Woodfox was eight or nine men ahead of Mr. Jackson in the line of inmates walking toward the dining hall after the second call to breakfast. Mr. Jackson stated that he saw Mr. Woodfox, wearing a "cap with the flap turned down and pulled down on his head as far as he could get it,"[4] drop out of the line near the clothing room. Mr. Jackson inexplicably, then became concerned he had not seen Mr. Wallace, so "feeling that something was wrong," he went down the walk to look for him. As he proceeded down the walk, he saw Mr. Wallace and Mr. Woodfox standing near the Pine dormitories. Mr. Jackson then stopped near Pine 1. Mr. Woodfox appeared and informed Mr. Jackson he was going to "kill a pig." Mr. Wallace, who had briefly disappeared, returned, said, "I didn't see nobody," and walked into Pine 1. He came back and said, "[t]he chump's in there." Mr. Jackson, who "wanted no part of this," departed towards Oak dormitories. Minutes later however, Mr. Jackson heard screaming coming from Pine 1. He ran back to the dormitory, looked through a window and allegedly saw Mr. Wallace and Mr. Woodfox stabbing Officer Miller. After seeing this, he decided to enter the dormitory. Mr. Wallace allegedly pushed Mr. Jackson out of the way, and left with Mr. Woodfox, after which Mr. Jackson walked away. As he walked away, Jackson ran into someone named "Scooter." Then, noticing that he had blood on his hand, Jackson went to his dormitory and washed it off. In this statement, Mr. Jackson did not include Hezekiah Brown among the

---

[4] Jackson was the only witness at the trial to testify that Mr. Woodfox was wearing a hat.

inmates on the scene. All of these supposed facts were dramatically inconsistent with Mr. Jackson's trial testimony, see *supra*.

112.    The implausible character of Mr. Jackson's trial testimony—according to which he was able to describe the details a murder even as he stood behind "a solid concrete wall" through which he could not see but did not know whether Gilbert Montegut was present—would have not had even a patina of believability had trial counsel been able to show the jury that Mr. Jackson had previously sworn to the accuracy of another, entirely different version of Officer Miller's murder.

### *Joseph Richey*

113.    Long suppressed evidence also reveals that Joseph Richey gave not one but two prior statements contradicting his trial testimony; one written and one memorialized in Sheriff Daniel's investigative notes. In addition, Mr. Richey is schizophrenic, a condition from which he suffered when he allegedly saw Mr. Wallace and his co-defendants near the crime scene as he testified at trial. Furthermore, at least one LSP official believed Mr. Richey's testimony was perjurious. Any of the above information could have been used by defense counsel to undermine severely Mr. Richey's testimony and credibility, if it had been disclosed by the State as the Constitution required.[5]

114.    On April 17th, 1972, Mr. Richey told Sheriff Daniel, he had no knowledge of the murder and that, earlier that morning, he "went to chow then went to Hic-4 [Hickory 4 dorm] and gave Crutches [an inmate] some cigarettes and came back to the dorm." In the written statement he

---

[5]  The undisclosed statement by Richey contained in Sheriff Daniel's interrogation notes was the subject of Albert Woodfox's *Brady* claim in his habeas corpus petition in this Court. This item of evidence supported the Magistrate's recommendation of reversal of conviction, and was adopted by this Court. *See Woodfox v. Cain*, No. 06-789-D-M2, Doc. 33, Magistrate Judge's Report at 61 n. 47.

gave one month after the murder, after being interviewed by Associate Warden Dees, Mr. Richey stated that on the morning of April 17th, 1972, he walked into Pine 1 as the murder of Officer Miller was taking place: "As the door opened, I saw Mr. Miller trying to get up off the floor and he fell back down. I got about two steps inside the door of Pine 1 and Woodfox, Montegut, Hooks [Mr. Wallace] and Noxema [Mr. Jackson] was there. I also saw Specks and Hezekiah." The statement also claims that "Noxema and the others went in different directions" when they left the dorm.

115.    These statements materially differ from Mr. Richey's trial testimony. First, in his interview with Sheriff Daniel, Richey denied knowledge of the crime. Second, unlike in his written statement, at trial Mr. Richey never claimed to have witnessed the murder; at trial he stated he stood in the doorway of Pine 4 across the walk from Pine 1 and saw the four defendants leave Pine 1, turn right and walk toward the dining hall. (R. at 214-15.) On this last detail his written statement differs as well, the statement indicated that all four defendants, "went in different directions."

116.    The State also suppressed the fact that Mr. Richey was psychiatric patient suffering from schizophrenia. Trial counsel was denied an opportunity to question Mr. Richey about whether it was possible for him to give an honest, accurate account of the morning of April 17th, 1972 since he was suffering from a disease with the characteristic symptoms of delusions, hallucinations and paranoia. In a sworn declaration Mr. Richey verifies:

> I was diagnosed with schizophrenia in the 60's and received Thorazine daily at Angola.... I got Thorazine [the morning of Officer Miller's murder] and took it.... I continued to take Thorazine and anti-psychotic medications until I was released.... I was taking Thorazine and anti-psychotic medications when I testified against Wallace and Woodfox in the 1970's.

117.   The State's suppression of evidence similarly denied Mr. Wallace an opportunity to question Mr. Richey about how he was rewarded for his testimony.   Trial counsel did not know Mr. Richey was transferred from Angola to minimum security confinement at the State Police Barracks, and was given a cushy trustee job at the Governor's Mansion, weekend furlough included.[6]

118.   Given the weakness of the prosecution's case, Mr. Richey's testimony was important because he placed Mr. Wallace near the scene of the crime, thereby appearing to partially corroborate the testimony Hezekiah Brown—although the two men's versions of events conflict in important ways.   If the State had disclosed Richey's pretrial statement and the fact that he suffered from a major mental illness marked by hallucinations and delusions, the jury would have completely rejected his testimony.

119.   The State also suppressed information that LSP officials did not believe Mr. Richey saw what he said he saw.   With respect to Mr. Richey, former Warden Henderson testified at Mr. Woodfox's 1998 retrial, "I don't think he knew anything about the case to begin with."   (AW 1998 at 1366.)

### *Howard Baker*

120.   Previously undisclosed evidence provided in connection with Mr. Woodfox's 1998 retrial revealed that Mr. Baker, the fourth inmate witness who testified on rebuttal at Mr. Wallace's trial, may have at one point been a suspect in Officer Miller's murder.   At Mr. Wallace's trial, one of the State's fingerprint experts testified that prints recovered from the crime scene were compared against suspects.   In 1998, the State finally disclosed evidence showing that, two weeks after the murder, Mr. Baker's fingerprints were compared to the crime scene prints.   In

---

[6] While there, he committed a series of bank robberies. *State v. Richey*, 364 So.2d 566 (La. 1978).

addition, the State disclosed for the first time a written statement from Mr. Baker, given October

16, 1972, which indicated that he was confined in the cell blocks at the time he gave his

statement. Although the fingerprints did not match, and there is no conclusive proof that his

incarceration in cell blocks was a consequence of LSP's suspicion that he was involved in

Officer Miller's murder, the wrongful suppression of this information hamstrung Mr. Wallace's

defense. Not only were important avenues of cross-examination foreclosed, but trial counsel was

denied an opportunity to investigate further into whether and why someone who took the stand

against Mr. Wallace was at one point a suspect in the same crime.

121.    Mr. Baker has since executed an affidavit wherein he wholly recants his trial testimony.

This affidavit makes clear why Mr. Baker—and any other Angola inmate witness—was

motivated to lie on the stand:

> Angola in those days was life and death, buying and selling people, and the officers
> knew it was happening. … There was a goon squad of guards. If they came after you,
> you could get anything from a beating to being killed, and they'd call it being killed by
> trying to escape. Physical conditions were about as bad as you can get: hot, dirty,
> overcrowded. Weapons were everywhere. You could shake down for weapons one night
> and have just as many the next. I saw as many as four stabbings a week, week after
> week. I was attacked and got 22 stitches in my head and only had an inmate to sew me
> up.
>
> When Miller was killed, I wasn't called in for questioning right away. The word
> went around from administration that it would be in an inmate's best interest to
> say what he knew about Miller's killing. So I looked at the situation like this, I
> got 60 something years, and I got a chance to help myself – so I was going to do
> something to help me get out of this cesspool.

Mr. Baker's affidavit not only zeroes in on the push factor pressuring inmate witnesses to

give false testimony, it also identifies the tempting pull factors—irresistible incentives

dangled in front of them by LSP officials:

> So, I gave a statement on 10/16/72, to Warden Dees, which was a lie. And my
> testimony based on that statement was a lie. I really thought this would help me

because Dees told me my statement would get my sentence commuted. And the two other investigators, Daniel and Guerin, were very agitated. I can't remember if they wore uniforms, but they were armed.

Dees just wanted a statement. If they could have hung and burned the guys involved they would have. But there was too much light on the situation.

Mr. Baker also explained why he decided to name Mr. Wallace and Mr. Woodfox—he

knew were targets of the investigation:

It was all over the penitentiary that they were the ones that administration thought was involved. So I gave a statement.

Finally, Mr. Baker noted how implausible his trial testimony was:

I was surprised that anyone didn't pick my statement apart. It was foolish to think that anyone could get to the tag plant with blood all over them, especially that day. And there was no furnace in the tag plant to burn clothes. There was only a heater to dry paint on the tags. You could not burn clothes in it and Dees knew that. And Dees knows that you have to go through (2) manned security checkpoints to get to the tag plant. You could not get there with blood on you.

I never saw anyone come out of Pine 1. I was not near Pine 1 at the time Miller was killed. I lied to try to help myself.

122. Mr. Baker's affidavit makes it clear that the suppression of impeachment evidence in this case compromised Mr. Wallace's ability to defend himself against Mr. Baker's testimony. Had the State's case been tested by the fires of fair adversarial process, the defense may have discovered that Mr. Baker's testimony was perjurious *before* it was submitted to the jury.

****

123. In addition to the State's suppression of deals, false testimony and prior inconsistent statements with respect to the inmate witnesses who testified against Mr. Wallace, the State also failed to disclose statements by other witnesses that would have undermined the State's case.

42

### Clarence Clark

124.    Clarence Clark was not used as a State witness.  However, had the State not failed to disclose evidence as to him, he might have been called as a defense witness.  According to a statement which was never provided to Mr. Wallace's defense counsel, Mr. Clark saw four men—Mr. Woodfox, "Noxzema," "Lil Man," and "Bowman"[7]—threaten Officer Miller on the morning of April 17th, 1972 and then walk away.  Mr. Clark's statement makes no mention of either Mr. Wallace or Mr. Montegut, making it favorable evidence for Mr. Wallace.

125.    The suppression of Clark's statement takes on special significance in the context of a crime that takes place inside a prison.  Unlike a crime that takes place on the streets, prison officials possessed absolute control over the crime scene and witnesses.  Defense counsel and defense investigators were not able to freely enter the prison to search for inmates who might have helpful information.  For the State to suppress the existence of a potentially important witness who the defense was unlikely ever to find on its own was unconscionable.

### Charles Evans

126.    The state also failed to disclose the April 20, 1972 written statement of an inmate named Charles Evans.  According to the statement, Evans lived in the Pine 2 dormitory, next door to Pine 1.  Evans stated that on April 17, 1972, he was awakened at 7:51 am to see "large group of people standing between Pine 1 and Pine 2.  I heard somebody in crowd [sic] say that it was a free man that was fighting.  I saw an old man I know as 'Hezekiah' standing at the door of Pine 1."  Evans further stated that he saw "a free man running toward Pine from Walnut dormitory."

---

[7] "Noxzema Black" was the prison nickname of Chester Jackson and "Lil Man" was the nickname of an inmate named Rory Mason.  (Mason was convicted of aggravated arson occurring on the previous day.  He had set fire to a guard shack and nearly killed a guard. *State v. Mason*, 305 So.2d 523 (La. 1974).)  Mr. Bowman is believed to be an inmate named Darrell Bowman.  Mr. Wallace has always been called "Hooks" by his fellow inmates.

127.    Unfortunately, prison officials failed to record any more details of Evans' recollections. What is clear, however, is that Charles Evans' recollection of event on the morning of April 17th, 1972 was inconsistent with the State's theory of the case and undermined the credibility of the State's witnesses.  Certainly, Evans' testimony would have been valuable impeachment evidence for Mr. Wallace, inasmuch as it would have called into question the testimony of all four inmate witnesses against him, each of whom—denying at times even the presence of each other— claimed that few people were present at the murder scene.

128.    Moreover, if defense counsel had been provided Mr. Evans' statement, he could have investigated further, to interview Mr. Evans and to seek the names of other prisoners who were part of this "crowd" present at the time of the murder.  One among the crowd may have had information as to who actually killed Brent Miller.


III.    **GROUNDS FOR RELIEF**

129.    Mr. Wallace has been convicted of murder and sentenced to life in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution in the following respects:

> A.  **At Trial the State Presented and Failed to Correct False Testimony, and Withheld Material Impeachment Evidence and Exculpatory Information From the Defense; these Acts Singularly and Collectively Denied Mr. Wallace a Fundamentally Fair Trial as Guaranteed by the Due Process Clause of the Fourteenth Amendment.**

130.    All facts alleged in this petition are fully incorporated into this claim for relief.

131.    The State's case at trial was based largely on the testimony of two inmate eyewitnesses, Mr. Brown and Mr. Jackson, who said they saw Mr. Wallace participate in the murder of Officer Miller; one inmate witness, Mr. Richey, who put Mr. Wallace at the scene of the crime near the

time of the murder; and one rebuttal inmate witness, Mr. Baker, who put Mr. Wallace at the scene of the crime near the time of the murder and covered in splotches of blood. The defense presented a credible, multi-witness alibi defense. According to this defense, Mr. Wallace was having breakfast and then at work—when the crime is known to have been committed. Therefore Mr. Wallace's defense strategy was to show that the State's inmate witnesses must be either mistaken or lying.[8] Although the State possessed precisely the information Mr. Wallace's defense counsel sought—material which would show that the State's witnesses lacked credibility and the State's prosecution lacked integrity—the State disclosed none of it. Because of this suppression, Mr. Wallace was denied the fair trial which would have protected him from being wrongfully convicted. The State's failure to disclose this material information violated Mr. Wallace's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), *Napue v. Illinois*, 360 U. S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972) lines of inquiry.

132.    Hezekiah Brown was the State's most important witness; indeed, the State's entire case depended on his testimony. He was one of only two people who claimed to have seen the murder, and the only witness who lacked an obvious motive to lie and whose testimony was not implausible on its face. Yet, State officials have since admitted that, at the time of Mr. Wallace's trial, they believed Mr. Brown was perjuring himself by implicating Mr. Montegut in Officer Miller's murder. Irrespective of whether officials actually believed Mr. Brown's testimony with regard to Mr. Wallace, trial counsel was denied an opportunity to show jurors that the State so badly wanted convictions in this case, it was willing to engage in misconduct of the highest order—the knowing use of false testimony. Given how crucial Mr. Brown's testimony was,

---

[8] The strategy was adequate to acquit Mr. Montegut—who had the good fortune of having a corrections officer willing and able to corroborate his alibi.

evidence showing he lied under oath, about something as important as one defendant's guilt undermines confidence in Mr. Wallace's conviction.

133.    The State also suppressed the fact that Mr. Brown was testifying pursuant to a deal that included, among other things a promise by the warden of Angola that he would do everything in his power to give Mr. Brown what the state Commissioner below called, "the ultimate reward—freedom from natural life and certain death in prison." This proof of this deal includes Warden Henderson's sworn testimony as well as several letters written by Mr. Henderson and his successors to the Secretary of Corrections, Mr. Brown's sentencing judge and the Board of Pardons, all pleading for Mr. Brown's pardon. These pleas were submitted "on the basis of previous agreements made" with Mr. Brown based on his testimony against Mr. Wallace and his codefendants. Warden Henderson acknowledged that he "absolutely" had promised Mr. Brown, *before* Mr. Brown testified against Mr. Wallace, that he would work to win him a pardon in exchange for his testimony against Mr. Wallace and his co-defendants. This information would have been destroyed Mr. Brown's credibility.

134.    Mr. Brown was in fact released in June 2, 1986; after entering Angola under a sentence of death, he had his natural life sentence commuted to time served by Governor Edwin Edwards.

135.    The State also possessed information regarding favors and generosity bestowed on Mr. Brown as part of pre-trial agreements that were made. In addition to the Warden's promise to help Mr. Brown obtain a pardon, one he ultimately obtained, the State suppressed evidence that Mr. Brown was offered extraordinary favorable treatment, including a weekly stipend of cigarettes, birthday cakes and private housing with TV. This information would have been material to the defense's theory that the version of events Mr. Brown testified to at trial was false

because it would have shown the jury the extent of Mr. Brown's self-interest in providing testimony that squared the State's theory of the case.

136.    Apart from suppressing information with regards to Mr. Brown's perjurious testimony, and with regard to evidence of a deal and favorable treatment, the State also possessed a written statement from Mr. Brown that they never disclosed to the defense. This statement contained evidence that it had been tampered with by the State; it showed that the favorable treatment to Mr. Brown began even before he gave his statement; and it contained material contradictions with his trial testimony—the statement, which detailed an active struggle between Officer Miller and his attackers and indicating that Officer Miller had been "screaming, saying, 'Oh don't do me that,'" undermined his trial testimony that Officer Miller had been subdued in one or two minutes and that Officer Miller said nothing but "uhhhhhhhh." The State flagrantly violated their obligation to turn over material impeachment evidence by failing to disclose this statement.

137.    The State also failed to disclose evidence of a deal offered to Chester Jackson. Under this deal, Mr. Jackson was allowed to plead to manslaughter and was transferred out of extended lockdown housing into the more comfortable living quarters of Camp H. Even if Mr. Jackson was only told that such a deal would be forthcoming upon his testimony being in accordance with what the State officials believed to be the truth, as the state courts determined, evidence as to the existence of the deal—either consummated or merely offered—would have enabled Mr. Wallace to show the jury that Mr. Jackson had not only lied on the stand, but that his testimony was evasive, self-interested and incredible.

138.    The State also possessed written pre-trial statements given by Chester Jackson. One statement, the April 19, 1972 8:50 pm statement, still to this day has never been produced to Mr. Wallace. Indisputably the statement existed and was never turned over, even after defense

counsel requested.  The other 6:20 pm statement was thoroughly irreconcilable with Mr.

Jackson's testimony at trial. By concluding that this statement did not undermine Mr. Jackson's

credibility because it "was an obvious initial attempt by Jackson to deny culpability, while

pointing the finger directly at [Mr. Wallace] and Woodfox" the state courts erroneously usurped

the role of the juror and misapplied clearly established controlling law.  The fact that Mr.

Jackson had changed his story so many times would have allowed Mr. Wallace to completely

undermine the credibility of Mr. Jackson's testimony—already implausible on its face and

inconsistent with statements of other witnesses.

139.    With respect to the prosecution's third inmate witness, Joseph Richey, the State followed

the same trinity pattern of failing to disclose evidence of perjurious testimony, a deal, and an

inconsistent prior  written statement—which it set with respect to star witness Hezekiah Brown.

Although former Warden Henderson believed that Mr. Richey knew "nothing about the case,"

the State did not share this information with Mr. Wallace's defense counsel before Mr. Richey

testified that he saw Mr. Wallace at the scene of the crime near the time of the murder.  In

addition, the state failed to disclose that, in consideration of his testimony, Mr. Richey was

transferred to minimum security housing and given trustee status.  Finally, the State withheld

evidence of Mr. Richey's prior written statement, a statement which radically diverged from his

trial testimony.

140.    The State possessed material information regarding whether the fourth and final inmate

witness to testify against Mr. Wallace, rebuttal witness Howard Devon Baker, was himself a

suspect in the murder of Officer Miller.  The State also possessed a written pretrial statement that

contained evidence that Mr. Baker, like all the inmate witnesses testifying against Mr. Wallace,

made a deal with the State in consideration for his testimony.  The State wrongfully failed to

disclose any of this evidence. This information would have not only undermined Mr. Baker's credibility before the jury, it would also have shattered the prosecution's credibility. Moreover, it would have enabled defense counsel the opportunity to confront Mr. Baker, and allow jurors to draw the unavoidable inference that Baker had fabricated his testimony.

141.    The State also suppressed evidence provided by other inmates which would have raised doubts about or flatly contradicted the State's theory of the case. Clarence Clark's statement indicated that neither Mr. Wallace nor Mr. Montegut were present when he saw inmates threaten Officer Miller. Charles Evans' statement described a crowded crime scene that didn't square with the testimony of the State's witnesses, all of whom stated that there were few people around at the time of Officer Miller's murder.

142.    The State's withholding of material information from Mr. Wallace deprived his defense counsel of the opportunity to conduct a meaningful and complete investigation of his client's defenses. It also deprived Mr. Wallace of the opportunity to cross-examine the witnesses against him—who provided the sole evidence of his guilt—and put their testimony through the crucible of fair adversarial process. The prosecution's repeated illegal suppressions of written statements, investigatory files, exculpating and impeaching information immeasurably harmed Mr. Wallace's defense. These suppressions, individually and collectively, violated Mr. Wallace's due process rights.

143.    Yet the state courts unreasonably found that none of this information was wrongfully suppressed. With the exception of Mr. Wallace's *Brady* claim as to lead witness Hezekiah Brown's deal with the State, and Mr. Wallace's *Brady* claim as to eyewitness Chester Jackson's deal with the State, the state courts based their rejection of each of Mr. Wallace's *Brady* claims on the conclusory determination that none of this information was "material." Regarding the

Hezekiah Brown deal claim, the state court ultimately decided simply that it "does not agree with the Commissioner's recommendation that a valid Brady claim exists." Regarding the Chester Jackson deal claim, the state courts misapplied governing law and unreasonably determined the facts when they ruled that the State was not under an obligation to disclose evidence of this deal to the defense because Mr. Jackson was not "promised" the deal in the narrowest sense of the word.

144.    Each of these decisions by the State courts is contrary, or and an unreasonable application of clearly established law, and/or an unreasonable resolution of the facts. Mr. Wallace is therefore entitled to habeas corpus relief.

145.    Mr. Wallace contends that each act of suppression of impeachment material, or exculpatory evidence, or evidence that state witnesses perjured themselves is material individually, but asserts also that when considered cumulatively, these acts rendered his trial fundamentally unfair.

## B. The State's Interference with Mr. Wallace's Right to Counsel Prevented A Fundamentally Fair Trial

146.    All facts alleged in this petition are fully incorporated into this claim for relief.

147.    At the time of trial, Mr. Wallace was represented by Charles Garretson. Mr. Garretson also represented co-defendants Montegut and Jackson. Each client had pleaded not guilty and had informed counsel they were not involved in the Brent Miller killing.

148.    After the trial of Mr. Wallace and Mr. Montegut commenced, the prosecution, without notice to counsel, spoke to Chester Jackson. At the conclusion of this meeting, Jackson agreed to become a prosecution witness and testify against Mr. Wallace and Mr. Montegut. In consideration of his agreement to testify, Jackson agreed to plead guilty to manslaughter, and to

be sentenced to a term of years.  Even though the prosecution was obligated to convey to Mr.

Wallace and to counsel the terms of this arrangement, it purposefully chose not to do so.

149.    When the State announced that Jackson would be a prosecution witness, counsel was

stunned and shocked.  Counsel failed to demand a hearing to explore (1) the circumstances under

which state authorities spoke to his client without his knowledge or consent, and (2) what

consideration the prosecution agreed to provide to Jackson for Jackson's willingness to plead

guilty and testify against his co-defendants.

150.    Jackson testified for the prosecution, and directly implicated Mr. Wallace in Brent

Miller's killing.  With regard to Mr. Montegut, Jackson's testimony was evasive.

151.    Counsel was unable to provide minimally effective representation to Mr. Wallace for a

number of reasons.  First, in prior meetings with Mr. Jackson,  Jackson had expressed his

innocence, as well as Mr. Wallace's innocence. These statements were directly contrary to his

trial testimony.  But as Mr. Jackson's former counsel, counsel did not offer to testify for Mr.

Wallace to inform the jury of those assertions, which, had the jury heard them, would have

provided jurors with a strong reason not to credit Jackson's testimony.

152.    Second, counsel could not and did not fully and adequately cross-examine Jackson

because, while Jackson's direct testimony was harmful to client Wallace, it was not nearly so to

client Montegut.  This problem flowed directly from the prosecution's announcement that

Jackson would be a prosecution witness mid-trial in this co-defendant trial, and placed counsel in

an impossible circumstance. Counsel owed a duty to Mr. Wallace to demonstrate in every way

possible that turncoat Jackson was not a credible witness, but at the same time, owed a duty to

Montegut to not destroy Jackson's credibility because his testimony was not incriminated

Montegut. In fact, counsel's cross-examination went easy on Jackson, and failed to protect Wallace's interests.

153. Third, at the time of trial, the prosecution was in possession of pre-trial statements that Jackson had made to state investigators. These statements were wildly inconsistent with Jackson direct examination, and were required to be disclosed to counsel but were not. The suppression of these statements further assured that counsel's cross-examination would not discredit Jackson.

154. In this joint trial, the prosecution-staged calling of Chester Jackson as a prosecution witness, and counsel's numerous conflicts of interest assured that Mr. Wallace was deprived of the effective assistance of conflict-free counsel when he needed it the most. The state courts' denial of this claim is contrary to and an unreasonable application of clearly established Sixth and Fourteenth Amendment law as well as an unreasonable resolution of the facts.

### C. Ineffective Assistance of Appellate Counsel

155. All facts in the petition are fully incorporated into this claim for relief.

156. Mr. Wallace's right to the effective assistance of direct appeal counsel, under the Fourteenth Amendment to the Constitution was denied in the following respects:

157. At trial, Mr. Wallace filed and litigated a motion to quash the grand jury due to the lack of adequate African-American and female representation that was directly caused by state policy. After a hearing, the trial court denied that motion.

158. Petitioner was represented on direct appeal by a public defender appointed by the court. In her brief filed on Mr. Wallace's behalf, she raised four claims, including a claim that the trial court committed reversible error by not quashing the indictment because African Americans and females were systematically and significantly underrepresented in the grand juries and in the

grand jury roles. Without consulting with Mr. Wallace, counsel abandoned three of these four claims, including the grand jury discrimination claim. When Mr. Wallace learned of this abandonment, he filed a pro se brief with the court urging consideration of those issues. The court of appeal refused to consider the abandoned claims.

159.    Counsel acted unreasonably by abandoning the meritorious grand jury discrimination claim, and Mr. Wallace suffered prejudice as a result. Had that claim been reviewed on its merits, the claim would have been adjudicated as meritorious and the indictment would have been dismissed.

160.    The state courts adjudication of this issue is contrary to and amounts to an unreasonable application of clearly established federal law.

### D. Mr. Wallace Was Impermissibly Convicted Because of the Discriminatory Selection of the Indicting Grand Jury

161.    Mr. Wallace was indicted by a West Feliciana Parish grand jury on May 5, 1972. That indictment was quashed by the trial court on May 7, 1973 after finding that the process of empaneling the grand jury discriminated against African Americans in violation of the equal protection clause of the fourteenth amendment. Following the trial court's ruling, the District Attorney presented the charge to a different West Feliciana Parish grand jury on September 10, 1973. Mr. Wallace was re-indicted for murder.

162.    Mr. Wallace filed a motion to quash the second indictment alleging that the process of selecting the grand jury members resulted in discrimination of African Americans and women. The motion was heard on January 7, 1974, just prior to trial. At the close of the hearing, the trial court denied the motion to quash the indictment. (HT at 44.)

163.    Members of the West Feliciana Parish Jury Commission, including Ruth P. Daniels, who

also served as Clerk of Court for the 20th Judicial District Court, and Anne Bennett, Registrar of

Voters for West Feliciana Parish, testified at the hearing.  The hearing focused on the process the

Jury Commission employed to selecting the September 1973 grand jury.

164.    The first step of process of selecting the grand jury began with the Registrar of Voters

supplying a list of registered voters in Parish to the Clerk of Court.  (HT at 17.)  The second step

required the Jury Commission to then select thirty-five persons from the list of registered voters

to be summoned for grand jury service.  (HT at 8.)  The third and final step was that the judge

selected twelve persons to comprise the actual grand jury.  (HT at 24.)

165.    Mrs. Bennett testified that as the Registrar of Voters she was responsible for registering

citizens to vote in the Parish, and that the qualifications necessary to register to vote was simply

that the person had to have residency in the Parish and be over the age of eighteen.  The

registered voter list compiled by Ms. Bennett and sent to the jury commission, however, only

included male registered voters because, as Mrs. Daniels testified, "no [woman] had ever asked

to serve."  (HT at 10.)  The only qualification used to determine whether a person could be

chosen to be in the grand jury venire was that person had to be a male and registered to vote.

Mrs. Daniels explained that a female registered voter was required to request to serve on a jury,

either a grand or petit jury, in order to be placed on the list.  (HT at 10.)  Mrs. Daniels confirmed

that no woman had ever served on a jury in West Feliciana Parish, including, of course, the

September 1973 grand jury.  (HT at 10.)  Ms. Bennett testified that a little more than half of all

registered voters in West Feliciana Parish were women.  (HT at 17.)

166.    At the time of the indictment, Louisiana law systematically excluded women from

serving on a petit or grand jury.  La. C.Cr.Pro. Art. 402 stated:

A woman shall not be selected for jury service unless she has previously filed with the clerk of court of the parish in which she resides a written declaration of her desire to be subject to jury service. The article was repealed in January 1975.

167.    Thus, by operation of that statute, the West Feliciana Parish grand jury that returned the September 1973 indictment against Mr. Wallace, did not include any women. The trial court's refusal to quash the second indictment requires reversal of Mr. Wallace's conviction because the systematic exclusion of female citizens from grand jury service violated the equal protection clause of the fourteenth amendment.

### E.  The Trial Court's Instructions to the Jury Were Constitutionally Flawed

168.    All facts alleged in this petition are fully incorporated into this claim for relief.

169.    The trial court instructed the jury that, "the defendant intended the natural and probable consequences of his act." This statement may have led a juror to interpret the judge's instruction as one which shifted the burden of proving an essential element of the offense charged against Mr. Wallace from the State to Mr. Wallace. As such, the trial court's instructions to the jury were constitutionally flawed; these instructions impermissibly constitute a burden-shifting presumption, in violation of Mr. Wallace's due process rights.

170.    The remainder of the trial court's instruction to the jury failed to sufficiently clarify for the jurors that the State alone bears the burden of proving every element of the crime charged against Mr. Wallace. The failure of the jury to understand that Mr. Wallace was under no burden of proof as to any element of the crime charged against him renders their verdict a violation of his Sixth, Eighth and Fourteenth Amendment rights.

171.   The State courts' resolution of these constitutionally erroneous instructions is contrary to and/or involves an unreasonable application of clearly established federal law.

**F.    Mr. Wallace Was Convicted In the Absence of Sufficient Credible, Reliable Evidence in Violation of the Fourteenth Amendment To the United States Constitution**

172.   All facts alleged in this petition are fully incorporated into this claim for relief.

173.   At its best, the State's case against Mr. Wallace depended—entirely—upon three prisoner witnesses (and one additional rebuttal witness).  Their testimony was entirely untrustworthy because, among other things, they had been promised deals, provided statements to authorities that were comprehensively inconsistent with their trial testimony, and perjured themselves on the stand.

174.   The law required the prosecution to reveal these facts to the defense so that the jury—to perform its Sixth Amendment role as fact-finder—could make a judgment of conviction by determining for itself that the prosecution's evidence was sufficiently reliable to  demonstrate guilt beyond a reasonable doubt.

175.   The purposeful suppression of the voluminous impeachment and exculpatory evidence cast the state's proof at trial in a fundamentally false light, so that its critical witnesses would appear much more credible then the known facts show.

176.   It was only through this misconduct that the state was able to satisfy the trial jury of Mr. Wallace's guilt.  Had the jury be aware of the extraordinary impeachment and exculpatory evidence that was suppressed at trial, no reasonable jury would have voted to convict.

177.   Every citizen has a right to avoid conviction unless the prosecution can demonstrate guilty by reliable evidence to the jury's satisfaction beyond a reasonable doubt.  The state court's

denial of this claim is both contrary to and amounts to an unreasonable application of clearly established federal law.


## IV.    PRAYER FOR RELIEF

178.    For all of the above stated reasons and other such reasons as may be made upon further amendment of this petition and a full evidentiary hearing, Mr. Wallace respectfully asks this Honorable Court to grant the following relief:

1.    Grant Mr. Wallace discovery under Rule 6 of the Rules Governing Habeas Corpus Cases and a sufficient period of time to conduct written discovery, and further grant Mr. Wallace authority to obtain subpoenas to further document and prove the facts set forth in his petition;

2.    Grant Mr. Wallace an evidentiary hearing at which additional proof may be offered supporting the allegations set forth in this petition;

3.    Permit Mr. Wallace an opportunity to brief and argue the issues presented in this petition;

4.    Issue a writ of habeas corpus granting Mr. Wallace relief from his unconstitutionally obtained conviction and sentence;

5.    Grant such further and other relief as may be appropriate.


Dated: December 4, 2009

Respectfully submitted,

NICHOLAS J. TRENTICOSTA
Attorney at Law
LSBA roll No. 18475
7100 St. Charles Avenue
New Orleans, LA 70118
504-864-0700


GEORGE H. KENDALL
SAMUEL SPITAL
CORRINE IRISH
CARINE WILLIAMS
Squire Sanders & Dempsey, LLP
30 Rockefeller Plaza
New York, NY 10112
212-872-9847
*Applications for Pro Hac Vice forthcoming*

Counsel for Petitioner

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing memorandum was filed electronically with the Clerk of the Court using the CM/ECF system this 4th day of December.  Notice of this filing will be sent to District Attorney of Baton Rouge by operation of the court's electronic filing system.  Notice will also be sent, via U.S. mail or courier service, to the following address:

Mr. Hiller C. Moore, III
222 St. Louis Street, Ste 550
Baton Rouge, LA 70802

/s/ Nicholas J. Trenticosta


NICHOLAS J. TRENTICOSTA
Attorney at Law
LSBA roll No. 18475
7100 St. Charles Avenue
New Orleans, LA 70118
504-864-0700

59