UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

HERMAN WALLACE(#76759)

VERSUS                                          CIVIL ACTION

HOWARD PRINCE, ET AL                            NUMBER 09-1027-BAJ-SCR

## NOTICE

Please take notice that the attached Corrected Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. §636(b)(1), you have 14 days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Baton Rouge, Louisiana, September 13, 2013.

STEPHEN C. RIEDLINGER
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

HERMAN WALLACE(#76759)

VERSUS                                      CIVIL ACTION

HOWARD PRINCE, ET AL                        NUMBER 09-1027-BAJ-SCR

**MAGISTRATE JUDGE'S REPORT**

Before the court is the Second Amended Petition For Writ of Habeas Corpus By Prisoner In State Custody filed on behalf of Herman Wallace.  Record document number 36.

For the reasons set forth herein, the petition for a writ of habeas corpus should be denied.

**I. State Procedural History**[1]

On April 17, 1972, correctional officer Brent Miller was stabbed to death at the Louisiana State Penitentiary ("LSP"), Angola, Louisiana.  On May 5, 1972, the petitioner and three co-defendants, inmates Albert Woodfox, Gilbert Montegut and Chester Jackson, were indicted  by a West Feliciana Parish grand jury on a charge of murder.  Woodfox was tried separately and convicted on

---

[1] Relevant parts of the following procedural history are repeated or summarized in the subsequent sections of this report which address the petitioner's specific grounds for relief.

1

March 7, 1973.[2]

On May 7, 1973, the petitioner's motion to quash the indictment was granted. Petitioner and his co-defendants were subsequently re-indicted by another West Feliciana Parish grand jury and a change of venue was granted transferring the case against the petitioner, Montegut and Jackson to the Nineteenth Judicial District Court for the Parish of East Baton Rouge, Louisiana. These three defendants were represented by attorney Charles Garretson.[3]

On October 31, 1973, the criminal cases against Montegut and Wallace were consolidated.[4] Petitioner filed a motion to quash his

---

[2] Woodfox's conviction was overturned in state court post-conviction proceedings, but the State re-indicted him and second trial was held in 1998. Woodfox was convicted again. After his conviction was affirmed and his application for post-conviction relief was denied, he filed a petition in federal court for a writ of habeas corpus, which was granted. *Albert Woodfox v. Burl Cain, et al*, CV 06-789-JJB. The United States Court of Appeals for the Fifth Circuit subsequently vacated the judgment and remanded the case for further proceedings. Following an evidentiary hearing, the court again granted Woodfox's petition on the ground that his 1993 indictment by a West Feliciana Parish grand jury was tainted by grand jury foreperson discrimination. The State appealed the judgment, and the case is currently on appeal before the Fifth Circuit Appeals Court of Appeals.

Relevant to this case is certain evidence, introduced at Woodfox's 1998 re-trial and submitted into evidence in support of the petitioner's fourth PCRA, which the petitioner contends supports finding that the State knowingly used false testimony and withheld exculpatory evidence during his trial.

[3] State Court Record, Vol. 1, p. 14.

[4] *Id*. at 19.

second indictment.   On January 7, 1974, the motion was denied. Petitioner's trial began January 8, 1974.   After commencement of the trial, Jackson informed the court of his intent to testify for the prosecution.[5]   Garretson withdrew as attorney for Jackson and another attorneys was appointed for him.   Jackson subsequently pled guilty to manslaughter.

Petitioner was found guilty of murder on January 10, 1974.[6] Petitioner was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.   Petitioner did not appeal his conviction or sentence.

Petitioner signed his first application for post-conviction relief ("PCRA") seeking an out-of-time appeal on March 7, 1990 and it was filed on March 15, 1990.[7]   On January 28, 1991, the petitioner was granted an out-of-time appeal.[8]   On appeal, the petitioner, through counsel, asserted four assignments of error but ultimately pursued only one: denial of effective assistance of counsel at trial due to a conflict of interest.[9]

---

[5] *Id.* at 5.

[6] The offense was committed in 1972, prior to the 1973 amendment to LSA-R.S. 14:30 to provide for first degree murder.

[7] State Court Record, Vol. 1, p. 129.

[8] *Id.* at 216.

[9] Specifically, the petitioner alleged that Garretson also acted as defense attorney for co-defendant Jackson.   Jackson
(continued...)

3

The Louisiana First Circuit Court of Appeal affirmed the conviction and sentence. *State of Louisiana v. Herman Wallace,* 1991-0916 (La. App. 1st Cir. 6/29/92), 610 So.2d 1127 (unpublished opinion). Petitioner filed an application for a writ of certiorari in the Louisiana Supreme Court. The Louisiana Supreme Court denied review on April 12, 1993. *State of Louisiana v. Herman Wallace,* 92-2209 (La. 4/12/93), 616 So.2d 679.

On November 30, 1992, the petitioner filed his second PCRA.[10] On January 12, 1993, the commissioner issued a Commissioner's Report recommending that the PCRA be denied as premature.[11] On January 20, 1993, the trial court denied the PCRA.[12] Petitioner did not seek review in the appellate court.

Petitioner filed his third PCRA on May 12, 1993.[13] Petitioner asserted the following grounds for relief:

1. the trial court erred in denying his motion to quash the grand jury indictment;

---

[9](...continued)
testified on behalf of the State at the petitioner's trial and subsequently pled guilty to manslaughter. Petitioner argued that Garretson was limited in his questioning of Jackson by the attorney-client privilege and that this limitation constituted an actual conflict of interest.

[10] Although this PCRA could not be located in the state court record, there is no dispute that the petitioner filed the second PCRA on this date while his out-of-time appeal was pending.

[11] State Court Record, Vol. 25, p. 12.

[12] *Id*. at 15.

[13] State Court Record, Vol. 4.

4

2.   the State failed to disclose the plea
     agreement entered into with co-defendant
     Jackson;

3.   the trial court gave an erroneous jury
     instruction regarding the essential element of
     intent; and,

4.   he received ineffective assistance of counsel
     when counsel also represented co-defendant
     Jackson, who became a witness for the State.

The district court denied relief on March 1, 1994.[14]
Petitioner sought review in the Louisiana First Circuit Court of
Appeal. The appellate court vacated the district court's ruling
and remanded, directing the district court to appoint counsel and
to conduct an evidentiary hearing. *State of Louisiana ex rel.,*
*Herman Wallace v. John P. Whitley*, 1994-0911 (La. App. 1st Cir.
8/29/94).

On March 21, 1997, in response to an application for a writ of
mandamus filed by the petitioner, the Louisiana First Circuit Court
of Appeal granted the writ in part and denied the writ in part.
*State of Louisiana ex rel., Herman Wallace v. State of Louisiana*,
1996-1419 (La. App. 1st Cir. 8/21/97).[15] Specifically, the
appellate court modified its previous decision in 1994 KW 0911 and
held that the motion to quash the indictment was untimely and that

---

[14] Record document number 32, Notice of Filing State Court
Record, filed May 7, 2010.

[15] Record document number 25-1, p. 100, Appendix A, Exhibit E
to Petitioner Herman Wallace's Response to the Warden's Motion to
Dismiss.

the jury was properly instructed. *Id*.  The appellate court directed the district court to order the State to respond to claims two and four and to conduct an evidentiary hearing limited to those two claims. *Id*.

Following several evidentiary hearings[16], the district court denied relief on September 30, 1998.[17] Petitioner sought review by the Louisiana First Circuit Court of Appeal.  The court denied review on March 19, 1999. *State of Louisiana ex rel. Herman Wallace v. State of Louisiana*, 1999-0275 (La. App. 1st Cir. 3/29/99).  On April 28, 1999, the petitioner sought review by the Louisiana Supreme Court.[18]  The court denied review on November 19, 1999. *State ex rel. Herman Wallace v. State of Louisiana*, 1999-1305 (La. 11/19/99), 749 So.2d 668.

Petitioner signed his fourth PCRA on September 11, 2000, and it was filed on September 18, 2000.[19]  Petitioner asserted the following grounds for relief:

1.   the State knowingly presented perjured testimony; and,

2.   the State withheld exculpatory evidence.

---

[16] State Court Record, Vol. 10, Appendices 27-29, Transcript of evidentiary hearings held December 12, 1997, March 27, 1998, and April 28, 1998, respectively.

[17] State Court Record, Vol. 4.

[18] Record document number 25-1, Appendix A to Petitioner Herman Wallace's Response to the Warden's Motion to Dismiss.

[19] State Court Record, Vol. 3.

The State filed procedural objections pursuant to La. C.Cr.P. arts. 930.8 and 930.4.  Following a hearing, the commissioner issued a Commissioner's Preliminary Report on District Attorney's Procedural Objections to PCR Application on September 10, 2011, recommending that all claims except the petitioner's *Brady* claim (that Hezekiah Brown was promised a pardon or aid in obtaining a pardon) be dismissed as untimely and repetitive pursuant to La. C.Cr.P. arts. 930.8 and 930.4.[20]  On June 28, 2004, the district court denied the petitioner's fourth PCRA, specifically holding that there were insufficient factual allegations to warrant a hearing on the *Brady* claim and adopting the reasoning in the commissioner's report as the court's opinion in all other respects.[21]

Petitioner sought review by the Louisiana First Circuit Court of Appeal.  The Louisiana First Circuit Court of Appeal granted review, in part, vacating the district court's ruling as to the petitioner's claim that the State failed to disclose information about a pardon and favors made to witness Hezekiah Brown, and the matter was remanded for further proceedings as to that claim only. *State of Louisiana v. Herman Wallace*, 2005-0150 (La. App. 1st Cir. 2005).  In all other respects, review was denied.  *Id*.  Following

---

[20] Record document number 32, Notice of Filing State Court Record, filed May 7, 2010.

[21] State Court Record, Vol. 3.

7

an evidentiary hearing,[22] the trial court denied relief on October 9, 2007.[23]

Petitioner again sought review by the Louisiana First Circuit Court of Appeal.  The court denied review on May 12, 2008.  *State of Louisiana ex rel. Herman Wallace v. State of Louisiana*, 2007-2525 (La. App. 1st Cir. 5/12/08).  Petitioner sought review by the Louisiana Supreme Court, which denied review on October 9, 2009. *State of Louisiana v. Herman Wallace*, 2008-1258 (La. 10/9/09), 19 So.3d 4.

## II. Federal Habeas Corpus Application

Petitioner filed his federal habeas corpus application through counsel on December 4, 2009.  Petitioner asserted the following grounds for relief:

> A.   The State knowingly used false testimony and withheld exculpatory evidence;
>
> B.   Trial counsel labored under an actual conflict of interest in violation of his Sixth Amendment rights;
>
> C.   Petitioner was denied effective assistance of counsel on appeal;
>
> D.   There was a systemic exclusion of women from grand jury service;
>
> E.   The trial judge gave an erroneous jury instruction; and,

---

[22] State Court Record, Vol. 7, Transcript of evidentiary hearing held September 19, 2006, on fourth PCRA.

[23] State Court Record, Vol. 17.

> F. There was insufficient evidence to support the conviction.

The State moved to dismiss Grounds C, D, E and F as procedurally defaulted.[24]   Thereafter, the petitioner amended his federal habeas corpus application to delete Grounds C and F.[25]

On March 9, 2011, a Magistrate Judge's Report was issued recommending that the State's Motion to Dismiss be denied.[26]   No objection to the Magistrate Judge's Report was filed.  On June 7, 2011, the district judge adopted the Magistrate Judge's Report and recommendation.[27]   On July 15, 2011, the State filed a Memorandum in Opposition to Petition for Writ of Habeas Corpus.[28]   On October 6, 2011, the petitioner filed Petitioner's Revised Memorandum of Law in Support of the Petition and in Reply to the State's Answer.[29]

Still before the court are Grounds A, B, D and E.


### III. Applicable Law and Analysis

### A. Standard of Review

Section 2254(d) provides  as follows:

---

[24] Record document number 24.  The State referred to these as Claims.  This report and recommendation refers to them as Grounds.

[25] Record document number 36 and 26, respectively.

[26] Record document number 45.

[27] Record document number 47.

[28] Record document number 53.

[29] Record document number 64.

9

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(e)(1) provides as follows:

    (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Subsection (d)(2) of § 2254 applies to a state court's factual determination.  It bars federal court relief unless the state court adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence."  Subsection (d)(1) provides the standard of review for questions of law and mixed questions of law and fact.  *Drinkard v. Johnson*, 97 F.3d 751, 767-68 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107, 117 S.Ct. 1114 (1997).

The second clause of subsection (d)(1) refers to mixed questions of law and fact because it speaks of an "unreasonable application of ... clearly established Federal law."  When the issue before the court is a mixed question of law and fact, the

10

court may grant relief only if it determines that the state court decision rested on "an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court," to the facts of the case. The first clause of subsection (d)(1) refers to questions of law. When the issue raised involves a purely legal question, the court may grant relief only if it determines that a state court's decision rested on a legal determination that was "contrary to...clearly established Federal law, as determined by the Supreme Court." *Id.*

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, ____ U.S. ____, ____, 131 S.Ct. 1388, 1399, 179 L.Ed.2d 557 (2011); *McCamey v. Epps*, 658 F.3d 491, 497 (5th Cir. 2011). Review under § 2254(d)(1) focuses on what a state court knew and did. *Cullen v. Pinholster*, 131 S.Ct. at 1399. "[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas corpus petitioner must overcome the limitation of § 2254(d)(1) based on the record that was before that state court." *Id.*, at 1400. State court decisions are measured against the Supreme Court's precedents as of "the time the state court renders its decisions." *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 1172 (2003). *Pinholster* prohibits a federal court from using evidence that is introduced for the first

11

time at a federal-court evidentiary hearing as the basis for concluding that a state court's adjudication is not entitled to deference under § 2254(d). *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011).[30]

To determine whether a particular decision is "contrary to" then-established law, a federal court must consider whether the decision "applies a rule that contradicts [such] law" and how the decision "confronts [the] set of facts" that were before the state court. *Williams v. Taylor*, 529 U.S. 362, 405, 406, 120 S.Ct. 1495, 1519 (2000). If the state court decision "identifies the correct governing legal principle" in existence at the time, a federal court must assess whether the decision "unreasonably applies that principle to the facts of the prisoner's case." *Id.*, at 413, 120 S.Ct. at 1523. An unreasonable application of federal law is different from an incorrect or erroneous application of the law. *Id.*, at 409-10, 120 S.Ct. at 1521-22. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 1939 (2007).

---

[30] The Fifth Circuit Court of Appeals has held that a federal court may properly hold an evidentiary hearing when it determines, based solely on the state court record, that the state court's determination was contrary to or involved an unreasonable application of clearly established federal law. *Bobby Smith v. Burl Cain*, 708 F.3d 628, 634 (5th Cir. 2013).

In considering whether the state court's decision constituted an unreasonable application of clearly established federal law, "a federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision." *Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir. 2002) (en banc).   Thus, the focus of the "unreasonable application" inquiry is "on the ultimate legal conclusion that the state court reached," and "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable."   *Id.*   In conducting that inquiry, "a habeas court must determine what arguments or theories supported or, ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Harrington v. Richter*, ____ U.S. ____, 131 S.Ct. 770, 786 (2011).

**B. Knowing Use of False Testimony and Suppression of Evidence**

In Ground A,[31] the petitioner argued that the State knowingly used false testimony and suppressed exculpatory and impeachment testimony.

### 1. *Procedurally defaulted claims*

In the first component of Ground A, the petitioner argued that

---

[31] Record document number 36, p. 45-51, Second Amended Petition for Writ of Habeas Corpus by Prisoner in State Custody.

the State knowingly presented and failed to correct the false testimony of Hezekiah Brown and Joseph Richey.[32]  Specifically, the petitioner argued that State officials[33] believed that Brown offered false testimony regarding Montegut's involvement in the murder of Miller.[34]  In addition, the petitioner argued that former LSP Warden C. Murray Henderson believed Richey knew nothing about the case and committed perjury when he testified on behalf of the State.[35]

In the second  component of Ground A, the petitioner argued that the State withheld exculpatory and impeachment evidence. Specifically, the petitioner argued that the State suppressed exculpatory and impeachment evidence related to Brown,[36] Chester

---

[32] Identified as Joseph Riche in Wallace's Trial Transcript.

[33] Identified as former LSP Wardens C. Murray Henderson and Hilton Butler in petitioner's fourth PCRA.  State Court Record, Vol. 3, Memorandum in Support of Application for Post-Conviction Relief, p. 23, § B.

[34] Record document number 36, Second Amended Petition for Writ of Habeas Corpus by Prisoner in State Custody, p. 46, ¶ 132.

[35] *Id*. at 48, ¶ 139.

[36] Record document number 36, Second Amended Petition for Writ of Habeas Corpus by Prisoner in State Custody, pp. 47-48, ¶¶ 133, 135 and 136.

Jackson,[37] Richey,[38] Howard Devon Baker,[39] Clarence Clark[40] and Charles Evans.[41]

As noted above in Section I. Factual and State Procedural History, except for the *Brady* claim related to the alleged offer of a pardon and favors to Brown, all other claims raised in the petitioner's fourth PCRA were dismissed as untimely and repetitive pursuant to La. C.Cr.P. arts. 930.8 and 940.3.

When a state court decision to deny post conviction relief rests on a state law ground that is independent of the federal questions raised by the petitioner and is adequate to support the judgment, the federal courts lack jurisdiction to review the merits of the petitioner's federal claims. *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 2553 (1991); *Moore v. Roberts*, 83 F.3d 699, *reh. denied*, 95 F.3d 56 (5th Cir. 1996). The independent and adequate state ground doctrine "applies to bar federal habeas when a state court decline[s] to address a prisoner's federal claims because the prisoner ha[s] failed to meet a state procedural requirement." *Coleman*, at 729-730, 111 S.Ct. at 2554.

In the absence of the independent and adequate state

---

[37] *Id*. at 49, ¶ 138.

[38] *Id*. at 49-50, ¶ 139.

[39] *Id*. at 50, ¶ 140.

[40] *Id*., ¶ 141.

[41] *Id*.

> ground doctrine in federal habeas, habeas petitioners
> would be able to avoid the exhaustion requirement by
> defaulting their federal claims in state court.   The
> independent and adequate state ground doctrine ensures
> that the States' interest in correcting their own
> mistakes is respected in all federal habeas cases.

*Id.*, at 731-32, 111 S.Ct. at 2554-55 (quoting *Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 1203 (1982)); *Moore*, *supra*, at 703.

For the independent and adequate state ground doctrine to apply, the state courts adjudicating a habeas petitioner's claim must explicitly rely on a state procedural rule to dismiss the petitioner's claims.   *Moore*, *supra*, at 702; *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995).   The procedural default doctrine presumes that the "state court's [express] reliance on a procedural bar functions as an independent and adequate ground in support of the judgment."   *Id*.   Petitioner can rebut this presumption by establishing that the procedural rule is not "strictly or regularly followed."   *Id*.   Even if the state procedural rule is strictly and regularly followed, the petitioner can still prevail by demonstrating "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."   *Coleman*, 501 U.S. at 750, 111 S.Ct. at 2565; *Moore*, *supra*, at 702.

Petitioner did not even attempt to establish that the procedural rule of Articles 930.8 and 930.4 have not been "strictly

or regularly followed," *Sones*, at 416, by the Louisiana state courts.

Petitioner has not shown cause for his procedural default, or actual prejudice resulting from it. *See Smith v. Johnson*, 216 F.3d 521, 524 (5th Cir. 2000). Nor has the petitioner made a showing to support a claim of factual innocence. *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).

## 2. *Suppression of evidence that Brown testified pursuant to a deal*

The only *Brady* claim which remains before this court is whether the State suppressed evidence that Warden Henderson offered State witness Hezekiah Brown favors and a pardon in exchange for testifying against Wallace.

Petitioner asserted that in 1998, 14 years after he was convicted, he obtained documents discovered by co-defendant Woodfox which indicated that the State suppressed evidence that Warden Henderson provided Brown favors and promised to help him obtain a pardon in return for Brown's testimony at the petitioner's trial. Petitioner argued that the State's case depended almost entirely on Brown's testimony, and because Brown's credibility as a witness was an important issue in the case, the suppression was material and the jury was entitled to know about it.

The foundation of the petitioner's *Brady* claim is centered on testimony of Warden Henderson and corrections officer Bobby

Oliveaux at Woodfox's 1998 retrial.  Oliveaux testified that Brown was housed at the dog pen and received cigarettes, birthday cakes and incentive wages.  Warden Henderson testified essentially that at some unspecified time prior to Brown's trial testimony he promised to help Brown obtain a pardon.  As noted above, Woodfox was tried separately and was convicted on March 7, 1973.  Thus, if any promise was made to Brown before Woodfox's trial, it necessarily would have also been made before Brown testified at the petitioner's trial in January 1974.

### (a) Purported favors - not a *Brady* violation

Wallace's *Brady* claim that the State failed to divulge the fact that Brown had received "favors," such as desirable housing in exchange for his testimony, is without merit.

Suppression exists only where a defendant did not - and could not - know about the essential facts that would enable him to take advantage of the evidence.  *United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011), *cert. denied*, _____ U.S. _____, 132 S.Ct. 1969 (2012).  Thus, a defendant cannot succeed on a *Brady* claim if he could have discovered the evidence through reasonable diligence. *Id*.

Garretson, the petitioner's attorney, testified at the evidentiary hearing held on March 27, 1998, in conjunction with the petitioner's third PRCA that prior to the petitioner's trial he

(Garretson) was aware of the favorable treatment Brown was receiving and had interviewed Brown regarding the favors.[42]

Petitioner failed to demonstrate that the State suppressed the evidence of alleged favors given to Brown. Wallace cannot meet his burden to show suppression. *See United States v. Edwards*, 442 F.3d 258, 267 n. 9 (5th Cir. 2006) (explaining that the party alleging a *Brady* violation bears the burden of establishing all three prongs of the *Brady* test) (citation omitted)).

### (b) *Brady* Standard

To show that the state court's proceeding resulted in a "decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," § 2254(d)(1), the petitioner must show that the prosecution's failure to disclose requested impeachment and exculpatory evidence constituted a violation of due process pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963).

To establish a *Brady* violation, the petitioner must prove that (1) the prosecution suppressed evidence, (2) it was favorable to the petitioner, and (3) it was material. *United States v. Brown*, 650 F.3d at 587-88. "There is no difference between exculpatory and impeachment evidence for purposes of *Brady* ... but it must,

---

[42] State Court Record, Vol. 10, Appendix 28, Transcript of evidentiary hearing held March 27, 1998, Testimony of Charles C. Garretson, pp. 22-23.

somehow, create a reasonable probability that the result of the proceeding would be different." *Id.* at 588. "A 'reasonable probability' exists when the government's suppression of evidence 'undermines confidence in the outcome of the trial.' To prove a reasonable probability of a different result, the 'likelihood of a different result must be substantial, not just conceivable.'" *Id.* (citations omitted).

### (c) Analysis

### Brown's testimony at Wallace's trial

Wallace claims that the prosecution suppressed evidence that Warden Henderson promised Brown a pardon in exchange for his testimony against Wallace.

The State's case against Wallace was built largely on the eyewitness testimony of Brown and co-defendant Chester Jackson and Joseph Riche. At the petitioner's trial, Brown testified that he was in the Pine 1 dormitory when Miller came in to have coffee.[43] Brown testified that Miller sat on his bed with his back to the door.[44] Brown testified that while he was squatting next to his coffee pot, inmates Woodfox, Wallace,[45] Montegut and Jackson entered

---

[43] State Court Record, Vol. 26, Trial Transcript, pp. 18-19.

[44] *Id.* at 24.

[45] Also referred to as "Hooks" by Brown. *Id.* at 8.

the dormitory.[46]   Brown testified that the men wore handkerchiefs over their faces but that he was able to identify each of them.[47] Brown testified that he could recognize petitioner by his walk.[48]

Brown testified that Woodfox grabbed Miller around the neck and stabbed him in the back.[49]   Brown testified that the other inmates, each armed with a knife, began "jugging" Miller.[50]   Brown testified that the four inmates carried Miller into the playroom near the water fountain.[51]   Brown testified that the four inmates threw Miller's body down near the foot of his bed and left through the door.[52]   Brown testified that the incident lasted one to two minutes.[53]

Brown testified that he was afraid the inmates were also going to kill him.[54]   Brown testified that he initially ran out the door while wearing his pajamas but returned, dressed in a shirt and pants, and then observed Miller take what he (Brown) believed was

---

[46] *Id.* at 25.

[47] *Id.* at 35-36.

[48] *Id.* at 36.

[49] *Id.* at 26.

[50] *Id.*

[51] *Id.*

[52] *Id.* at 27.

[53] *Id.* at 39.

[54] *Id.* at 27.

his (Miller's) last breath.[55]  Brown testified that because he did not want to be discovered in a black dormitory with a dead white man, he did not stop.[56]  Brown testified that he then went to the blood plasma center to establish an alibi.[57]  Brown testified that he pestered the doctor in the plasma center long enough that a guard escorted him out of the center, thus creating an alibi.[58]

Brown testified that he went from the plasma center to the laundry and waited until Mr. Hunter, the other officer assigned to the Pine dormitory,[59] walked past him and then he fell in behind the officer, trailing him back to the dormitory.[60]  Brown testified that Hunter opened the dormitory door and shut it quickly.[61]  Brown testified that when he put his hand on the door Hunter told him not to go inside and ordered him to go down the walk.[62]

Brown testified that he was questioned by Capt. Butler right

---

[55] *Id.*

[56] *Id.*

[57] *Id.* at 28.

[58] *Id.* at 29.

[59] *Id.* at 15.

[60] *Id.* at 30–31.

[61] *Id.* at 31.

[62] *Id.*

after Miller's body was discovered.[63]  Brown testified that after he told Capt. Butler he had been at the plasma center and knew nothing about the murder he was excused.[64]

Brown testified that two or three nights later he was awakened and ordered to report to the administration building.  There he met with several wardens who told him what he had done the morning Miller was murdered, including the fact that he had prepared coffee for Miller.[65]  Brown testified that he did not want to take the rap for something he did not do and feared that if he said he did not know anything, he would end up being punished.[66]  Brown testified that after contemplating his predicament, he told prison officials what he had witnessed and identified the perpetrators.[67]

Brown testified that following this meeting he was moved into security for his own protection.[68]  Brown was not asked, and therefore offered no testimony, about any promises made in consideration of his testimony.

---

[63] *Id.* at 33.

[64] *Id.*

[65] *Id.* at 33-34.

[66] *Id.* at 35.

[67] *Id.*

[68] *Id.* at 7, 74.

**Jackson's testimony at Wallace's trial**

Chester Jackson testified that at approximately 7:20 a.m. on April 17, 1972, the day of Miller's murder, he met Woodfox while on his way to the dining hall.[69]  Jackson testified that Woodfox was armed with a knife,[70] which Woodfox placed under his (Woodfox's) sweatshirt[71] and asked Jackson if he was ready.[72]  Jackson testified that a week earlier he and Woodfox discussed "throwing a free man away."[73]

Jackson testified that he and Woodfox proceeded to the plasma center where they waited to meet up with Hooks [Wallace].[74]  Jackson testified that the petitioner arrived approximately 10 minutes later.[75]  Jackson testified that the petitioner asked Woodfox if he (Woodfox) had the weapons.[76]  Jackson testified that Woodfox responded that he was ready.[77]

Jackson testified that he first observed the petitioner with

---

[69] State Court Record, Vol. 26, Trial Transcript, pp. 99-101.

[70] *Id.* at 101.

[71] *Id.* at 102.

[72] *Id.* at 103.

[73] *Id.* at 103-105.

[74] *Id.* at 108.

[75] *Id.*

[76] *Id.* at 109.

[77] *Id.*

a weapon (which he stored up his sleeve) when they were walking in the direction of Pine 1 dormitory.[78]   Jackson testified that the petitioner left the group to go scout for a free man to kill.[79] Jackson testified that the petitioner returned and stated that there was a man in Pine 1 dormitory "that would be easy to get."[80] Jackson testified that Woodfox entered the dormitory first, followed by the petitioner, and then he entered.[81]   Jackson testified that each of them wore a handkerchief over his face to avoid being recognized.[82]

Jackson testified that Miller was sitting on Brown's bed with his back toward the door when they first entered the dormitory.[83] Jackson testified that there were five or six other inmates inside the dormitory, including Brown and an inmate named "Specs."[84] Jackson testified that Woodfox grabbed Miller around the throat from behind and began stabbing him with the knife.[85]   Jackson testified that Specs walked out the front door when the attack

---

[78] *Id.*

[79] *Id.* at 110-111.

[80] *Id.* at 113.

[81] *Id.* at 114.

[82] *Id.* at 120-121.

[83] *Id.* at 123-124.

[84] *Id.* at 125.

[85] *Id.* at 127.

began.[86]   Jackson testified he remained behind the partition to avoid being seen by Brown, who knew him.[87]

Jackson testified that Miller tried to get away but was pushed back by the petitioner.[88]   Jackson testified that Woodfox and the petitioner repeatedly stabbed Miller.[89]   Jackson testified that he entered the sleeping area and was handed a knife by Woodfox who told him that he "was in it."[90]   Jackson testified that he took the knife and stabbed Miller.[91]   Jackson testified that Woodfox snatched the knife from him and stabbed Miller after he (Miller) was down.[92] Jackson testified that the three inmates then exited the dormitory in the same order as they had entered: Woodfox, the petitioner and then Jackson.[93]

Jackson testified that he was questioned by authorities between 8:15 a.m. and 8:30 a.m. on the morning of the incident.[94] Jackson testified that he told the investigators that he might be

---

[86] *Id.* at 128.

[87] *Id.* at 129.

[88] *Id.* at 130.

[89] *Id.* at 130-131.

[90] *Id.* at 131-132.

[91] *Id.* at 132.

[92] *Id.* at 134.

[93] *Id.*

[94] *Id.* at 142.

willing to tell them if he knew something about the incident.[95]
Jackson testified that investigators questioned him twice on April
18 but he did not tell them anything.[96]  Jackson testified that on
April 19 investigators questioned him again, but this time he
realized that they had information regarding his involvement.[97]
Jackson testified that at this time he told investigators the
truth.[98]

On cross-examination, Jackson testified that Brown's testimony
implicating him in the murder of Miller was truthful.[99]  Jackson
offered no testimony placing Montegut at the Pine 1 dormitory on
the day of Miller's murder.[100]  Jackson testified that he provided
a written statement to Sheriff Daniel and prison officials in which
he identified himself, Woodfox and the petitioner as the
perpetrators.[101]

### Riche's testimony at Wallace's trial

Inmate Joseph Riche testified that on April 17, 1972, he was

---

[95] *Id.*

[96] *Id.* at 143.

[97] *Id.* at 143-144.

[98] *Id.* at 144.

[99] *Id.* at 150.

[100] *Id.* at 151-158.

[101] *Id.* at 178-181.

living in Pine 4 dormitory, which is located across from Pine 1 dormitory.[102]   Riche testified that while standing in the doorway, he saw an inmate nicknamed Specs come out the door of Pine 1 dormitory.[103]   Riche testified that when the door opened it struck a garbage buggy and got stuck in an open position.[104]   Riche testified that he could see directly into Pine 1 dormitory and saw a body at the end of the lobby entering into the sleeping quarters.[105]   Riche testified that he observed Woodfox, Montegut, Jackson and the petitioner exit the Pine 1 dormitory, one after the other.[106]   Riche testified that he saw Brown, dressed in his pajamas, run out of the Pine 1 dormitory, travel a short distance and then return to the dormitory.[107]   Riche testified that less than a minute later, he saw Brown exit the Pine 1 dormitory once again, this time dressed in jeans and in the process of putting on a shirt.[108]

---

[102] *Id.* at 204.

[103] *Id.* at 207.

[104] *Id.*

[105] *Id.* at 207-208.

[106] *Id.* at 209-213.

[107] *Id.* at 213.

[108] *Id.*

28

**Brown's testimony at the 1973 Woodfox trial**

Brown's testimony at Woodfox's 1973 trial was consistent with the testimony he later gave at the petitioner's trial.   Of significance to the petitioner's *Brady* claim is the following exchange between the prosecutor and Brown.

Q    Did anybody promise you anything to make you tell the truth?

A    Promise me anything?

Q    Did they?

A    No, they didn't threaten me, I sat there a long time; I weighed it before I could say anything. Nobody promised me <u>nothing</u>.

*State of Louisiana v. Albert Woodfox*, p. 110-111.[109]

**Warden Henderson's testimony at the April 1998
PCRA Evidentiary Hearing**

On April 28, 1998, Warden Henderson testified at a hearing held in conjunction with the petitioner's third PCRA.[110]   Warden Henderson was questioned regarding any agreement he struck with Brown in exchange for his testimony.   Warden Henderson testified as follows.

Q.   Did you have an occasion on April 17, 1972, to head up an investigation regarding the death of Brent Miller?

A.   Yes, I participated in it.

---

[109] State Court Record, Vol. 22.

[110] State Court Record, Vol. 10, Appendix 28.

29

Q.   Were you the warden in 1972?

A.   Yes.

Q.   Do you recall discussing this matter with a
     Hezekiah Brown?

A.   Yes.

Q.   Do you recall striking up any kind of an agreement
     for his testimony?

A.   No.

Q.   Do you recall the fact that you wrote a letter
     dated April 22, 1974 to Ms. Hunt regarding Hezekiah
     Brown?

A.   Yes, I think I do.[111]

### Warden Henderson's testimony at December the 1998 Woodfox re-trial

During the petitioner's re-trial, Warden Henderson was called as a witness for the defense and testified in relevant part as follows.

Q    And so, then, I presume you - - you went to talk to
     Hezekiah Brown, is that - - is that correct?

A    Yeah.

Q    And Hezekiah Brown, you didn't - - did you threaten
     him with anything?

A    Oh, no.  No.

Q    He was in fact, doing natural life, was he not?

A    Yeah.  And he was in his sixties then, too.

Q    And he had recently had a death penalty vacated?

---

[111] April 28, 1998 PCRA Transcript, p. 10.

A      Yeah.

Q      And he was a – – he was doing time for multiple
       rape, aggravated rape offenses?

A      Yeah.

Q      And did you – – did you have any – – did you make
       any statements to Hezekiah Brown with regard to
       what you would do?

A      I told him that we would protect him.

Q      Excuse me, let me – – let me ask my question?  What
       you would do in exchange for statements about what
       happened and in exchange for testimony?

A      I told him that I would protect him.

Q      And you told him you would protect him, send him to
       the dog pen?

A      Do what?

Q      Send him to the dog pen?

A      Yeah.  I don't remember when I told him that, but I
       guess after he gave us the information.

Q      Didn't you also tell him that if he gave you the
       information and proceeded to testify for the State,
       that you would also promise to support a pardon
       application for him?

A      Yeah, I told him that later, I've forgotten when.
       And shortly after that, or sometime after that, I
       was – – I went to Tennessee as Commissioner of
       Corrections an I went up to the dog pen and told
       him that because I was leaving, didn't mean that I
       wouldn't continue to try to do something for him.

Q      And did you do that?

A      I wrote letters for him.

31

*State v. Albert Woodfox*, No. 99-2102, pp. 1347-1348.[112]

Warden Henderson further testified that although nothing was promised to Brown, they did tell him they would help him in any way that they could if he helped them crack the case.  When questioned further, Warden Henderson testified that he agreed to "support" Brown's pardon.

> Q    He [Brown] also indicated in his testimony that nothing was promised him.  Absolutely nothing was promised him to secure his testimony.    That statement by Hezekiah Brown is - - is not true, is it?
>
> A    Well, nothing was promised to him to begin with, but we told him, you know, we would protect him and try to help him any way we could after he, you know, cracked the case for us.
>
> Q    And that if he testified, you promised him that you would do whatever you could to support his pardon?
>
> A    Right.
>
> Q    - - Did you not?
>
> A    Absolutely.
>
> Q    And those promises were - - were made to him by you?
>
> A    Yeah.
>
> Q    Before he testified?
>
> A    That's right.

*Id*. at 1362-1363.

Petitioner has not carried his burden to establish that

---

[112] State Court Record, Vol. 15.

evidence was suppressed.  First, Warden Henderson's testimony was equivocal.  During the April 1998 PCRA evidentiary hearing, Warden Henderson emphatically denied that an agreement had been struck with Brown.  Then, in December 1998, during Woodfox's re-trial, he testified that nothing was promised to Brown initially, other than protection.  Warden Henderson testified that sometime after that - he could not recall when - he told Brown he would support a pardon application.  Later, Warden Henderson agreed with defense counsel that promises were made before Brown testified.  Obviously, this testimony was inconsistent.

Even assuming, without deciding, that the petitioner has established that the prosecution suppressed evidence that Warden Henderson promised Brown help with a pardon in exchange for his testimony against the petitioner, there is no likelihood of a different result.  Brown's testimony was consistent with Jackson's testimony, the co-defendant who testified on behalf of the State against the petitioner.  Moreover, Brown was a neutral witness. Although it is arguably conceivable that a promise to assist in obtaining a pardon could have affected the jury's credibility determination, the petitioner failed to show that such limited impeachment evidence of a neutral witness was substantially likely to produce a different result.

Finally, even assuming that Warden Henderson's testimony could impeach Brown, there can be no viable *Brady* claim when the

33

allegedly suppressed evidence was available to the defendant through his own efforts. *Rector v. Johnson*, 120 F.3d 551, 558 (5th Cir. 1997)(holding that to state a valid *Brady* claim a habeas petitioner must demonstrate *inter alia* that "discovery of the allegedly favorable evidence was not the result of a lack of due diligence"); *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990)(finding no *Brady* claim where defendant could have discovered exculpatory information by interviewing witnesses). It is undisputed that co-defendant Woodfox called Warden Henderson at his 1998 re-trial to testify about his interaction with Brown after the murder. There is no reason to believe that the petitioner could not have also presented the same testimony at his 1974 trial. Therefore, the petitioner's *Brady* claim is without merit.

## D. Sixth Amendment Right to Conflict-free Counsel

In Ground B the petitioner argued that his trial attorney labored under an actual conflict of interest.[113]

### 1. *Procedural history post-trial*

On January 28, 1991, the petitioner was granted an out-of-time appeal. On appeal, the petitioner, through counsel, asserted that he was denied effective assistance of counsel at trial due to a conflict of interest. Specifically, the petitioner alleged that

---

[113] Record document number 36, pp. 51-52, Second Amended Petition for Writ of Habeas Corpus by Prisoner in State Custody.

attorney Garretson also acted as attorney for co-defendant Jackson.[114]  Petitioner argued that Garretson was limited in his questioning of Jackson by the attorney-client privilege and that this limitation constituted an actual conflict of interest.

The Louisiana First Circuit Court of Appeal affirmed the petitioner's conviction and sentence. *State of Louisiana v. Herman Wallace,* 1991-0916 (La. App. 1st Cir. 6/29/92), 610 So.2d 1127 (unpublished opinion).  In doing so, the Louisiana First Circuit Court of Appeal applied *Cuyler*, which was the appropriate standard. The court framed the issue as follows: "Defendant contends that Garretson was limited in his questioning of Jackson by the attorney-client privilege and that this limitation constituted an actual conflict of interest." *Wallace,* 1991-0916 at 3.  The court held that the record was devoid of any evidence of an actual conflict, "except for the bare fact that one attorney ... represented defendant and Jackson." *Id.*  Petitioner filed an application for a writ of certiorari in the Louisiana Supreme Court which denied review on April 12, 1993. *State of Louisiana v. Herman Wallace,* 92-2209 (La. 4/12/93), 616 So.2d 679.

---

[114] After the petitioner's trial began, Jackson informed the court of his intent to testify for the prosecution.  Garretson withdrew from his representation of Jackson and new counsel was appointed for Jackson.  Jackson subsequently pled guilty to manslaughter.

In his third PCRA,[115] the petitioner once again asserted that he was denied effective assistance of counsel based on a conflict of interest arising from attorney Garretson's representation of the petitioner and Jackson.[116]   Petitioner argued that an actual conflict of interest was established solely by Garretson's joint representation of him and Jackson.[117]

The district court denied relief.  Petitioner sought review and the Louisiana First Circuit Court of Appeal remanded, directing the district court to appoint counsel and to conduct an evidentiary hearing.[118]   Following several evidentiary hearings,[119] a Commissioner's Recommendation was issued.[120]  The commissioner found that as to Wallace's claim of a Sixth Amendment violation based on a conflict of interest, "the record clearly does not support Mr. Wallace's contentions."[121]   The district court denied relief on

_____

[115] State Court Record, Vol. 4.

[116] State Court Record, Vol. 4, Original Application on Behalf of Herman Wallace, Assignment of Errors No. 4, p. 16.

[117] *Id*.

[118] See Section I. State Procedural History for a complete procedural history.

[119] State Court Record, Vol. 10, Appendices 27-29, Transcript of evidentiary hearings held December 12, 1997, March 27, 1998, and April 28, 1998, respectively.

[120] State Court Record, Vol. 7.

[121] Commissioner's Recommendation at 5.

September 30, 1998.[122]   Petitioner sought review.   Both the
Louisiana First Circuit Court of Appeal and the Louisiana Supreme
Court denied review.[123]

### 2. *Procedural default of conflict of interest claim*

In his federal habeas corpus application, the petitioner
argued for the first time that his trial attorney labored under an
actual conflict of interest as result of his divided loyalties
between his ethical duties to the petitioner and to Jackson, and
between the petitioner and Montegut.[124]

The AEDPA requires that a habeas petitioner exhaust available
state remedies before raising a claim in a federal habeas petition.
*See* 28 U.S.C. § 2254(b)(1).   To exhaust state remedies, a
petitioner "must have fairly presented the substance of his claim
to the state courts." *Nobles v. Johnson*, 127 F.3d 409, 420 (5th
Cir. 1997).   "It is not enough that all the facts necessary to
support the federal claim were before the state courts or that a
somewhat similar state-law claim was made." *Anderson v. Harless*,
459 U.S. 4, 6, 103 S.Ct. 276, 277 (1982)(internal citation

---

[122] State Court Record, Vol. 4.

[123] *State of Louisiana ex rel. Herman Wallace v. State of
Louisiana*, 1999-0275 (La. App. 1st Cir. 3/29/99); *State ex rel.
Herman Wallace v. State of Louisiana*, 1999-1305 (La. 11/19/99), 749
So.2d 668, respectively.

[124] Second Amended Petition for Writ of Habeas Corpus by
Prisoner in State Custody, record document number 36, pp. 51-52.

omitted).   Therefore, the exhaustion requirement is not satisfied where the petitioner presents new legal theories or entirely new factual claims in his petition to the federal court. *Vela v. Estelle*, 708 F.2d 954, 958 (5th Cir. 1983).

Wallace did not fairly present the substance of this claim to the state courts.

Although claims are considered to be "technically" exhausted when state relief is no longer available, without regard to whether the claims were actually exhausted by presentation to the state courts, *Coleman v. Thompson*, 501 U.S. 722, 731-33, 111 S.Ct. 2546 (1991), if a petitioner "fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would find the claims procedurally barred'", then the claim is procedurally defaulted. *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997), *cert. denied*, 523 U.S. 1139, 118 S.Ct. 1845 (1998) (quoting *Coleman*, 501 U.S. at 735 n.1, 111 S.Ct. 2546).

Petitioner's unexhausted claim is "technically exhausted because, and only because, petitioner allowed his state law remedies to lapse without presenting his claims to the state courts." *Jones v. Jones*, 163 F.3d 285, 296 (5th Cir. 1998) (internal citation and quotation omitted).

Petitioner's technically exhausted claim would be barred from consideration in a post-conviction relief application by Louisiana

38

Code of Criminal Procedure Article 930.8. This provision of Louisiana law fixes a time limit of two years after the judgment of conviction and sentence has become final within which to file an application for post-conviction relief. Although the statute contains four exceptions, none of those exceptions apply in this case, and the petitioner has not offered any evidence or argument supporting the application of any exception.

When a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750, 111 S.Ct. at 2565. Reliance upon Article 930.8 has been held to be a valid procedural bar. *Glover v. Cain*, 128 F.3d 900 (5th Cir. 1997).

Petitioner has not shown cause for his procedural default, or actual prejudice resulting from it. Nor has the petitioner made a showing to support a claim of factual innocence. This court is barred from considering the petitioner's technically exhausted claim.

### 3. *Standard of Review*

Even assuming the petitioner's Sixth Amendment conflict of

39

interest claim is not procedurally defaulted, it is nonetheless without merit.

Under the AEDPA, a petitioner is not entitled to relief unless he can show that the state court decision denying relief was "contrary to" or "an unreasonable application of [ ] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002), *cert. denied*, 538 U.S. 969, 123 S.Ct. 1768 (2003). The AEDPA also requires the court "to presume state-court findings of fact to be correct 'unless the petitioner rebuts that presumption by clear and convincing evidence.'" *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010) (citing *Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001), *cert. denied*, 537 U.S. 883, 123 S.Ct. 106 (2002)(citations omitted)). The AEDPA's deferential standard of review only applies to the state court's adjudication of a petitioner's claim on the merits, a condition satisfied here. 28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established Supreme Court precedent when it "applies a rule that contradicts the governing law set forth in [the Court's] cases," or reaches an opposite conclusion from a Supreme Court case upon facts that are "materially distinguishable." *Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 1519-20 (2000). In the alternative, a state court "unreasonably applies" clearly established federal law

40

if it correctly identifies the governing law but unreasonably applies it to the facts of a particular case. *Id*. at 407-09, 120 S.Ct. at 1520-21. A state court's application of the law must be objectively, not subjectively, unreasonable. *Id*. The Supreme Court has explained "the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law," in the sense that it is *not* "simply because [the reviewing] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, the application must be unreasonable." *Id*. *Accord, Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 1939 (2007).

### 4. *Cuyler v. Sullivan standard*

"Under the Sixth Amendment, if a defendant has a constitutional right to counsel, he also has a corresponding right to representation that is free from any conflict of interest." *United States v. Vaquero*, 997 F.2d 78, 89 (5th Cir. 1993), *cert. denied*, *Taylor v. United States*, 510 U.S. 1016, 114 S.Ct. 614 (1993)(citing *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103 (1981)); *Cuyler v. Sullivan*, 446 U.S. 335, 345, 100 S.Ct. 1708, 1716 (1980).

To prevail on an ineffective assistance of counsel claim, the petitioner must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense."

41

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984).  Thus, to succeed under *Strickland*, a petitioner must show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mickens v. Taylor*, 535 U.S. 162, 166, 122 S.Ct. 1237, 1240 (2002)(framing the issues before the Court as "what a defendant must show in order to demonstrate a Sixth Amendment violation where the trial court fails to inquire into a potential conflict of interest about which it knew or reasonably should have known.")

A petitioner alleging a Sixth Amendment violation on the basis of counsel's purported conflict of interest involving multiple representations bears a slightly different burden.  To obtain relief on counsel's conflict of interest, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718 (1980).  The mere "*possibility* of conflict is insufficient to impugn a criminal conviction." *Id.* (emphasis added).

In *Mickens*, the Supreme Court explained that "'an actual conflict of interest' mean[s] precisely a conflict that affected counsel's performance - as opposed to a mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171, 122 S.Ct. at 1243 (emphasis deleted).  "[D]efects in assistance that have no probable effect upon the trial's outcome do *not* establish a violation" of a

criminal defendant's Sixth Amendment right to "the Assistance of Counsel for his defence". *Id*. at 166, 122 S.Ct. at 1240.

To prove a Sixth Amendment violation based on a conflict of interest arising from multiple representation, *Cuyler v. Sullivan* requires a defendant to show: (1) that his counsel was acting under the influence of an actual conflict that (2) adversely affected representation. *See Cuyler*, 446 U.S. at 348-49, 100 S.Ct. at 1718; *see also Mickens*, 535 U.S. at 169, 122 S.Ct. at 1242 (clarifying the standard under *Cuyler*). The defendant need not show prejudice in the sense that the outcome of the proceeding would have been different absent the conflict because prejudice is presumed upon a showing of an actual conflict that adversely affected representation. *See Perillo v. Johnson*, 205 F.3d 775, 781-82 (5th Cir. 2000).

The first prong of *Cuyler* requires a defendant to show something more than a speculative or potential conflict. *United States v. Infante*, 404 F.3d 376, 391-92 & n. 13 (5th Cir. 2005). A conflict will exist only when counsel is "compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006)(internal quotation marks omitted). To meet this standard requires that "it ... be demonstrated that the attorney made a choice between possible alternative courses of

action....If he did not make such a choice, the conflict remained
hypothetical." *Id*. Whether a conflict of interest exists depends
on a number of factors, including, but not limited to, whether the
attorney has confidential information that is helpful to one client
but harmful to another; whether and how closely the subject matter
of the multiple representations is related; how close in time the
multiple representations are related; and whether the prior
representation has been unambiguously terminated. *See Perillo v.
Johnson*, 205 F.3d at 798-99. Ultimately, "*Cuyler's* 'actual
conflict' and 'adverse effect' elements have been described as
'rather vague'" and such a determination is therefore "tightly
bound to the particular facts." *Id*. at 782.

Petitioner argued that attorney Garretson was compelled to
compromise his loyalties between him and Jackson and between him
and Montegut.

At the evidentiary hearing, Garretson testified that he
cross-examined Jackson about things Jackson told him during his
representation of Jackson and attempted to impeach him using this
information.[125]

There is no evidence that Garretson was compelled to
compromise his duty of loyalty or zealous advocacy to the
petitioner by choosing between or blending the divergent or

---

[125] State Court Record, Vol. 10, Appendix 28, Transcript of
evidentiary hearings held March 27, 1998, Testimony of Charles C.
Garretson, pp. 7, 12, 13, 14, 22.

competing interests of Jackson or Monetgut.  For this reason, the court cannot conclude that the state habeas court's rejection of Wallace's *Cuyler* claim was unreasonable.  Petitioner's conflict of interest claim is without merit.

**E. Systemic Exclusion of Women From Grand Jury Service**

In Ground D[126] the petitioner argued that there was a systematic exclusion of women from grand jury service in West Feliciana Parish in violation of his Fourteenth Amendment right to equal protection.

### 1. *Factual and Procedural History*

On September 10, 1973, the petitioner was indicted by a West Feliciana Parish grand jury for the April 17, 1972 murder of corrections officer Brent Miller.[127]  On September 21, 1973, the petitioner's motion for a change of venue was granted and the matter was transferred to the Nineteenth Judicial District Court for the Parish of East Baton Rouge, Louisiana.[128]

On October 31, 1973, the petitioner moved to quash the grand jury indictment.[129]  The motion specifically alleged that females

---

[126] Record document number 36, pp. 54-55, Second Amended Petition for Writ of Habeas Corpus by Prisoner in State Custody.

[127] State Court Record, Vol. 1, p. 12.

[128] *Id*. at 16.

[129] *Id*. at 34.

were systematically excluded from the grand jury list and venire.[130] The motion to quash was set for hearing on January 7, 1974.[131] Following a hearing in which several witnesses testified, the trial court denied the motion to quash.[132]

Among the witnesses was West Feliciana Parish Clerk of Court Ruth Daniels who testified that as part of her duties as Clerk of Court, she also served on the Jury Commission, which is responsible for selecting the names for the grand jury, petit jury and jury venire.[133] Daniels testified that the names were obtained from the Registrar of Voters list of male registered voters.[134]   Daniels testified that the list did not include women because no woman had asked to serve on a jury.[135]   Daniels testified that no woman had

---

[130] *Id.*   Louisiana did not exclude women from grand juries but merely provided them with an exemption.   At the time of the petitioner's trial, the state constitution provided that "no woman shall be drawn for jury service unless she shall have previously filed with the clerk of the District Court a written declaration of her desire to be subject to such service."   LA. CONST. art. VII, § 41 (repealed eff. Jan. 1, 1975).

[131] *Id.* at 36.

[132] *Id.* at 223-250; State Court Record Vol. 2, at 251-269.

[133] State Court Record, Vol. 1, at 228,  Transcript of Hearings on Prayer for Oyer, Motion for Bill of Particulars, Motion to Quash Grand Jury Indictment, Motion to Suppress Confession, Motion to Suppress Evidence.

[134] *Id.* at 230.

[135] *Id.* at 232.

ever served on a jury in West Feliciana Parish.[136]    Daniels
testified that this method was used to select the names for the
grand jury that indicted the petitioner.[137]

West Feliciana Parish Registrar of Voters Anne H. Bennett
testified that approximately 50% of the registered voters in the
parish were female.[138]

The trial court ruled that there was no evidence of
discrimination and denied the motion to quash.[139]

Following the trial, the jury returned a guilty verdict.
Petitioner was sentenced to life imprisonment at hard labor without
benefit of probation, parole or suspension of sentence.  Petitioner
did not appeal his conviction and sentence.

On January 28, 1991, the petitioner was granted an out-of-time
appeal.  Petitioner did not assert an equal protection claim based
on the systematic exclusion of women from grand jury service on
appeal.

After the petitioner's conviction and sentence were affirmed
on appeal, he filed his third application for PCRA on May 12,

---

[136] *Id.*

[137] *Id.* at 230.

[138] *Id.* at 238.

[139] State Court Record, Vol. 2, at 267, continuation of
Transcript of Hearings on Prayer for Oyer, Motion for Bill of
Particulars, Motion to Quash Grand Jury Indictment, Motion to
Suppress Confession, Motion to Suppress Evidence.

1993.[140]  Among the claims asserted was that the trial court erred in denying his motion to quash the grand jury indictment. Petitioner relied on *Taylor v. Louisiana,* 419 S.Ct. 522, 95 S.Ct. 692 (1975), which invalidated Louisiana's exclusionary practice regarding the automatic exemption of women from jury service.

A Commissioner's Recommendation was submitted to the district judge recommending that the petitioner's equal protection claim be denied on grounds that: (1) *Taylor* held that the exclusion of women from jury venires deprives a criminal defendant of his Sixth Amendment right to trial by an impartial jury drawn from a fair cross section of the community and did not extend to grand jury venires; and (2) the decision in *Daniel v. Louisiana*, 420 U. S. 31, 95 S.Ct. 704 (1975) specifically held that *Taylor* is not to be applied retroactively to convictions obtained by juries empaneled prior to that decision.[141]

The district court denied relief on March 1, 1994.[142] Petitioner sought review in the Louisiana First Circuit Court of Appeal which vacated the district court's ruling and remanded, directing the district court to appoint counsel and to conduct an

---

[140] State Court Record, Vol. 4.

[141] Record document number 32, Notice of Filing State Court Record, filed May 7, 2010.

[142] Record document number 32, Notice of Filing State Court Record, filed May 7, 2010.

evidentiary hearing.[143]

On March 21, 1997, in response to an application for a writ of mandamus filed by the petitioner, the Louisiana First Circuit Court of Appeal granted the writ in part and denied the writ in part.[144] Specifically, the appellate court modified its previous decision in 1994 KW 0911 and held that the motion to quash the indictment was untimely and that the jury was properly instructed.[145] The appellate court directed the district court to order the State to respond to claims two and four and to conduct an evidentiary hearing limited to those two claims.[146]

On September 30, 1998, the district court denied relief.[147] Petitioner sought review by the Louisiana First Circuit Court of Appeal which denied review on March 19, 1999.[148] Petitioner sought review by the Louisiana Supreme Court which also denied review.[149]

---

[143] *State of Louisiana ex rel., Herman Wallace v. John P. Whitley*, 1994-0911 (La. App. 1st Cir. 8/29/94).

[144] *State of Louisiana ex rel., Herman Wallace v. State of Louisiana*, 1996-1419 (La. App. 1st Cir. 8/21/97).

[145] *Id.*

[146] *Id.*

[147] State Court Record, Vol. 4.

[148] *State of Louisiana ex rel. Herman Wallace v. State of Louisiana*, 1999-0275 (La. App. 1st Cir. 3/29/99).

[149] *State ex rel. Herman Wallace v. State of Louisiana*, 1999-1305 (La. 11/19/99), 749 So.2d 668.

## 2. *Not entitled to benefit of Taylor*

As noted above, the petitioner was tried and convicted of murder in 1974.  Petitioner was granted an out-of-time appeal in 1991.  After the petitioner's trial, but before his direct appeal became final, the Supreme Court issued its decision in *Taylor*.  In *Taylor*, the Supreme Court held that the systematic exclusion of women from jury service violated the principle, which it found implicit in the right to jury trial guaranteed by the Sixth Amendment, "that petit juries must be drawn from a source fairly representative of the community."  *Taylor*, 419 U.S. at 538, 95 S.Ct. at 702.

In *Daniel* the Supreme Court held "that *Taylor* is not to be applied retroactively, as a matter of federal law, to convictions obtained by juries empaneled prior to the date of that decision."  *Id*. at 32, 95 S.Ct. at 705.  Applying the three-factor test for retroactivity initially adopted in *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731 (1965),[150] the *Daniel* Court considered "'(a) the

---

[150] In *Linkletter,* the Court, in considering whether the decision in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684 (1961) should be applied retroactively, explained that whether a given rule should be applied retroactively must be decided on a case-by-case basis.  *See Linkletter*, 381 U.S. at 629, 85 S.Ct. at 1731.  The *Linkletter* Court considered "the purpose of the *Mapp* rule; the reliance placed upon the [ ] doctrine; and the effect on the administration of justice of a retroactive application of *Mapp*," *id.* at 636, 81 S.Ct. at 1684, and concluded that, based upon those factors, the *Mapp* decision would not be applied retroactively to a state conviction that had become final before *Mapp* was decided.
(continued...)

purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards,'" *Daniel*, 420 U.S. at 32, 95 S.Ct. at 705 (quoting *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970 (1967)), and concluded that each factor weighed in favor of giving *Taylor* only prospective effect.[151]  *Id.* at 32-33, 95 S.Ct. 705.

In *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708 (1987), the Supreme Court significantly altered the legal landscape of retroactivity.  In *Griffith*, the Court rejected the particularized, case-by-case approach to retroactivity adopted in *Linkletter* and

---

[150](...continued)
*Id.* at 640, 85 S.Ct. 1731.

[151] The Court reasoned that, first, the *Taylor* Court was more concerned with the general function that the jury serves in the criminal justice system, rather than "the premise that every criminal trial, or any particular trial, was necessarily unfair because it was not conducted in accordance with what we determined to be the requirements of the Sixth Amendment." *Daniel*, 420 U.S. at 32, 95 S.Ct. at 705.  Second, the Court explained that "the reliance of law enforcement officials and state legislatures on prior decisions of this Court" was clear.  *Id.* at 32-33, 95 S.Ct. at 705.  Finally, the Court explained that "the requirement of retrying a significant number of persons were *Taylor* to be held retroactive would do little, if anything, to vindicate the Sixth Amendment interest at stake and would have a substantial impact on the administration of criminal justice in ... States whose past procedures have not produced jury venires that comport with the requirement enunciated in *Taylor*." *Id.* at 33, 95 S.Ct. at 705.  In view of each of these factors, the Court concluded that *Taylor* should be applied only prospectively, that is, to cases where the jury was empaneled after the Court's decision in *Taylor*.

applied in *Daniel*.    The Court reasoned that such an approach "violates basic norms of constitutional adjudication," *id*. at 322, 107 S.Ct. at 713, and held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final." *Id*. at 328, 107 S.Ct. at 716.   The Court identified two principal reasons for its decision.   First, the court explained that because it could only establish new rules in specific cases, and because, as a practical matter, the Court cannot hear each case pending on direct review when it establishes a new rule, the Court "fulfill[s] [its] judicial responsibility by instructing the lower courts to apply the new rule retroactively to cases not yet final." *Id*. at 323, 107 S.Ct. at 713.   Second, the Court explained that the "selective application of new rules violates the principle of treating similarly situated defendants the same." *Id*.   The Court noted that the problem which arises when new rules are not applied to cases pending on direct review is "'the *actual inequity* that results when the Court chooses which of many similarly situated defendants should be the chance beneficiary' of a new rule." *Id*. (quoting *United States v. Johnson*, 457 U.S. 537, 102 S.Ct. 2579 (1982)).

Petitioner contends that he should receive the benefit of *Taylor's* fair cross-section requirement because (1) the *Taylor* decision was announced before his conviction became final on direct

appeal and (2) under the retroactivity principle adopted in *Griffith* he is entitled to the benefit of the *Taylor* decision.

### (a) *Griffith did not overrule Daniel*

Petitioner presumed that this court should not apply the Supreme Court's decision in *Daniel* because it was overruled by *Griffith*. Yet, it is clear from even a cursory review of *Griffith* that the Supreme Court disapproved of the three-factor *Linkletter* retroactivity test, which was applied in *Daniel* to find the fair cross section requirement of *Taylor* inapplicable to cases in which the jury was empaneled prior to the date *Taylor* was decided. *See Griffith*, 479 U.S. at 321, 107 S.Ct. at 712.

Nevertheless, in 1994, the United States Court of Appeals for the Fifth Circuit, sitting *en banc*, explained in *Wilkerson v. Whitley*, 28 F.3d 498 (5th Cir. 1994), *cert. denied*, 513 U.S. 1085, 115 S.Ct. 740 (1995), "'absent clear indications from the Supreme Court itself, lower courts should not lightly assume that a prior decision has been overruled *sub silentio* merely because its reasoning and result appear inconsistent with later cases.'" *Id.* at 504 (quoting *Williams v. Whitley*, 994 F.2d 226, 235 (5th Cir. 1993).

The *Wilkerson* court reasoned:

*Griffith* overruled *Linkletter's* retroactivity test (as clarified by *Johnson v. New Jersey*, *Stovall* and *Desist* [*v. United States*, 394 U.S. 244, 89 S.Ct. 1030 (1969)]) by creating a bright-line rule that applies new rules to all cases not yet final. This line of cases had

established the test for how to apply new constitutional decisions.    On the other hand, cases such as *Daniel* merely applied the test to particular new constitutional rules.   Thus, while *Griffith* changed the methodology for determining retroactivity, it did not abrogate the results of the prior retroactivity test.   In the absence of explicit language overruling cases such as *Daniel*, we must assume that these results are still valid as to those new rules for which retroactive application was rejected.

*Wilkerson*, 28 F.3d at 505.[152]

*Daniel* clearly holds that *Taylor* is not to be applied retroactively to cases in which the jury was empaneled prior to the date *Taylor* was decided, and no Supreme Court case has expressly overruled that decision.   Because the petitioner's jury was empaneled prior to the date *Taylor* was decided, he is not entitled to the benefit of that decision.

### 3. *Griffith analysis*

Even assuming that *Griffith* effectively overruled *Daniel* and *Daniel* is no longer good law, the petitioner is still not entitled

---

[152] The *Wilkerson* court noted that the Supreme Court in *Teague* cited *Daniel* with apparent approval.   *See Teague*, 489 U.S. at 314, 109 S.Ct. at 1077 (reasoning that "as we stated in *Daniel* ..., which held that *Taylor* was not to be given retroactive effect, the fair cross section requirement does not rest on the premise that every criminal trial, or any particular trial, is necessarily unfair because it is not conducted in accordance with what we determined to be the requirements of the Sixth Amendment," and concluding that a rule extending fair cross section requirement to petit jury would not be "bedrock procedural element" retroactively applied under second *Teague* exception (internal quotations and alterations omitted)).   This adds additional support to the conclusion that *Griffith* did not overrule *Daniel*.

to habeas corpus relief.

Petitioner argued that at the time his conviction became final in 1993, Supreme Court precedent established that Louisiana's gender-based classification which resulted in the exclusion of women from grand jury service was unconstitutional.

Under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060 (1989), the court is prohibited from granting habeas relief based on "new" rules of constitutional law.  A rule of constitutional law is "new" if the result sought by application of the rule was not "dictated by precedent existing at the time the defendant's conviction became final."  *Teague*, 489 U.S. at 301, 109 S.Ct. at 1070.  The duty of the court is to "[s]urve[y] the legal landscape as it then existed and determine whether a state court considering [Wallace's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [sought to be applied] was required by the Constitution." *Caspari v. Bohlen*, 510 U.S. 383, 390 114 S.Ct. 948, 953 (1994)(internal quotations and citations omitted).  If not, then *Teague*'s bar applies.  The only exceptions to the non-retroactivity principle of *Teague* are "for rules that would place certain primary conduct beyond the government's power to proscribe or bedrock rules of criminal procedure that are necessary to ensure a fundamentally fair trial." *See O'Dell v. Netherland*, 521 U.S. 151, 157, 117 S.Ct. 1969, 1973 (1997).

55

A state conviction and sentence becomes final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied. *See Griffith v. Kentucky*, 479 U.S. 314, 321, n. 6, 107 S.Ct. 708, 712, n. 6 (1987). For *Teague* purposes, the petitioner's conviction and sentence became final on July 12, 1993.[153] Therefore, the court's analysis is limited to a survey of the legal landscape as it existed on July 12, 1993.

First, in *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221 (1972), the Court held that Louisiana's method for selecting veniremen was not racially neutral and therefore presumptively violative of a black defendant's rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment when no blacks served on that defendant's jury. *Alexander,* 405 U.S. at 632, 92 S.Ct. at 1226. Although the Court raised the issue of whether the grand jury selection procedures were invidiously discriminatory against women because of the statutory exemption provision, the defendant's conviction was set aside on other grounds.

After the petitioner was convicted in 1974, the United States Supreme Court decided *Taylor*, holding that the state constitutional

---

[153] The conviction and sentence became final on July 11, 1993, which was a Sunday. Thus, the time period was extended to the next business day for the court, which was Monday, July 12.

provision, insofar as it permitted women to be exempted from petit jury venires, violated the Sixth and Fourteenth Amendments.   The Court also decided *Daniel*, holding that *Taylor* would not be applied retroactively to "convictions obtained by juries empaneled prior to the date of [*Taylor*]."   The *Taylor* court limited its holding to petit jury selection and did not announce a rule about the exclusion of women from grand juries.[154]

In 1973, a class action was instituted challenging the Louisiana constitutional provision and statute exempting women from service on juries unless they filed a written declaration of their desire to serve.   *Healy v. Edwards*, 363 F.Supp. 1110, (E.D. La. 1973).   The district court held that the exemption denied all litigants due process and deprived female litigants equal protection.  On June 9, 1975, the Supreme Court remanded the matter to the district court to determine whether the matter had become moot because Louisiana had changed its jury selection rule. *Edwards v. Healy*, 421 U.S. 772, 95 S.Ct. 2410 (1975).

In *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272 (1977), the Supreme Court held that "in order to show that an equal

---

[154] 419 U.S. at 538, 95 S.Ct. at 702 ("in holding that *petit* juries must be drawn from a source fairly representative of the community ...") (emphasis added); *id*. At 527, 95 S.Ct. at 696 ("[T]he American concept of the jury *trial* contemplates a jury drawn from a fair cross section of the community.") (emphasis added); *id*. at 533, 95 S.Ct. at 699 ("[W]omen cannot be systematically excluded from jury panels from which *petit* juries are drawn.") (emphasis added).

protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in the substantial underrepresentation of his race or of the identifiable group to which he belongs." *Id*. at 494, 97 S.Ct. at 1280.

In *Mississippi University for Women v. Hogan*, 458 U.S. 718, 102 S.Ct. 3331 (1982), which involved a challenge to the single-sex admissions policy of the state university's nursing school, the Supreme Court held that gender-based classifications require "an exceedingly persuasive justification in order to survive constitutional scrutiny and the burden is met only by showing at least that the classification serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives." *Id*. at 724, 102 S.Ct. at 3336.

Finally, the Court once again passed on an opportunity to address the issue of under-representation of women on grand juries in *Ford v. Kentucky*, 469 U.S. 984, 105 S.Ct. 392 (1984)(denying certiorari).

At the time the petitioner's conviction became final, the Court had not explicitly declared unconstitutional the exemption of women from grand jury pools. Moreover, a state court considering the petitioner's claim at the time his conviction became final would not have felt compelled by existing precedent to conclude

58

that the gender-based classification which resulted in the exemption of women from *grand* jury service was required by the Constitution.

## F. Erroneous jury instruction

In Ground E, the petitioner argued that the trial judge gave an erroneous jury instruction.[155]   Specifically, the petitioner complained that the trial judge erroneously instructed the jury "that the defendant intended the natural and probable consequences of his act."[156]   He contends that the jury instruction was unconstitutional because it placed a burden shifting presumption before the jury in violation of the principles established by the Supreme Court in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450 (1979).

### 1. *Brecht harmless-error review is appropriate*

The Supreme Court has recognized two categories of constitutional violations: "trial error" and "structural defects." *See Arizona v. Fulminante*, 499 U.S. 279, 306-09, 111 S.Ct. 1246, 1263-64 (1991).  The former class is made up of those errors that "may be 'quantitatively assessed in the context of other evidence presented.'" *Myers v. Johnson*, 76 F.3d 1330, 1337 (5th Cir. 1996) (quoting *Fulminante*, 499 U.S. at 308, 111 S.Ct. at 1264).  Harmless

---

[155] Record document number 36, p. 56, Second Amended Petition for Writ of Habeas Corpus by Prisoner in State Custody.

[156] *Id*.

error review is appropriate for the former class of errors but not the latter class. *Id.* Because the error alleged by the petitioner falls into the former class, the error is subject to harmless error analysis. *See Robertson v. Cain*, 324 F.3d 297, 304 n. 3 (5th Cir. 2003) ("A *Sandstrom*-type error has been held to be a 'trial error' to which the harmless error rule applies.").

Holding that the complained-of error is subject to harmless error analysis does not complete the inquiry. In *Brecht v. Abrahamson*, 507 U.S. 619, 634-38, 113 S.Ct. 1710, 1720-22 (1993), the Supreme Court declined to apply the harmless-beyond-a-reasonable-doubt standard from *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828 (1967), on habeas review of a state court conviction. Rather, "[r]ecognizing the distinction between direct and collateral review," the Court adopted the standard announced in *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946). *Brecht*, 507 U.S. at 634, 637, 113 S.Ct. at 1720, 1722. Under this *Brecht* harmless-error standard, the relevant question is whether the state court's error "had substantial and injurious effect or influence in determining the jury's verdict.'" *Id*. at 637, 113 S.Ct. at 1722 (quoting *Kotteakos*, 328 U.S. at 776, 66 S.Ct. at 1253).

When the state court does not perform its own harmless-error review, the federal court should simply apply the *Brecht* harmless-error analysis. *Robertson*, 324 F.3d at 306 ("We hold that AEDPA's

restrictions on federal review of state habeas decisions do not alter *Brecht's* mandate for harmless error analysis by federal courts when state courts have failed to address the question of harmless error").

### 2. *The Sandstrom error, if any, was harmless*

The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *Sandstrom v. Montana*, 442 U.S. at 520, 99 S.Ct. at 2457. However, the fact that the instruction was allegedly incorrect under state law is not a basis for federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 71, 112 S.Ct. 475, 482 (1991). Instead, the court must focus on "whether the ailing instruction by itself so infected the entire trial process that the resulting conviction violates due process." *Id*. In examining the challenged instruction, the court does not look at it in "artificial isolation," but must consider it in the "context of the instructions as a whole and the trial record." *Id*. Finally, when there is a question of whether a jury instruction is ambiguous and violates due process by relieving the state of the burden of proof of an element of a crime, the question before the court is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Id*. at 482 & n. 4; *accord Flowers v. Blackburn*, 779 F.2d 1115, 1119 (5th Cir.), *cert. denied,* 475 U.S. 1132, 106 S.Ct.

1661 (1986).

To determine whether the language of a jury charge amounts to a constitutional error, the reviewing court must determine whether the instructions relieved the State of its burden to prove each element of the crime beyond a reasonable doubt in violation of the principles set forth in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068 (1970). *See Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965 (1985). In doing so, the reviewing court must consider whether the quoted language created a constitutionally objectionable "mandatory presumption," or "merely a permissive inference," on an essential element of the crime. *Franklin*, 471 U.S. at 314, 105 S.Ct. at 1971.

In *Sandstrom*, the Court held that a jury instruction that "[t]he law *presumes* that a person intends the ordinary consequences of his voluntary acts" was unconstitutional because it improperly shifted the burden and misled the jury regarding its duties. *Sandstrom*, 442 U.S. at 523, 99 S.Ct. at 2458. In *Coleman v. Butler*, 816 F.2d 1046, 1048 (5th Cir. 1987), the Fifth Circuit distinguished mandatory presumptions from permissive inferences as follows, "[a] mandatory presumption, one that instructs a criminal jury that it must infer the presumed fact if the state proves the predicate fact or facts, is unconstitutional. A permissive inference suggests to the jury that it may, but need not, draw an inference if the state proves the predicate fact or facts. A

permissive inference is unconstitutional only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts."

The jury instruction provided, in relevant part, as follows:

Article 10 of the Code deals with intent, criminal intent. "Criminal intent may be specific or general. Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." There are several legal presumptions in the Code, one of which I have read to you about the presumption of innocence. A legal presumption is defined in Article 432 of the Code of Criminal Procedure as follows: "A legal presumption relieves him in whose favor it exists from the necessity of any proof, but may nonetheless be destroyed by rebutting evidence." The [sic] give some examples. "Such is the presumption attaching to the regularity of judicial proceedings; that the grand jury was legally constituted; that public officers have done their duty; that a relation or subject matter, once established, continues, but not that it pre-existed; that the defendant intended the natural and probable consequences of his act; that the defendant is innocent; that the defendant is sane and responsible for his actions; that the person in the unexplained possession of property recently stolen is the thief; that evidence under the control of a party and not produced by him was not produced because it would not have aided him; and that the witnesses have told the truth."

Jury Instruction Transcript, p. 411.[157]

Unlike the instruction in *Sandstrom*, which created a presumption of intent, the jury instruction at issue here provided for an allowable inference; it did not create the prohibited presumption.

---

[157] State Court Record, Vol. 27.

Even assuming the jury instruction was erroneous, viewing it in the context of the jury instructions as a whole and the trial record, it did not have a substantial and injurious effect on the verdict.

## **RECOMMENDATION**

It is the recommendation of the magistrate judge that the petition of Herman Wallace for a writ of habeas corpus be denied.

Baton Rouge, Louisiana, September 13, 2013.

STEPHEN C. RIEDLINGER
UNITED STATES MAGISTRATE JUDGE