# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| HERMAN WALLACE, | : |
| Petitioner, | : CIV. NO: 3:09-CV-01027-BAJ-SCR |
| | : |
| vs. | : |
| | : CHIEF JUDGE BRIAN A. JACKSON |
| HOWARD PRINCE, WARDEN, | : |
| Respondent. | : |
| | : MAGISTRATE JUDGE STEPHEN C. |
| | : RIEDLINGER |
| | : |
| | : |
| | : |

## PETITIONER'S OBJECTIONS
## TO THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Pursuant to Federal Rule of Civil Procedure 72, Petitioner Herman Wallace respectfully objects to the Magistrate Judge's Report and Recommendation (hereinafter "Report"), filed September 13, 2013. (Doc. No. 91.)

On all but one of the four claims asserted by Wallace, the Report raises, *sua sponte*, defenses and argument waived and abandoned by the State. Petitioner Wallace objects, as there are no grounds for this Court to adopt these defenses. *See, e.g.*, *Magouirk v. Phillips*, 144 F. 3d 348 (5th Cir. 1998) (raising a procedural bar *sua sponte* may constitute an abuse of discretion, particularly where no notice and opportunity to respond is afforded petitioner, and noting that the discretion exercised must be guided by "comity and judicial economy," as much as "the petitioner's substantial interest in justice"); *accord Esslinger v. Davis*, 44 F. 3d 1515 (11th Cir. 1995) (finding "no federal interest served" by the magistrate judge's *sua sponte* imposition of a procedural default bar; further finding the imposition of the bar "disturbingly arbitrary," and noting that it is "fundamentally unfair for a court *sua sponte* to invoke a procedural default

without giving the petitioner an opportunity to show cause for the default," because in so doing, the magistrate judge and the district court, "effectively 'sandbagged' the petitioner").

More importantly, the Report is replete with legal and factual errors. Each of these Mr. Wallace addresses in turn below. When these errors are addressed and corrected, it is plain that habeas relief is warranted. Accordingly, Wallace requests that this Court decline to adopt the Report, and grant his petition for habeas corpus.

### A. The Report Failed to Apply Precedents Existing as of 1993 to Wallace's Grand Jury Claim (Claim D).

As a threshold matter, the Report is clearly erroneous in finding that "Louisiana did not exclude women from grand juries but merely provided them with an exemption," (Doc. No. 91 at 46, n.130.) In fact, at the time of Wallace's indictment, the Louisiana statutory scheme provided that, "no woman shall be drawn for jury service," unless she formally declared her desire to do so. *Id.* This facial classification resulted in not a single woman ever serving on a parish grand jury as of the January, 1974 hearing on Wallace's motion to quash. *Alexander v. Louisiana,* 405 U.S. 625, 644 (1972) (Douglas, J. concurring) (citing *Pierre v. Louisiana*, 306 U.S. 354 (1939) and observing that, "[a] statutory procedure which has the effect of excluding all women does not produce a representative jury, and is therefore repugnant to our constitutional scheme.").

The Report is likewise plainly wrong to claim that, on direct appeal, Wallace failed to seek relief based on the exclusion of women in his grand jury. (Doc. No. 91 at 47.) Wallace filed pro se a supplemental appeal brief January 21, 1992. "Whether Judge Lear [the trial judge] committed reversible err[or] denying his motion to quash the grand jury indictment, which error was properly reserved for consideration on direct appeal," was thereby raised. *See* Vol. 25; *see also State ex rel. Spitz v. Court of Appeal, First Circuit*, 637 So. 2d 149 (La. 1994) (citing *State v. Smalley*, 599 So. 2d 1090 (La. 1992), and showing that, under state law, the First Circuit was

-2-

obligated to consider the claims raised in Wallace's pro se supplemental brief). The Report recommends that this Court decline to enforce our constitutional protection against the taint of discrimination in the grand jury selection process, even though the record clearly establishes that Wallace was more than diligent in litigating this claim.

There is no dispute that Wallace's grand jury claim is governed by the state of our laws as they existed when Wallace's conviction became final in July of 1993—*including* as they applied to the rules of retroactivity. (Doc. No. 91 at 56.) However, the Report's recommendation relies on an erroneous assessment of that legal landscape. First, the Magistrate wrongly finds that retroactivity law precluded Wallace from relying on *Taylor v. Louisiana*, 419 U.S. 522, 537 (1975), which barred Louisiana's exclusion of women from jury service eighteen years before Wallace's conviction became final. Second, the Magistrate contends, in the alternative, that neither *Taylor* nor existing precedent as of 1993 would have compelled a state court to find the exclusion of women unconstitutional. The Report therefore recommends that Wallace be barred from relief for urging the adoption of a "new rule" under *Teague v. Lane*. These alternative grounds for denying relief are each clearly erroneous.[1]

### 1. *Retroactivity Law Requires the Application of Taylor v. Louisiana.*

In 1987, well before Wallace's conviction became final, *Griffith* unequivocally instructed that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all

---

[1] It must be noted that the Magistrate fails to explicitly address whether deference under the AEDPA is required in this case. To be clear, AEDPA does *not* apply because the Louisiana First Circuit relied exclusively on procedural grounds in denying relief, thereby stripping the trial court's merit-decision of significance. *Liegakos v. Cooke*, 106 F. 3d 1381, 1385 (7th Cir. 1997) (Easterbrook, J.) (holding that § 2254(d) is inapplicable where the last state court decision relies solely on procedural grounds, even where the trial court rejected the claim on the merits, because the procedural "disposition of the last state court to issue an opinion" is dispositive) (citing *Ylst v. Nunnemaker*, 501 U.S. 797 (1991)); accord *Jackson v. Johnson*, 194 F.3d 641, 651 (5th Cir. 1999); *Fisher v. Texas*, 169 F.3d 295, 304 (5th Cir. 1999) (favorably citing *Liegakos*, and noting that in *Liegakos*, the petitioner's "claim was not adjudicated on merits by state court."). Finally, Wallace notes that this Court reviews all objected to portions of the Report de novo, and any remainder of the report for clear error. *Longmire v. Gust,* 921 F.2d 620, 623 (5th Cir. 1991) (Party is "entitled to a *de novo* review by an Article III Judge as to those issues to which an objection is made.")

cases, state or federal, pending on direct review or not yet final." *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987). The Report contorts the dicta of a Fifth Circuit case (ironically, one decided the year *after* Wallace's conviction became final, and therefore inapplicable, in any event), in deciding that Wallace should not be entitled to *Griffith's* bright line retroactivity rule. (Doc. No. 91 at 51-52.) In the absence of *Griffith*, the Report reasons wrongly, Wallace cannot rely on *Taylor v. Louisiana*. *Taylor* holds, forthrightly:

> [I]t is **no longer tenable** to hold that women as a class may be excluded or given automatic exemptions based solely on sex if the consequence is that criminal jury venires are almost totally male.

Prior to *Griffith*, *Daniel v. Louisiana*, 420 U.S. 31 (1975) applied then-existing retroactivity law and found *Taylor* inapplicable to cases pending on direct appeal. The Report wrongly considers in isolation the following language in a case decided subsequent both *Griffith* and *Daniel,* in 1994, to suggest that *Griffith* did not abrogate the results of the prior-existing retroactivity law: "'In the absence of explicit language overruling cases such as *Daniel*, we must assume that these results are still valid as to those new rules for which retroactive application was rejected.'" (*See* Doc. No. 91 at 53-54, citing, *inter alia*, *Wilkerson v. Whitley*, 28 F.3d 498, 505 (5th Cir. 1994).) The Report then relies on the "results" of *Daniel* to recommend denying Wallace the benefit of *Taylor* because his jury was empaneled prior to when *Taylor* was decided. (*Id.* at 54.)

In so doing, however, the Report mistakenly conflates *Wilkerson's* application of the law to the facts before it, with the law itself. Set in context, *Wilkerson* is plainly directed to the specific instance before it, wherein the petitioner's conviction had become final before *Griffith*. *Wilkerson*'s holding is that retroactivity law as it existed when the petitioner's conviction became final is controlling:

> In summary, the pivotal issue in this case is whether *Daniel* was overruled. Since the Supreme Court has never explicitly overruled

> *Daniel*, it is still valid, **but only**, **as here, where habeas petitioners seek to take advantage of the rule announced in *Taylor* but whose convictions became final before *Griffith*.**

*Wilkerson*, 28 F.3d at 509 (emphases added). The Report is wrong to ignore that, by contrast, in this case, Wallace's conviction became final long **after** *Griffith*. Therefore, he is entitled to the retroactivity law that allows him the protection of the rule announced in *Taylor*.

### 2. There is No Teague-Bar to Relief.

The Report's misapplication of relevant case law is also evident in the Magistrate Judge's recommendation that this Court find—even if *Griffith*, and therefore *Taylor*, do apply—that precedent as of July 1993 did not dictate relief in this case.

By 1993, it was settled beyond any room for fair-minded disagreement that a facial gender classification resulting in the absolute exclusion of women from jury service violates the Constitution. The Report contends *Taylor* is inapposite because it, "limited its holding to petit jury selection and did not announce a rule about the exclusion of women from grand juries," specifically. (Doc. No. 91 at 57.) But this analysis cannot square with *Pierre v. Louisiana*, which, in 1939, established that grand juries are accorded the same constitutional protection from systematic exclusion of potential jurors as petit juries. 306 U.S. 354, 362 (1939) ("Principles which forbid discrimination in the selection of Petit Juries also govern the selection of Grand Juries."); *see also Alexander v. Louisiana,* 405 U.S. 625 (1972); *Castaneda v. Partida*, 430 U.S. 482 (1977); *and see Payne v. Tennessee*, 501 U.S. 808, 830 n.1 (1991) (describing *Taylor* as "overruling in effect" *Hoyt v. Florida*, 368 U.S. 57 (1961), a case which upheld a Florida statute that, like Louisiana's, required women to declare her desire to serve on a grand or petit jury.) The Report is plainly deficient in failing to contemplate *Pierre* in conjunction with *Taylor*.

Moreover, decisions subsequent *Taylor,* and prior to Wallace's July 1993 conviction, leave no doubt that Louisiana's grand jury selection process was prohibited by the Fourteenth

-5-

Amendment. In *Craig v. Boren*, 429 U.S. 190, 197-98 (1976), decided one year after *Taylor*, the Supreme Court reaffirmed that statutory distinctions between men and women must be subject to heightened scrutiny under the Equal Protection Clause. And by 1982, it was well established that gender-based classifications violate the Fourteenth Amendment unless the State can "carry the burden of showing an **exceedingly persuasive justification for the classification***." Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (citations and internal quotations omitted) (emphasis added); *accord Kirchberg v. Feenstra*, 450 U.S. 455, 461 (1981). Yet, the Report gives no consideration to whether the State here had any justification, much less an "exceedingly persuasive" one, for the gender-based classification at issue.

The possibility of the State meeting that burden in this case is foreclosed. In *Craig*, the Court specifically observes that Louisiana's gender-based classification turned on an "increasingly outdated misconception[] concerning the role of females in the home rather than in the 'marketplace and world of ideas,'" and concludes that Louisiana's justification was insufficient to withstand Equal Protection scrutiny. *Craig,* 429 U.S. at 198-99 (citing *Taylor,* 419 U.S. at 535, n.17). *Craig* further recognizes that equal protection doctrine clearly articulated in 1971—in *Reed v. Reed*, 404 U.S. 71 (1971)—"provided the underpinning for decisions that have invalidated statutes employing gender as an inaccurate proxy for other, more germane bases of classification." *Id.*at 198. *See also J.E.B. v. Alabama*, 511 U.S. 127, 134 (1994) ("Since *Reed*, this Court **has consistently subjected gender-based classifications to heightened scrutiny**[.]") (citation omitted and emphasis added).[2] Because no justification is available to the State, relief is required here.

---

[2] *J.E.B.* was decided the year after Wallace's conviction became final. Petitioner Wallace cites it here, however, because it shows strikingly that the Court's earlier precedents had long-before established the rule that gender

Furthermore, the year after *Craig*, the Court refined jurisprudence on discrimination in the grand jury selection process. In *Castaneda,* the Court ruled unequivocally that a grand jury selection process which results in the substantial underrepresentation of "recognizable, distinct class[es]" in the community creates an equal protection violation if the State cannot prove the underrepresentation resulted from objective and neutral criteria. *Castaneda*, 430 U.S. at 494-95. *Castaneda* defines recognizable, distinct classes as those "singled out for different treatment under the laws, as written or as applied," just as women had been under Louisiana's statutory scheme. *Id.* at 494. *See also Duren v. Missouri*, 439 U.S. 357, 364 (1979) (concluding women constitute a distinct cognizable class for jury selection purposes); *Taylor*, 419 U.S. at 531-32 (same); *Gibson v. Zant*, 705 F.2d 1543, 1547 (11th Cir. 1983) (same).

In this case, though Wallace has made a prima facie showing of an absolute exclusion of women from West Feliciana Parish grand juries, the Report fails to hold the State to its burden of proof on the question of whether Louisiana's section process was objective and neutral. *Guice v. Fortenberry,* 661 F.2d 496 (5th Cir. 1981) ("The prerequisites for federal relief from the allegedly discriminatory selection of a grand jury were established in *Castaneda v. Partida*[.]") When *Castaneda* is applied here, Wallace's prima facie showing of exclusion cannot be rebutted. Because the statute at issue was neither objective nor neutral, on its face, relief is required.

*Taylor, Craig, Casteneda, Duren* and *Mississippi Univ. for Women* were all decided well before Wallace's conviction became final. Each singularly—and certainly when considered in tandem, as part of the "legal landscape" existing in 1993—starkly establishes the unconstitutionality of gender-based classifications which result in the absolute exclusion of women from grand jury service. These cases dictate that, as of 1993, a state court considering

discrimination in the jury selection process is unconstitutional: "[S]hort of overruling a decade of cases interpreting the Equal Protection Clause, the result we reach today is doctrinally compelled." *J.E.B.,* 511 U.S. at 141, n.12.

-7-

Wallace's claim was required to subject the gender-classification at issue to heightened scrutiny or, in light of the degree the degree of underrepresentation (absolute, in this case), require that the State prove that the statutory scheme was objective and gender-neutral.

While the Report acknowledges some of these cases, the Magistrate unreasonably fails to *apply* any of them to the facts of Wallace's claim. In finding Wallace's claim *Teague*-barred because, as of 1993, the Supreme Court had not "explicitly declared" that the exclusion of women from grand jury pools is impermissible, (Doc. No. 91 at 58), the Report ignores that *Taylor* and *Pierre v. Louisiana* say precisely that. The Report also disregards that an "explicit declaration" is not the standard for when a "new rule" is announced, such that a *Teague* bar can be imposed.[3] "*Teague* [] made clear that a case does *not* 'announce a new rule, [when] it [is] merely an application of the principle that governed' a prior decision to a different set of facts." *Chaidez v. U.S.* 133 S. Ct. 1103, 1107 (2013) (citing *Teague*, 489 U.S. at 307) ("Otherwise said, when all we do is apply a general standard to the kind of factual circumstances it was meant to address, we will rarely state a new rule for *Teague* purposes.").

When the Report's failure to *apply* precedent is corrected for, habeas relief is required on Wallace's grand jury claim.

### B.    *The Wrongful Suppression of Evidence* (Claim A).

Petitioner Wallace has raised and argued two powerful due process claims based on the State's wrongfully suppression of multiple pieces of favorable evidence. *Kyles v. Whitely*, 514 U.S. 419, 434, 438 (1995); *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

---

[3] Notably, even as of today, what the Report wrongly demands—an explicit declaration from the Supreme Court that the exclusion of women from grand jury pools is unconstitutional—does not exist. Yet, if confronted by the same statutory scheme in use in Louisiana when Wallace was indicted today, no fair-minded jurist could conceivably find to the contrary.

Notwithstanding that Wallace's *Brady* claims are copiously supported by record evidence, the Report fails to analyze the bulk of them. The Report recommends that this Court decline to exercise jurisdiction over any *Brady* claim connected to Chester Jackson, relying on a purported procedural bar improperly raised *sua sponte* on the State's behalf. The bar, however, is based on the Report's manifest factual error in identifying the state court's grounds for dismissing Jackson related *Brady* claims, and cannot be applied here. With respect to Wallace's Hezekiah Brown related *Brady* claim, the Report wrongly focuses only on the suppression of Warden Henderson's admission that he promised to help Brown obtain a pardon before Brown testified at Wallace's trial. Even as to this undisclosed evidence alone, the Report wrongly applies the relevant authorities in reaching the conclusion that there was no *Brady* violation.

Considered in isolation, and certainly cumulatively, the prosecution's multiple suppressions violated Wallace's due process under clearly established federal law, and relief is therefore warranted. 28 U.S.C. § 2254(d)(1).[4]

1.    ***The Report Errs in Identifying the State Law Grounds for Rejecting the Jackson*-Brady *Claim.***

Inappropriately, the Report recommends that this Court *sua sponte* raise a procedural bar against Wallace's claim as to Chester Jackson, a co-defendant who flipped mid-trial in exchange for an undisclosed plea deal to manslaughter. The Report accordingly gives no consideration to Wallace's *Brady* claim as to the wrongful suppression of the State's deal with Jackson.

---

[4] It should be noted that the Louisiana district court did not make a single factual finding in addressing Wallace's Brown-*Brady* claims, and therefore this Court reviews all factual issues as to Brown-related suppressions de novo. *See Wallace v. State*, 10-73-6820 (La. 19th JDC Oct. 9, 2007; *and see Wiggins v. Smith*, 539 U.S. 510 (2003) (finding 28 U.S.C. § 2254(e) deference inapplicable where there is no state court factual finding and that, in such cases, the federal court must determine factual issues de novo). As discussed *infra*, the state court's denial of wrongful suppression as to the Jackson plea deal was "contrary to" and "involved an unreasonable application of," the clearly established federal law set by *Giglio*, *Napue*, *Brady*, and as articulated in *Tassin*. 28 U.S.C. § 2254(d)(1).

The State did not argue that Wallace's Jackson-*Brady* claim is procedurally barred. In fact, the State ignored this clearly pleaded claim entirely in its Answer. However, on the State's behalf, the Report reasons that, in Wallace's final state court application for post-conviction review, this claim was dismissed as "untimely" and "repetitive" under La. C. Cr. P. arts. 930.8 and 940.3, and that these were independent and adequate state law ground for the judgment. (Doc. No. 91 at 15-17.) The Report faults Petitioner for "not even attempt[ing] to establish that the[se] procedural rule[s] [are] not 'strictly or regularly' followed." (*Id.* at 16.) But, the State did not argue a procedural bar in its own defense, and the Court never put Wallace on notice that raising one *sua sponte* was in contemplation. Accordingly, Wallace was denied fair notice that he needed to address whether La.C.Cr.P. arts. 930.8 and 940.3 are independent and adequate state grounds which bar relief here.[5] The Report further faults Petitioner because he has not "made a showing to support a claim of actual innocence," *id.* at 17, which could excuse a purported procedural bar. However, because he has colorably alleged that he is factually innocent of the crime for which he is presently incarcerated, Petitioner *has* requested—and has not as yet been granted—an opportunity to demonstrate that failure to consider his claims will result in a fundamental miscarriage of justice.

More glaring, it is factually inaccurate that the last-reasoned state court decision dismissed Wallace's claim regarding the wrongful suppression of Jackson's plea deal on procedural grounds. The Report contends that this claim was dismissed by the June 28, 2004 district court denial of Wallace's fourth application for postconviction review. (*See* Doc. No. 91

---

[5] As discussed *infra*, whether or not these grounds can generally serve as procedural bars because they are independent and adequate, in this case, because the last state court did not "clearly and expressly" indicate that its dismissal of the Jackson-*Brady* claims rested on La.C.Cr.P. arts. 930.8 and 940.3 (in fact it indicated quite clearly that the dismissal of this claim was merit-based), the independence requirement cannot met. *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. La. 1997).

at 7, 15.) However, Wallace's Jackson-*Brady* claim as to the plea deal suppression was not

raised in the application then under review.[6]   Instead, the Louisiana district court denied relief as

to the suppression of Jackson's plea deal, "for the reasons stated in the commissioner's

recommendation," in 1998.  *Wallace v. Whitley*, 10-73-6820 (La. 19th JDC Sept. 30, 1998),

Order, 9/30/98 (adopting recommendation) (available in Vol. 4).  That recommendation does

indeed consider the merits of Wallace's Jackson-*Brady* claim, although it unreasonably rejects

them.  In the recommendation, Commissioner Bergeron notes evidence that "a plea to a lesser

charge would have been discussed without specific promises being made," but reasons relief

should be denied because, "[i]f Mr. Jackson testified at the trial that he had not been promised

anything [as he in fact did testify], it is my belief that he more likely than not spoke the truth in

the most narrow sense."  *Wallace v. Whitley*, 10-73-6820 (La. 19th JDC Sept. 1, 1998)

Commissioner Bergeron's 9/1/98 Recommendation at 5 (available in Vol. 7).   The district

court's denial of relief was accordingly on the merits.  This Court therefore has jurisdiction to

review Wallace's pending Jackson-*Brady* claim regarding a plea deal suppression, and to grant

relief.[7]

---

[6] That application was based on newly discovered evidence and, in connection with Chester Jackson, raised a *Brady* claim only as to previously undisclosed prior statements of Jackson which did not concern a plea deal, but would have helped trial counsel show factual inconsistences in Jackson's account of the crime.  *See* Postconviction Relief Application 9/18/2000 at 37-41, and at 55-56, available in Vol. 3.

[7] Upon any such review, clearly established Supreme Court precedents require relief on this Jackson claim alone. This was a hornbook *Brady* violation, as evidence of leniency was (1) suppressed by the State; (2) favorable to Wallace's defense; and (3) material to Chester Jackson's credibility.  *DiLosa v. Cain*, 279 F.3d 259, 262-63 (5th Cir. 2002); *Tassin v. Cain*, 517 F.3d 770 (5th Cir. 2008) held that a state court decision which required evidence of a "promise" in exchange for testimony when evaluating wrongful suppression could not withstand review under § 2254(d)(1), as it was contrary to clearly established federal law.  "A promise is unnecessary. Where, as here, the witness's credibility 'was… an important issue in the case… evidence of *any understanding or agreement as to a future prosecution* would be relevant to his credibility and the jury was entitled to know of it.'" *Id.* at 778 (quoting *Giglio v. United States*, 405 U.S. 150, 154-55 (1972)) (emphasis and ellipsis in original). Indeed, "'[t]he fact that the *stake was not guaranteed through a promise or binding contract*, but was expressly contingent on the Government's satisfaction with the end result, *served only to strengthen any incentive to testify falsely* in order to secure a conviction. *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 683 (1985)) (emphasis in original). Even if Commissioner Bergeron believed that Jackson was being truthful before the jury "in the most narrow sense" when

### 2. The Report Wrongly Assesses Suppression, Favorability and Materiality with Respect to Wallace's *Brown*-Brady *Claim*

#### a. Suppression

The Report erroneously finds there was no suppression of evidence related to Hezekiah Brown because Wallace supposedly, "could have discovered the evidence through reasonable diligence." (Doc. No. 91 at 18, citing *United States v. Brown*, 650 F. 3d. 581, 588, 5th Cir. Tex. 2011). Again, the Report raises argument not raised by the State, which is entirely incongruous with the record in this case.

Even the State recognized in state court that, "the defense exercised due diligence in investigating whether any promises of favors had been given to Hezekiah Brown by the State in return for his testimony[.]" State's Traversal, 4/2/07 at 17, available in Vol. 17. Indeed, Wallace's counsel filed a pre-trial bill of particulars requiring the State to answer, *inter alia*: "Does the State obtain or does the State have any…. Evidence whatsoever that is favorable to any of the defendants and that could aid the defendants in their defense?" Vol. 1 at 26 (¶ 24). In response, the State made no mention of any of the incentives supplied to Brown (nor the leniency deal with Jackson). *Id.*; *see also* Answer at 39 (State recognizing same); Comm'r Morgan Report at 6 and n.23. Even after trial, Wallace made repeated pro se efforts to uncover—and the State continued to suppress, for almost a quarter century—the pretrial incentives supplied to

---

he denied having been "promised anything," Jackson blatantly lied when defense counsel asked—in the broadest possible terms: "has the District Attorney offered you any type of leniency or anything whatsoever for your testimony." Trial Tr. at 184. Jackson responded, "[n]o, sir," notwithstanding his now-uncontroverted manslaughter plea deal. The Commissioner does not address this part of Jackson's testimony, in contravention of the Supreme Court's "clear precedent, establishing that, where a key witness has received consideration or potential favors in exchange for testimony and lies about those favors, the trial is not fair." *Tassin v. Cain*, 517 F.3d 770, 778 (5th Cir. La. 2008).

Moreover, certainly, as discussed further *infra*, when viewed cumulatively with the pending *Brown* Brady claim, relief is warranted in this case.

Brown. (*See* Doc. No. 1, Pet. ¶ 95 (detailing Wallace's various efforts to ferret out suppressed evidence using, *inter alia*, public records requests, subpoenas and letter writing).) Indeed, contrary to the Report's assessment, this Court would be hard pressed to find a record with more copious evidence of the petitioner's diligence.

The Report cites testimony trial counsel offered in March of 1998 as basis for finding lack of diligence. In a hearing below, trial counsel testified that prior to trial he "was aware of" the favorable treatment Brown was receiving, and that he "had interviewed Brown regarding the favors." (Doc. No. 91 at 19). The Report further notes that co-defendant Woodfox had called Warden Henderson at his 1998 re-trial and got testimony from him then. The Report concludes that *Brady* warrants no relief here because "[t]here is no reason to believe that the petitioner could not have also presented the same [Henderson] testimony [which was presented by Albert Woodfox, in his own 1998 retrial] at his 1974 trial." (Doc. No. 91 at 34).

But the Report misses the mark entirely, both factually and legally. Factually, the hearing testimony by trial counsel established only that trial counsel *believed* Brown was receiving favors, not that he had admissible evidence to substantiate that belief before jurors. Trial counsel testified that, from "underground gossip at Angola," and his interview of Brown, "it was real apparent to me that Hezekiah was being groomed, you know, and being compensated." Vol. 10, App. 28 at 23:1-13. Though he "certainly wanted to know as much about [the grooming and compensation] as [he] could," *id.*, the prosecution withheld that information. *Id.* at 23-24. Legally, controlling authority squarely forecloses the premise that, if defense counsel believes a prosecution witness is receiving favors—based on prison gossip and his own perception—then the State does not have to disclose evidence substantiating those favors. *See*, *e.g.*, *Giglio*, 405 U.S. at 151-52, 154 (defense counsel cross-examined vigorously to

establish the existence of a deal between the State and State's witness, but the State suppressed *proof* of that arrangement and failed to correct the witness's false testimony); *Banks v. Dretke*, 540 U.S. 668, 693-96 (2004) (rejecting the argument that defense counsel was at fault for failing to independently discover the evidence, because "[a] rule... declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process.").

Moreover, while Woodfox did call former Warden Henderson to the stand in December of 1998, it was only *because* of the documents substantiating the promise of a pardon that Henderson provided the testimony he then offered. During the April 1998 post-conviction hearing in this case, Henderson initially claimed he did not remember making any agreement with Brown for his testimony—testimony the Report now contends illustrates equivocation. (Doc. No. 91 at 33.) However, when Wallace's counsel showed Henderson a letter he wrote to the Secretary of the Department of Corrections in April 1974, he said the letter refreshed his recollection on the matter. 4/28/98 Hearing Tr. at 11, available in Vol. 10. The State successfully objected to further inquiry as to favorable treatment of Brown on relevancy grounds. *Id.* at 11, 13, 19-20. Wallace was denied these documents for use at trial, and therein lies the rub.

The authorities cited in the Report in support of finding that there was no suppression because Wallace was not diligent are inapplicable here. (Doc. No. 91 at 34.) They stand only for the unexceptional proposition that the State does not have to conduct the defense's investigation for exculpatory evidence. In *Rector v. Johnson*, 120 F. 3d 551 (5th Cir. 1997), the alleged suppression concerned a witness statement of someone who had not testified at the petitioner's trial, but had seen him at a certain time on the night of the rape-murder for which he was convicted. The panel, finding it highly unlikely that the petitioner had not known where he

was minute-by-minute the night of the crime, and noting that he had an investigator, observed that there was no indication on the record that the witness had been unavailable for defense counsel to question. "Under these circumstances," the panel concluded, there was no suppression because "the evidence was readily available to defense counsel." *Id.* at 560. Likewise, in *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990), the panel found no abuse of discretion in the denial of a *Brady* claim where the only alleged suppression was a government survey of the psychologist-petitioner's patients, and she could have interviewed her own patients to get the same potentially exculpatory information.

By contrast, in this case, though trial counsel interviewed Brown, and picked up on rumor about his favorable treatment in the prison, he could neither testify on his clients' behalf, nor call "prison gossip" to the stand for the jury to hear. Trial counsel (and Wallace himself post-trial) tried mightily to get information and documents solely in the possession of the State concerning any offers made to State witnesses, because such material is classic *impeachment* evidence, which goes to the heart of credibility. As to that sort of evidence, the Fifth Circuit agrees that, "[t]he defendant gains nothing... by knowing that the Government's witness has a personal interest in testifying **unless he is able to impart that knowledge to the jury.**" *United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977) (emphasis added).

Furthermore, as to suppression, though the record evidence in this case establishes beyond room for dispute that Brown in fact received substantial favors from the State, including:

- The promise—and receipt of, ultimately—a pardon;
- Valuable prison currency, in the form of a carton of cigarettes, delivered to him once a week;
- Daily incentive wages, whether he worked or not;
- A private room in the best inmate housing at prison then-renown for violence and overcrowding;
- Personally delivered birthday cakes;

the Report disregards the bulk of this evidence. (*See* Doc. 64 at 14-21.) When the Report concludes that "Petitioner has not carried his burden to establish that evidence was suppressed," *id.* at 32-33, the sole explanation offered is that former Warden Henderson's testimony, with respect to his promise that he would support Wallace's pardon application, was "equivocal" and "inconsistent."

But, even if Henderson could be characterized as inconsistent about precisely what he promised Brown and when, the material facts at issue are that: (a) at least 10 months before Wallace's trial, (b) Henderson promised a hugely substantial incentive if Brown would testify. These facts *are* unequivocally established on the record:

> **Q: --Did you not [promise you could do whatever you could to support his pardon]:**
> **A:  Absolutely.**
> **Q:  And those promises—were made to him by you?**
> **A:  Yeah.**
> **Q:  Before he testified?**
> **A:  That's right.**

Vol. 15 at 1963-64. However Warden Henderson's testimony is characterized, documentary evidence that this information had been suppressed is very clear. Yet, the Report ignores the wrongfully suppressed letters Henderson wrote which emphasized that Brown had given testimony to convict "black militants from the New Orleans area" who killed "a white officer" and explained that there was accordingly, "an obligation to try to help" Brown. *See*, *e.g.*, Vol. 22. Likewise ignored is documentary evidence that the prison paid for advertisement of Brown's clemency request in consideration of "valuable assistance to [LSP] by testifying in court" against Wallace. *Id.*; *see also* Vol. 15 at 1957.

In focusing solely on former Warden Henderson's testimony as to the pardon, the Report wrongly ignores all the *other* favorable treatment—considerable even apart from a promise of a

pardon—Hezekiah Brown received in exchange for his testimony. The Report disregards the fact that far more evidence existed about favorable treatment than what could have been offered by former Warden Henderson's testimony alone. Bobby Oliveaux, a long time prison employee, not Henderson, provided testimony about all the pre-trial incentives which had been offered to Brown beside the pardon, including the weekly cigarette carton delivery and the incentive pay. *See* 2006 Hearing Tr. at 32-49, available in Vols. 26-28; *see also* Vol. 22. Oliveaux also established that he began supplying the cigarette cartons weekly in 1972, well *before* Brown offered testimony against Wallace. *Id.* at 35, 45-46. Wrongly suppressed documents corroborated Oliveaux on the existence of favors to Brown beside the pardon. As the then-new warden of LSP wrote to the Secretary of the Department of Corrections in 1978, continuing the weekly cigarette delivery, "would partially fulfill commitments made to [Brown] in the past with respect to his testimony in the State's behalf in the Brent Miller murder case." *See* Vol. 22. "I concur," the Secretary responded, "Warden Henderson made the original agreement with Brown." *Id.* None of this evidence could be presented at Wallace's 1974 trial because, though counsel requested it, it was suppressed, and kept wholly in the State's control.

### b.    Favorability

Regarding favorability, the Report again only considers, in isolation, Warden Henderson's promise to assist Brown in obtaining a pardon. The Report allows only that, "it is arguably conceivable" that this promise "could have affected the jury's credibility determination…." (Doc. No. 91 at 33.) It is plainly erroneous for the Report to refuse to evaluate the favorability of all the other suppressed evidence as to Hezekiah Brown. Each of these favors constituted distinct incentives to testify for the State, and therefore each suppression related to Brown was favorable. *Banks*, 540 U.S. at 691; *see also Napue* v. *Illinois,* 360 U.S.

264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").

      **c.**     **Materiality**

Setting aside his standing objection to the fact that the Report gives no consideration to the materiality of any of the Brown-*Brady* evidence unconnected to Brown's pardon, Wallace respectfully submits that the Report erroneously applies the *Brady* materiality standard. The Report conclusorily avers that, even assuming the suppression of evidence as to Warden Henderson's promise regarding a pardon, "such limited impeachment evidence" creates "no likelihood of a different result." *Id.* at 33. Perplexingly, the Report claims that "Brown's testimony was consistent with Jackson's testimony," the co-defendant who testified on behalf of the State, and goes on to characterize Brown as a "neutral witness." *Id.*

The suppressed promise of a pardon can hardly be considered "such limited impeachment evidence," given that "the ultimate reward—freedom from natural life and certain death in prison," would "quite naturally have increased [Brown's] desire to help the State at trial." (Doc. No. 64 at 23-24 (quoting Comm'r Morgan Report at 17, 18). Indeed, the suppression of Brown's "direct, personal stake in [Wallace's] conviction" constitutes a hornbook *Brady* violation. *Tassin*, 517 F.3d at 778 (quoting *Bagley*, 473 U.S. at 683); *see also Giglio*, 405 U.S. at 152-55; *Napue*, 360 U.S. at 265, 266 n.1; *Graves*, 442 F.3d at 344; *United States v. Sipe*, 388 F.3d 471, 492 (5th Cir. 2004); *Williams*, 609 F.2d 216, 221 (5th Cir. 1980); *United States v. Barham*, 595 F.2d 231, 242-43 (5th Cir. 1979); *Sanfilippo*, 564 F.2d at 177-79; *Blankenship v. Estelle*, 545 F.2d 510, 513-15 (5th Cir. 1977); *United States v. Tashman*, 478 F.2d 129, 130-31 (5th Cir.

1973); *Blanton v. Blackburn*, 494 F. Supp. 895, 899 (M.D. La. 1980), *aff'd* 654 F.2d 719 (5th Cir. 1981).

Second of all, the Report appears to apply a sufficiency of the evidence test, in citing the supposed consistency between Brown's testimony and Chester Jackson as grounds for finding no materiality. To be clear, factually, there was very little consistency between Brown and Jackson. As Commissioner Morgan noted, "most of the evidence that was accumulated in this case was not necessarily consistent throughout—from witness to witness. Many saw irreconcilable events and people." Comm'r Morgan's Report at 24. (*See also* Doc. No. 64 at 28-31 (reviewing the inconsistencies in State witness testimonies)). Jackson was inconsistent with Brown on numerous basic allegations, including who was in the dormitory when Officer Miller was killed; what happened in the attack; what weapons were used; and when Brown left the scene. *Id. See also Cannon v. Alabama*, 558 F.2d 1211, 1214-15 (5th Cir. 1977) (granting habeas relief where the State's case depended on two eye-witnesses who contradicted each other about who was present at the crime scene, and further describing such a case as "extremely weak"). Plus, given that Jackson's testimony was "questionable at best, and incredible at worst," "intentionally and inexplicably obfuscating," and "decidedly evasive on important facts he should have been certain of," *id.* at 9, 25, 26, there are compelling grounds to find that, with Brown's credibility impeached, a juror would have had serious doubts about the State's case. *Lacaze v. Warden, La. Corr. Inst. For Women*, 645 F.3d 728, 738 (5th Cir. 2011) ("[W]here 'the jury's estimate of the truthfulness and reliability of the witness may well be determinative of guilt or innocence,' the failure to disclose *Brady* information [about that witness] is material"). Setting aside the sufficiency of Jackson's testimony, or lack thereof, however, "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence,

there would not have been enough left to convict." *Kyles*, 514 U.S. at 434-35, 453. Here, the dispositive issue is that multiple suppressions of evidence which would have undermined Brown's credibility deprived Wallace of a fair trial.

### 3. The Report Ignores the Context of the Case and Fails to Consider the Cumulative Error of the State's **Brady** *Misconduct*.

Petitioner Wallace's final objection as to the Report's treatment of his wrongful suppression claims is that the duty to weigh these claims in the context of the case as a whole was abdicated entirely in the Report. *See United States v. Agurs*, 427 U.S. 97, 112 (1976) (materiality must be evaluated in the contest of the entire record).

As discussed, with limited exceptions, the Report fails to consider any of the suppressed evidence beyond Warden Henderson's testimony about the pardon. Even as to the pardon alone, the Report further ignores a host of documentary evidence which was suppressed. Beyond that, the Report fails to conduct *Brady* analysis in the context of a case where the prosecution's case was weak to begin with. The evidence against Wallace was wholly insufficient to support any confidence that the verdict would have been the same if the State had not suppressed evidence of the incentives supplied to Brown.

There was no physical evidence inculpating Wallace. None of the prints on the scene, including a bloody print, matched Wallace or his co-defendants. *Woodfox v. Cain*, 609 F.3d 774, 810-11 (5th Cir. 2010) (recognizing the bloody print did not inculpate Woodfox and in fact exculpated him). And, apart from Brown and Jackson, the testimony of the remaining State witnesses was implausible. For example, Josephe Riche—who was not, as the Report suggests, an eyewitness to the crime—testified that he stood around and "waited" after walking into the dorm and seeing Officer Miller's body lying on the ground, such that he was nearby when a corrections officer appeared on the crime scene. Trial Tr. at 207-13. But that officer never

reported seeing Riche in the vicinity. *See id.*. at 268. Similarly, Howard Baker, testified that he saw Wallace in clothes with blood splotches all over (inconsistent with every other State witness), which Wallace burned in a furnace at the tag plant. *Id*. at 379, 383-85, 392-95. But this would have required Wallace to walk through multiple security check points in bloody clothes. Moreover, as with the eye-witnesses, evidence emerged post-trial discrediting Riche and Baker. *See also* Pet. ¶¶ 33, 113-19 (describing, *inter alia*, evidence of Riche's schizophrenia and Warden Henderson's assertion that, "I don't think he knew anything about the case[.]); *and see id.* ¶¶ 120-121 (discussing Baker's recantation and affidavit acknowledging, "I lied [at Wallace's trial] to try to help myself").

Additionally, the Report erroneously disregards Wallace's robust alibi defense. Four prisoner witnesses testified on Wallace's behalf, and a tag plant roster confirmed that he had been checked in by corrections officers for work on the morning of April 17, 1972. Trial Tr. at 307. The jury thus was presented a classic witness credibility test. Indeed, credibility becomes "all important" when the jury is confronted by irreconcilable prosecution and defense alibi witnesses, and the suppression of impeachment evidence as to Brown was, accordingly, especially devastating to Wallace's defense. *Barham*, 595 F.2d at 238-39. Petitioner Wallace "was entitled to a jury that, before deciding which story to believe, was truthfully apprised of ***any possible interest*** of key state witnesses in testifying falsely." *Blackburn*, 494 F. Supp. at 901 (Polozola, J.), *aff'd* 654 F.2d 719.

The Report further turns a blind eye to the fact that the jury was deprived of information that Brown had, at least once before, perjured himself. Because of the State's wrongful suppression, jurors at Wallace's trial were prevented from learning that Brown had lied, under oath, at Woodfox's trial 10 months prior, when he testified expressly—and falsely—that the

State had not promised him anything for taking the stand. Perjury, of course, "is almost unique in its detrimental effect on a witness' credibility." *United States v. Cuffie*, 80 F.3d 514, 518 (D.C. Cir. 1996).

The Report also ignores the State's particular efforts at trial to emphasize and reinforce Brown's credibility. (*See* Doc. 64 at 25-26 (discussing the State's leading questions on direct, posed to bolster Brown's credibility, such as, "[y]ou wouldn't lie on them, either?").) Without impeachment evidence, Wallace was handicapped not only from showing jurors that they shouldn't trust Brown, but also that they should not trust the State's presentation more generally. The recommendation that this court find "an unrevealed deal is immaterial after [the State went] to such lengths to emphasize [the witness's] credibility and lack of any motives for lying at trial simply lacks force." *Lacaze,* 645 F.3d at 737, n.1.

Finally, because the Report wrongly refuses to consider Brown-*Brady* suppressions unrelated to the pardon, or the merits of the Jackson-*Brady* claim entirely, the Report also errs in failing to weigh the wrongful suppressions in this case cumulatively, as required by fundamental principles of due process. "When there are a number of *Brady* violations, a court must analyze whether the cumulative effect of all such evidence suppressed by the government raises a reasonable that disclosure would have produced a different result." *Sipe*, 388 F.3d at 478 (citing, *inter alia*, *Kyles*, 514 U.S. at 421-22). Both of the key witnesses against Wallace were offered extremely valuable consideration in exchange for their testimony, and each at some point denied under oath that these incentives existed. The State's suppressions of this evidence denied trial counsel powerful opportunities to discredit those witnesses in front of jurors. Under clearly established law, the suppressions concerning each witness, in isolation, are material and require relief. But when considered cumulatively, the force of the wrongful suppressions is profound.

The fundamental question under *Brady* is whether the defendant was denied a fair trial but, here, "fairness cannot be stretched to the point of calling [Wallace's] a fair trial." *Kyles*, 514 U.S. at 434.

### C.      The Conflict of Interest **(Claim B)**.

Petitioner Wallace objects to the Report's suggestion that relief is not available on his claim regarding trial counsel's conflict of interest on the grounds of:  (1) a *sua sponte* argument that the claim was not fairly presented before the state courts, and is thus defaulted; (2) Wallace's purported failure to show his counsel labored under conflicting interests during the trial after co-defendant Jackson switched sides, accepted a deal and testified against Wallace and co-defendant Montegut; or (3) that the state courts' adjudication of this claim was not an unreasonable application of Supreme Court authority.  (Doc. No. 91 at 34-45.)  On each count, the Report errs.  Wallace adequately presented this claim before the state courts.  Furthermore, the evidence presented to those courts demonstrated that counsel was profoundly conflicted after the prosecution engineered a leniency deal for Jackson's testimony mid-trial.  Finally, the state court's failure to conclude that these circumstances did not require relief under *Cuyler v. Sullivan*, 446 U.S. 335 (1980) is indeed an unreasonable application of binding Supreme Court precedent.

### 1.      *This Claim is Not Defaulted.*

The Report's finding that Wallace did not properly exhaust this claim, and that it is thus now defaulted, is both wrong and surprising.  Again the Report has inappropriately raised a defense *sua sponte* on behalf of the State.  The State never argued that Wallace's claim was not adequately presented in the state courts (even while vigorously asserting that other claims were not properly exhausted).  The Warden has been represented in this matter by the same assistant

district attorney for more than a decade. If this claim had not been adequately presented, the State would have pleaded default. However, the State did not, and for good reason.

In state court, trial counsel's testimony made it very clear that Wallace's defense was adversely affected by a profound conflict of interest because there were other plausible defense strategies he did not pursue. Trial counsel did not know how he could adequately cross-examine Jackson without revealing privileged material or hurting Wallace or Montegut. Wallace explained the breadth of this claim in his pro se state court brief:

> As counsel testified at the evidentiary hearing, when Jackson suddenly decided to testify, counsel was put "in an extremely ethical, awkward situation in cross-examining" him. . . . His cross-examination was compromised by the attorney-client privilege. Counsel admitted fearing reprisals from the Bar Association because of his cross-examination. . . . Additionally, Jackson's testimony on direct examination was favorable to counsel (sic) other client, Montegut. Thus, to undertake extensive cross-examination would have been to jeopardize Montegut's defense. Jackson's sudden decision to testify forced counsel to divide his loyalties in four directions: 1) protecting the attorney-client privilege owed to Jackson; 2) advocacy of the cause on behalf of Wallace; 3) fear of reprisal from the Bar if he stretched the bubble of cross-examination; and 4) the defense of Montegut.

(*See* Doc. No. 25-1 at 20.) The claim that Wallace seeks relief on in this proceeding is the same claim litigated before the state courts. The Report's *sua sponte* assertion of default could not be more mistaken.

### 2. The Report's Conclusion the Counsel Had No Actual Conflict is Wrong.

The Report concludes trial counsel did not compromise his duty of loyalty and zealous advocacy to Wallace. It does so by focusing entirely upon trial counsel's contention that, in his cross-examination of Jackson, he tried to use some privileged information, without violating any ethical rules. (Doc. No. 91 at 44.) However, just as the state courts did below, the Report wrongly ignores not only that any such efforts were necessarily impossible, but the great weight

of evidence which shows that trial counsel—then a young attorney with about five years of experience—was so overwhelmed at the sudden, mid-trial turn of events his advocacy was seriously constrained.  Indeed, trial counsel was unequivocal:

> I came back from lunch and they walked out, one defendant, I was missing a defendant.  He wasn't there.  And out came [the prosecutor] and his staff and announced to me that mu codefendant, during the lunch period, had decided to make a deal with the State, and obviously I was shocked.  And that was it.

Vol. 14 (Ex. U) at 5.  Trial counsel, "did not know what the deal was," *id*. at 7; *see also id*. at 5, 8, and when trial counsel conferred with him, Jackson denied the existence of any plea bargain. *See id*. at 31.  On the stand, Jackson again repeatedly denied any deal, explicitly denying that the prosecution had "offered [him] any type of leniency or anything whatsoever for [his] testimony." Trial Tr. at 183-84 (emphasis added).[8]  Chester Jackson's mid-trial switch—from one of three co-defendants, to prosecution eye-witness—was like a bomb going off in the courtroom.  Trial counsel was given only 30 minutes to regroup.  The prosecution immediately called Jackson. Besides disavowing the existence of any deal, his testimony was generally helpful to Montegut, Wallace's remaining co-defendant, who was jointly represented by trial counsel, while incriminating toward Wallace. These circumstances placed counsel in an untenable situation; he had to cross Jackson so that jurors would believe Jackson's testimony about Montegut, yet expose every reason the jury should discount Jackson's testimony as to Wallace.  Having to choose in this manner between Wallace, Montegut, and his former client Jackson, created an undeniable conflict of interest for trial counsel.  His "struggle to serve two [in this case, three] masters cannot serious be doubted." *Glasser v. United States*, 315 U.S. 60, 75 (1946); *United States v. Newell*, 315 F.3d 510, 516 (5th Cir. 2002) ("A lawyer places himself in an impossible

---

[8] The prosecution never corrected Jackson's false testimony, flouting its most basic due process obligations.  *See, e.g., Giglio*, 405 U.S. at 153-54; *Napue*, 360 U.S. at 269.

situation when the defense of one client is perforce to the detriment of another client.")
Although trial counsel acknowledged in retrospect that "I probably should have asked for a
retrial," or could have pursued other appropriate defense strategies, in his shock and confusion
over being blind-sided by the State, he failed to. Vol. 14 (Ex. U) at 46.

This impossible situation created not only plain "actual conflict" but also clear "adverse
effect" upon Wallace's defense. (*See* Doc. No. 64 at 38-39).

### 3. The State Court's Denial of Relief Was Unreasonable.

The Louisiana district court denied relief on Wallace's conflict of interest claim with no
reasoning or citation to authority, adopting the recommendation of Commissioner Bergeron. The
entirety of Commissioner Bergeron's discussion and analysis of this claim was as follows:
"[T]he record clearly does not support Wallace's contentions." *See* Recommendation, 9/1/98 at
5, *adopted by* Order 9/30/98 (Vol. 11, Apps. 22, 24). The one state judge who offered analysis
on this claim—Judge Guidry—dissented from the denial of Wallace's writ, after concluding that,
"[Wallace's] attorney should have filed a motion for a mistrial or sought other counsel for
defendants." *Wallace*, 99 KW 0275 (Supp. Vol. 1). Under *Cuyler v. Sullivan*, when it is shown
that trial counsel, as here, labored under an "actual conflict," there is no requirement that
petitioner show that, but for the conflict, there is a reasonable probability of a different result.
446 U.S. 335 (1980). Instead, he need show only that counsel's divided loyalties adversely
effected his representation. *Id.* at 349-50.

The Report's conclusion that the state court's adjudication did not unreasonably apply
*Cuyler* is wrong. Given trial counsel's sharply divided loyalties, trial counsel's representation
was adversely effected by the impossible situation of being charged to protect Wallace's interests

in thoroughly discrediting Jackson; Montegut's interests in jurors believing Jackson's testimony; and Jackson's interests in his attorney-client confidences and privileges.

### D.     *Instructional Error Requires Relief* (Claim E).

Again, *sua sponte*, with no explanation for why it has done so, the Report improperly raises harmless error in defense of Wallace's *Sandstrom* claim. However, even if that defense should not be deemed lost to the State by waiver, the classic burden shifting instruction at issue in this case must survive harmless error review because, in a close case, the prosecution was wrongly relieved of the burden of proving intent.

### 1.     *Overlooking the State's Waiver of Harmless Error is not Warranted Here.*

As with any procedural bar defense, when the State fails to raise harmless error defense, it is waived. *See*, *e.g.*, *United States v. Dominguez Benitez*, 542 U.S. 74, 82, n.7 (2004) ("Government has the burden of showing that constitutional trial error is harmless"); *Saldano v. Roach*, 363 F.3d 545, 554 (5th Cir. 2004) (finding acceptance of the State's waiver of harmless error consistent with Supreme Court authority); *Sanders v. Cotton*, 398 F.3d 572, 582 (7th Cir. Ind. 2005) (concluding that the State "did not make this [harmless error] argument in the district court, so it is waived"). While district courts have discretion to overlook the State's failure to argue harmless error, that discretion is generally only exercised when the "harmlessness of the error or errors found is certain," and "reversal will result in protracted, costly, and ultimately futile proceedings" at retrial. *See United States v. Giovannetti,* 928 F.2d 225, 227 (7th Cir. Ill. 1991); *and see Nelson v. Quarterman*, 472 F.3d 287, 332 (5th Cir. Tex. 2006) (Dennis, J., concurring) (applying the *Giovannetti* factors, and concluding "this is not a case in which we should exercise our discretion to overlook that waiver"); *United States v. Vontsteen*, 950 F.2d 1086, 1091-1092 (5th Cir. Tex. 1992) (citing *Giovannetti* with approval).

Applying the *Giovannetti* factors makes it plain that it is inappropriate to a harmless error defense here. "The certainty of harmlessness does not appear with such clarity" from the record in Wallace's case, such "that [this Court] should raise the issue on [it's] own motion."[9] *Giovanneti,* 928 F.2d at 227. Moreover, the record in the case "is substantial and the issues are complex," and "it is certainly debatable whether the trial court's error" in instructing the jury in Wallace's was harmless when the impermissible instruction went right to an element of proof. *Nelson*, 472 F.3d at 332. Finally, given that Wallace has served nearly his entire life at this point (over forty years) for a conviction won only through multiple constitutional violations, it can hardly be said that a grant of habeas relief, "can[] be considered a futile act." *Id.*

### 2. The Instructional Error is not Harmless.

Even it were proper to consider harmless error *sua sponte* in this case, the instructional error at issue cannot be considered harmless here. The instruction heard by Wallace's jury was a paradigmatic burden-shifting instruction in violation of *Sandstrom v. Montana*, 442 U.S. 510, 520 (1979).

In *Sandstrom*, jurors had been instructed: "'the law presumes that a person intends the ordinary consequences of his voluntary acts.'" *Sandstrom,* 442 U.S. at 512. Similarly, in *Francis v. Franklin*, 471 U.S. 307, 309 (1985), jurors were instructed, *inter alia*, that "'[a] person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts but the presumption may be rebutted.'" In this case, the jury instructions unconstitutionally

---

[9] Notably, even if there was some basis to raise a harmless defense on the State's behalf, in so doing the Report relies on the wrong harmless error review. The Magistrate Judge applies *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). (Doc. No. 91 at 60.) But because harmless error was not raised below, Wallace's *Sandstrom* claim has never undergone a *Chapman* analysis. Thus, the *Chapman* standard for harmless error, and not *Brecht*, is the applicable standard of review. Holding the error to be harmless would therefore require proof that that *Sandstrom* error in this case was harmless beyond a reasonable doubt. *See* Hertz, Randy, and James S. Liebman. Federal Habeas Corpus Practice and Procedure § 31.1 (5th ed. 2005); *see also Barrett v. Acevedo*, 169 F.3d 1155, 1164 (8th Cir. 1999) ("we use the strict standard set out in *Chapman v. California* . . . (harmless beyond a reasonable doubt) in [habeas corpus] cases where the state court has not applied the *Chapman* analysis in the first instance").

shifted the burden of proof on the question intent to the defense. Jurors were instructed that Louisiana law included a number of presumptions, which "relieve[] him in whose favor it exists from the necessity of any proof," one of which being "the presumption . . . that the defendant intended the natural and probable consequences of his act." As with *Francis*: "These words carry precisely the message of the language condemned in *Sandstrom*." 471 U.S. at 316. And, as in *Sandstrom* and *Francis*, intent under state law was a required element of the offense for which Wallace was convicted. Trial Tr. at 5.

Critically, in all three cases, "jurors 'were not told that they had a choice, or that they might infer [a] conclusion [about the defendant's intent based on his acts]; they were told only that the law presumed it.'" *Id.* at 316 (quoting *Sandstrom*, 442 U.S. at 515). Though the Report conclusorily distinguishes the instruction in Wallace's case from *Sandstrom* and *Franklin* by characterizing it as creating "an allowable inference" instead of a "mandatory presumption," the Report identifies no basis for that distinction, nor any authority which would permit jurors to be instructed that they *may* infer intent, even in the absence of proof from the State, in a prosecution for intentional murder. (Doc. No. 91 at 62-63.)

Indeed, it is noteworthy that in *Francis*, immediately after the challenged instruction, jurors were told that "'[a] person *will not be presumed* to act with criminal intent but… the Jury, may find criminal intention upon a consideration of the words, conduct, demeanor, motive and all other circumstances connected with the act for which the accused is prosecuted." 471 U.S. at 320. Yet, the Court nevertheless found that, "[n]othing in these specific sentences or in the charge as a whole makes clear to the jury that one of the[] contradictory instructions [on intent] carries more weight that the other." *Id.* at 322.

Especially given the record in this case, it would be untenable to be excuse the intent instruction here as harmless error that failed to exert substantial influence on the jury's verdict. First, the Report ignores the exceptional weakness of the State's case against Wallace. *See Giovanetti*, 928 F.2d at 227 (noting that where evidence against a defendant "although strong, was not overwhelming," the instructional error "could well have confused the jury and by doing so have caused his conviction"). In addition, Wallace was convicted in a multiple co-defendant case, wherein one co-defendant flipped for the State midtrial, and the other was acquitted. Plainly, in such contexts, there are multiple theories on which jurors could base a finding of guilt. For example, jurors may have been persuaded that Wallace participated in the offense regardless of whether there was proof that he had the requisite intent. *See Casper v. Grant*, 817 F.2d 756 (6th Cir. 1987) (finding a *Sandstrom* violation in a co-defendant case where, "we have no way of knowing on which theory the jury based its conviction, and such persuasion-shifting instructions may well have affected the outcome of the trial.").

Given these circumstances, even under a harmless error review, the jury instructions at Wallace's trial were unconstitutional, and warrant *habeas* relief.

### E. Conclusion and Prayer for Relief.

Mr. Wallace respectfully urges this Court to reject the Magistrate Judge's recommended disposition because under correctly applied law, the facts of his case warrant a grant of habeas relief. In the alternative, Wallace requests that this Court grant an evidentiary hearing where he may further develop his evidence of innocence, and where this Court will have the opportunity to make credibility determinations based on live testimony and evidence.

New York, New York
September 30, 2012

Respectfully submitted,

By: _[signature]_ _____

GEORGE H. KENDALL
CARINE WILLIAMS
Squire Sanders (US) LLP
30 Rockefeller Plaza
New York, NY 10112
212-872-9847
Email: Carine.Williams@squiresanders.com

By: /s/NicholasJ. Trenticosta/CW

NICHOLAS J. TRENTICOSTA
Attorney at Law
LSBA roll No. 18475
7100 St. Charles Avenue
New Orleans, LA 70118
504-864-0700 tel
504-864-0780 fax
Email: nicktr@bellsouth.net

Counsel for Petitioner