# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**HERMAN WALLACE**                                           **CIVIL ACTION**

**VERSUS**

**HOWARD PRINCE, WARDEN**                    **NO.: 3:09-cv-01027-BAJ-SCR**

## RULING AND ORDER

Before the Court is petitioner Herman Wallace's Second Amended Petition for Writ of Habeas Corpus by Prisoner in State Custody ("Petition"). (Doc. 36). The Court has jurisdiction pursuant to 28 U.S.C. § 2241. Oral argument is not necessary.

In 1974, Mr. Wallace was convicted of murder and sentenced to life imprisonment for the killing of a correctional officer at the Louisiana State Penitentiary in Angola, Louisiana. (*Id.* at ¶¶ 2, 6). Mr. Wallace now seeks relief from his state conviction and sentence under 28 U.S.C. § 2254. The State opposes Mr. Wallace's habeas petition. (Doc. 53). Mr. Wallace has filed a memorandum in response to the State's opposition. (Doc. 64).

Upon consideration, the Magistrate Judge has recommended that Mr. Wallace's habeas petition be denied. (Doc. 91). Mr. Wallace has filed objections to the Magistrate Judge's Report, (Doc. 95); the State did not file objections. For the reasons set forth herein, the Court DECLINES to adopt the Magistrate Judge's

1

Report and the recommendation therein, and GRANTS Mr. Wallace's Petition,

because systematic exclusion of women from the Louisiana grand jury that returned

the indictment against him violated the Fourteenth Amendment's guarantee of "the

equal protection of the laws," U.S. Const. amend. XIV, § 1, thereby rendering his

conviction and resulting sentence unconstitutional.[1]

## I.    Background

### A.    Wallace's Offense and Trial

The relevant facts are as follows. On April 17, 1972, correctional officer

Brent Miller was stabbed to death at the Louisiana State Penitentiary, in Angola,

Louisiana. (State Court Record ("SCR"), Vol. 1, pp. at 41–42). On September 14,

1973, Mr. Wallace and two codefendants, inmates Gilbert Montegut and Chester

Jackson[2], were indicted by a West Feliciana Parish grand jury on charges of

---

[1] Mr. Wallace has also filed a motion requesting bail pending resolution of his habeas petition, and related motions requesting leave to file additional pleadings in support of his bail request. (Docs. 81, 88, 89). Based on this Court's disposition of Mr. Wallace's habeas petition, these motions are DISMISSED AS MOOT.

[2] A third codefendant, Albert Woodfox was tried separately for the offense and convicted on March 7, 1973. (SCR, Vol. 8 (Transcript of 1973 Trial of Albert Woodfox)). Mr. Woodfox's conviction was overturned in state post-conviction proceedings, but the State re-indicted him and he was convicted again after a second trial in 1998. After this conviction was affirmed on direct appeal and Woodfox exhausted state post-conviction remedies, Woodfox filed a petition for habeas corpus in federal court, which was granted. *Albert Woodfox v. Burl Cain, et al.*, No. 06-789 (M.D. La. Sept. 25, 2008). A Fifth Circuit panel, with one judge dissenting, subsequently vacated the district court's judgment and remanded Woodfox's case for further proceedings. *Woodfox v. Cain*, 609 F.3d 774 (5th Cir. 2010). Following an evidentiary hearing, the district court again granted Woodfox's petition on the ground that his 1993 indictment by a West Feliciana Parish grand jury was tainted by grand jury foreperson discrimination. *Albert Woodfox v. Burl Cain, et al.*, No. 06-789 (M.D. La. Feb. 26, 2013). The State's appeal of this ruling is pending before the Fifth Circuit.

Case 3:09-cv-01027-BAJ-SCR    Document 96    10/01/13    Page 2 of 61

murder.[3]  (SCR, Vol. 1, at pp. 8, 10, 12, 13).  At the time Wallace and his

codefendants were indicted, the Louisiana Constitution and certain state statutes

exempted women from service on grand juries *unless* they filed a written

declaration of their desire to serve.[4]  "This benign dispensation . . . resulted in jury

panels that, in the parishes here involved, . . . never included more than five percent

females, and frequently less."  *Healy v. Edwards*, 363 F. Supp. 1110, 1111 (E.D. La.

Aug. 31, 1973), *vacated as moot* 421 U.S. 772 (1975).  Indeed, there is no dispute in

this case that up to and including the grand jury that indicted Mr. Wallace on

September 14, 1973, no woman had *ever* served as a grand juror in West Feliciana

Parish, despite more than half the eligible Parish population being female.  (SCR,

Vol. 1, at pp. 232, 239; *see generally id.* at pp. 223–250; *see generally* SCR, Vol. 2, pp.

at 251–66; *see also* Doc. 53 at pp. 60–61).

On September 21, 1973, Wallace, Montegut, and Jackson were formally

arraigned on charges of murder in the Twentieth Judicial District, Parish of West

---

[3] Wallace, Montegut, and Jackson were originally indicted by a different West Feliciana Parish grand jury on May 5, 1972.  (SCR, Vol. 1, at p. 187).  On April 27, 1973, the defendants moved to quash this indictment, on grounds that women and Blacks were systematically excluded from the lists from which grand juries were selected.  (Doc. 36 at ¶ 3).  The district court granted this motion on May 7, 1973.  (*Id.*).  Mr. Wallace's May 5 indictment is not included in the state court record.  The record also does not include documents related to Mr. Wallace's motion to quash the original indictment.  However, the State does not contest the date of the original indictment's return, or that it was subsequently quashed due to systematic exclusion of women and Blacks from the grand jury pool.  (*See* Doc. 53 at p. 1, 7, 58–61).

[4] The Louisiana Constitution of 1921 provided: "[N]o woman shall be drawn for jury service unless she shall have previously filed with the clerk of the District Court a written declaration of her desire to be subject to such service."  La. Const. art. VII, § 41 (repealed eff. Jan. 1, 1975).  Under the authority of this constitutional provision, separate statutes allowed the exemption in civil and in criminal cases.  *See* La. Rev. Stat. Ann. § 13:3055 (1967) (repealed eff. Jan. 1, 1975); La. Code Crim. Proc. Ann. art. 402 (1924) (repealed eff. Jan. 1, 1975).

3

Feliciana, Louisiana. (SCR, Vol. 1, at p. 14). Each was represented by attorney Charles Garretson, each pleaded not guilty, and each requested a change of venue. (*Id.*). After a hearing on the change of venue request, the district court granted the defendants' motion, and transferred the defendants' case to the Nineteenth Judicial District Court, Parish of East Baton Rouge. (*Id.* at pp. 14–16).

Judge Elmo Lear presided over the proceedings in the Nineteenth Judicial District. (*Id.* at p. 1). On October, 31, 1973, Mr. Wallace filed a Motion to Quash his indictment. In this Motion, Wallace alleged that "females were systematically excluded from the Grand Jury list and venire, and from the Grand Jury as impaneled," violating "Due Process of Law and the equal portection [sic] of the laws as provided for in the [Fourteenth Amendment to the] Constitution of the United States." (*Id.* at p. 34). Thus, Wallace argued, "[t]he indictment against the defendants is invalid and illegal and should be quashed." (*Id.* at p. 35). The State opposed Wallace's motion, stating simply that "[t]he State denies the allegations of fact and law contained in defendants' Motion to Quash the Grand Jury Indictment and calls for strict proof thereof." (*Id.* at p. 48).

On Monday, January 7, 1974, immediately before jury selection for the defendants' trial was set to begin, the district court held a hearing on the Motion to Quash. (*Id.* at pp. 1, 223). At the hearing, Wallace presented uncontested evidence—in the form of direct testimony from the West Feliciana Parish Clerk of Court, the West Feliciana Parish Registrar of Voters, and each of the members of

4

the West Feliciana Parish Jury Commission—that no woman had *ever* served on a

grand jury in West Feliciana Parish despite more than half the eligible Parish

population being female. (*Id.* at pp. 232, 239; *see generally id.* at pp. 223–250; *see*

*generally* SCR, Vol. 2, at pp. 251–66). Still, Judge Lear denied Wallace's Motion to

Quash, stating he had not "seen a shred of evidence of discrimination." (SCR, Vol.

2, p. 267). Further, Judge Lear denied Mr. Wallace's request to submit a

memorandum on the issue of whether systematic exclusion of women from grand

jury panels violated the Fourteenth Amendment based on "the Healy [sic] case"—a

then-recent decision by a three-judge panel in the Eastern District of Louisiana

enjoining the state of Louisiana from enforcing its automatic exemption provision

because it violated the Fourteenth Amendment's equal protection and due process

guarantees.[5] (SCR, Vol. 2, at p. 267; *see also* SCR, Vol. 1, at p. 233 (identifying the

---

[5] In *Healy v. Edwards*, the three-judge panel ruled that Louisiana's automatic exemptions for
women were unconstitutional because they "denie[d] all litigants Due Process of Law and deprive[d]
female litigants of their right to Equal Protection." 363 F. Supp. 1110, 1117 (E.D. La. Aug. 31, 1973);
*see also id.* at 1111 nn. 1–2. As to the plaintiffs' equal protection claim, the District Court reasoned
that Louisiana's law "accord[ed] an exemption from jury service to women on a basis different from
that available to men under substantially similar circumstances, and on the basis of a sexual
criterion that is wholly unrelated to the objectives of jury service." *Id.* at 1117. The Court further
stated:

> Louisiana's continued subscription to the notion that women must be shielded from
> jury duty, unless they choose to volunteer, results in juries that are predominantly
> male. Whether favorable or unfavorable to females, the sexual prejudice implicit in
> the thesis that women are entitled to an exemption not accorded men imparts to the
> jury a potential prejudice, be it ever so subtle or intangible, that is real and
> meaningful.

*Id. at* 1114. Finally, the District Court declined to follow the U.S. Supreme Court's decision in *Hoyt
v. Florida*, 368 U.S. 57 (1961), which "upheld the constitutionality of a Florida statute almost
identical to the challenged provisions of the Louisiana Constitution" against an equal protection
challenge, because intervening Supreme Court decisions had "so eroded" *Hoyt* to compel the
conclusion that it was no longer good law. *Id.* at 1113, 1117 (quotation marks omitted).

 Mr. Wallace and his codefendants were each indicted on September 14, 1973, two weeks *after*
the *Healy* Court enjoined the State "from enforcing the constitutional and statutory provisions

case as "Edwards versus Heally")). Wallace objected to the district court's ruling on the Motion to Quash, and the court granted a bill of exception, preserving the issue for appeal. (SCR, Vol. 2, at pp. 267, 269).

Other irregularities occurred during Mr. Wallace's trial. For example, on October 31, 1973, at the State's request, Judge Lear consolidated cases against Wallace and Montegut because "both [were] charged with the murder of one, Brent Miller." (SCR, Vol. 1, at p .19). The State did not, however, include Jackson's case in its consolidation request, nor did Judge Lear include it in his consolidation order. (*Id.*). Then, on Monday, January 7, 1974, the day of the pre-trial hearing on the Motion to Quash, and the first day of jury selection, the State moved to continue Jackson's, and *only* Jackson's, case.[6] (*Id.* at 2). The district court granted the State's request without setting a date for Jackson's trial. (*Id.*).

---

declared to be unconstitutional." *Id.* at 1117. (SCR, Vol. 1, at pp. 8, 10, 12). Despite the injunction, the West Feliciana Parish grand jury that indicted Mr. Wallace was constituted according to the same procedures that were ruled unconstitutional by the *Healy* Court. (SCR, Vol. 1, at pp. 232, 239; *see generally id.* at pp. 223–250; *see generally* SCR, Vol. 2, at pp. 251–66; *see also* Doc. 53 at p. 60–61). Further, despite knowledge of "the Heally [sic] case," Judge Lear denied Garretson's request to brief the equal protection violation at issue, stating, "I don't know what good a memorandum will do," because "the United States Supreme Court has upheld the Louisiana method of selecting jurors, by excluding women unless they request to be put in the jury venire, and as far as this Court is concerned, that is still the law until the United States Supreme Court changes it." (SCR, Vol. 1, at p. 234; Vol. 2, at p. 267).

After Louisiana repealed the constitutional and statutory provisions exempting women from jury service in 1974, the U.S. Supreme Court vacated *Healy*, and remanded the case to the three-judge panel "to consider whether in the light of recent changes in the state constitutional, statutory, and other rules applicable to this case the cause has become moot." *Edwards v. Healy*, 421 U.S. 772 (1975).

[6] As of Monday, January 7, 1974, the state court record indicates that the State was proceeding against Wallace, Montegut, *and* Jackson. (SCR, Vol. 1, at p. 223). The Minutes of Court for January 7 do not state why the State requested to continue its case against Jackson, nor is there a transcript of the hearing on this motion. (*Id.* at p. 2).

6

The next day, Tuesday, January 8, after the jury was impaneled,[7] but before

opening statements, Jackson requested to speak to the District Attorney without his

attorney (Garretson) present. (SCR, Vol. 1, at pp. 1–2, 5; SCR, Vol. 2, at pp. 414,

454–56). This conversation was not recorded, but the record is clear that Jackson

wanted to discuss the possibility of cooperating with the State in its prosecution of

Wallace and Montegut. (SCR, Vol. 2, at pp. 454–55). When Garretson realized that

Jackson intended to cooperate with the prosecution, he moved to withdraw as

Jackson's counsel. The district court granted this motion. (SCR, Vol. 1, at p. 5;

SCR, Vol. 2, p. 414). The next day (Wednesday, January 9), Jackson testified

against Wallace and Montegut. (SCR, Vol. 1, at p. 5; SCR, Vol. 2, at pp. 363–459).[8]

---

[7] No women were selected to Wallace's jury. (SCR, Vol. 1, at pp. 2–4). Indeed, no women were on the petit jury venire, by operation of the same Louisiana law that exempted women from grand jury service. (*See id.* at p. 232). The year after Wallace was convicted, the United States Supreme Court determined that Louisiana's jury selection system, which resulted in "systematic exclusion of women" from *petit* juries violated "the fair-cross-section requirement . . . guaranteed by the Sixth Amendment." *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975). Less than a week later, the Supreme Court held that *Taylor's* rule "that petit juries must be selected from a source fairly representative of the community . . . . is not to be applied retroactively . . . to convictions obtained by juries empaneled prior to the date of that decision." *Daniel v. Louisiana*, 420 U.S. 31, 31–32 (1975) (per curiam). The Court notes these developments for historical context only. To be clear, Wallace did *not* argue in 1974, and is *not* currently arguing, that the make-up of his petit jury (*or* his grand jury) violated the Sixth Amendment's fair-cross section requirement—the issue at stake in *Taylor* and *Daniel*. Instead, he challenged, and is now challenging, the *systematic exclusion* of women from the grand jury that indicted him as a violation of the Fourteenth Amendment's guarantee of "the equal protection of the laws." U.S. Const. amend. XIV, § 1.

[8] It is certainly possible that the State's unexplained decision to continue Jackson's case was related to Jackson's last minute decision to cooperate. And although Jackson denied on cross-examination that "the District Attorney . . . offered to reduce [his] charges to manslaughter, for [his] testimony," (SCR, Vol. 2, at p. 454), ten months later, on October 29, 1974, Jackson indeed pleaded guilty to manslaughter for his role in Brent Miller's death. (SCR, Vol. 1, at pp. 94, 110). Jackson received a sentence of twenty-one years imprisonment. (*Id.*).

Garretson's co-representation of Wallace and Jackson, coupled with Jackson's late decision to cooperate with the State, is the basis of Wallace's ineffective assistance of counsel claim in his federal habeas petition. (Doc. 36 at ¶¶ 152–54). Further, the State's "fail[ure] to disclose evidence of

7

The State submitted its case on Thursday, January 10. (SCR, Vol. 1, at p. 5). Then, after a brief defense case, rebuttal, and closing arguments, the district court charged the jury. (*Id.*). At 6:22 p.m. on January 10, 1974, the jury received the case. (*Id.*). Less than two hours later, the jury returned with verdicts. (*Id.* at p. 6). The jury found Montegut not guilty; Wallace, however, was convicted of murder.[9] (*Id.*). Without delay, Wallace was sentenced to imprisonment "for the rest of his natural life." (*Id.*; SCR, Vol. 16 (Judgment of Conviction and Sentence, Jan. 10, 1974)).

## B. Wallace's Appeal

Wallace did not immediately appeal his conviction or sentence.[10] (*See* SCR, Vol. 1, at p. 7). However, on March 15, 1990, sixteen years after his conviction, Wallace filed his first state application for post-conviction relief ("PCRA") in the Nineteenth Judicial District Court, requesting leave to file an out-of-time appeal.

---

a deal offered to Chester Jackson" in return for his cooperation is *one* of the bases for Mr. Wallace's claim under *Brady v. Maryland*, 373 U.S. 83 (1963). (*Id.* at ¶¶ 137, 142–145).

[9] Wallace's offense of conviction occurred in 1972, prior to the 1973 amendment to La. Rev. Stat. Ann. § 14:30 providing for first degree murder.

[10] The state court record is ambiguous as to the cause for Mr. Wallace's delay in pursuing his appeal. On one hand, Wallace stated in his first application for post-conviction relief that "Petitioner has not exercised the right to appeal," and indicated the name of the lawyer that represented him on appeal as "N/A." (SCR, Vol. 1, at p. 132). On the other hand, Wallace suggested in the same petition that it was not his intention to waive his right to appeal, that he never did waive his right to appeal, and that his failure to "perfect an appeal" was the result of inaction by his lawyer, Norbert A. Simmons, who had assured Wallace that he did file an appeal. (*See id.* at p. 136–37). Further, there are documents in the record suggesting that in the intervening years between 1974 (when Wallace was convicted) and 1990 (when he requested to file an out-of-time appeal), Mr. Wallace *was* seeking to pursue a direct appeal, albeit without the assistance of counsel. (*E.g.*, *id.* at p. 89 (letter from Mr. Wallace to Sylvia R. Ludlow, Deputy Clerk of Court, dated Sept. 2, 1982, seeking transcripts of his trial)). In any event, it is uncontested that Wallace requested to file an out-of-time appeal in March 1990, and that this request was granted.

(SCR, Vol. 1, at p. 138). On November 28, 1990,[11] the district court, Judge Frank Saia, granted Wallace's request for leave to pursue his appeal and assigned the Public Defender, Kathryn M. Flynn, to Wallace's case. (*Id.* at pp. 216–217).[12] The district court further ordered that Wallace file his "assignment of errors" by January 23, 1991. (*Id.* at p. 216).

On appeal, Wallace, through counsel, initially designated four assignments of error: (1) ineffective assistance of counsel; (2) failure to grant his Motion to Quash the indictment; (3) failure to grant his request for a special jury charge; and (4) adjudication of guilt without sufficient evidence. (*Id.* at p. 222). However, for reasons unexplained, in her opening brief filed September 3, 1991 Flynn expressly abandoned all issues except Wallace's claim that Garretson's co-representation of Wallace, Montegut, and Jackson at trial created an actual conflict of interest, particularly in light of Jackson's late decision to cooperate with the prosecution.[13] (Doc. 32 (Original Brief Filed on Behalf of Appellant at p. 4, 5–9, Sept. 3, 1991)).

---

[11] The district court delayed in acting on Wallace's petition, such that Wallace sought a Writ of Mandamus from the Louisiana Supreme Court compelling the district court to act. (SCR, Vol. 1, at p. 186). On August 17, 1990, the Supreme Court granted Wallace's request, and "transferr[ed] the application to the district court with instructions to the trial judge to act on relator's application for post conviction relief." (*Id.* at p. 210).

[12] In the meantime, Mr. Wallace filed a second petition to the Louisiana Supreme Court, "claim[ing] that the district court ha[d] not complied with [the Supreme] Court's order(s) of August 17, 1990," and seeking an enforcement order. (*See* SCR, Vol. 1, at pp. 211, 213). On January 4, 1991, the Supreme Court denied this motion as moot because "[t]he district court granted relator's motion for an out-of-time appeal." (*Id.* at 211).

[13] Later, in a letter to Wallace, Flynn justified the decision to abandon his three additional claims, including his jury exclusion claim, as a tactical one. (*See* State Court Record Vol. 25 (Letter from Kathryn Flynn to Herman Wallace, Sept. 23, 1991 ("The 3 assignment[s] of error[] abandoned were

9

Wallace strongly disagreed with Flynn's decision to abandon his additional claims. Indeed, on January 21, 1992, after the State filed its response Brief and Flynn filed her Reply, but *before* the First Circuit Court of Appeal rendered its decision in Wallace's case, Wallace filed a *pro se* Supplemental Brief arguing the three issues that Flynn abandoned. (*See* Doc. 32 (Original Brief on Behalf of the State of Louisiana, Sept. 20, 1991); *id.* (Reply Brief File on Behalf of Appellant, Sept. 30, 1991); SCR, Vol. 25 (Pro Se Supplemental Brief on Behalf of Herman Wallace, Jan. 21, 1992)). Regarding his grand jury claim, Wallace argued that the district court erred in denying his Motion to Quash because the West Feliciana Parish "jury selection system" that produced the grand jury that returned his indictment "excluded women . . . from the grand jury venire" by operation of La. C. Cr. P. art. 402, thereby constituting "an unconstitutional discrimination" in light of the United States Supreme Court's decision in *Taylor v. Louisiana*, 419 U.S. 522 (1975).[14] (SCR, Vol. 25 (Pro Se Supplemental Brief on Behalf of Herman Wallace at p. 3, Jan. 21, 1992).

---

done so because further research found them to be without merit and may detract from the very strong issue remaining."))).

[14] As part of his effort to compel the First Circuit Court of Appeal to consider the arguments raised in his *pro se* Supplemental Brief, Wallace petitioned the Louisiana Supreme Court for another Writ of Mandamus, this one requesting the Supreme Court to order the First Circuit to (1) make the State "file an answer to [his] *pro se* brief," and (2) "acknowledge receipt of [his] *pro se* brief, which [he] put forth in good faith." (Doc. 32 (Petition for Writ of Mandamus at p. 4, June 1, 1992). More than a year after the First Circuit denied Wallace's appeal without considering his *pro se* brief, the Supreme Court denied Wallace's request for a Writ of Mandamus. (*Id.* (Order Denying Application for Writ of Mandamus, July 1, 1993)).

10

In June 1992, the First Circuit Court of Appeal issued an unpublished

decision affirming Wallace's conviction and sentence. *State v. Wallace*, 1991-0916

(La. App. 1st Cir. 6/29/92), 610 So. 2d 1127 (unpublished opinion). The Court of

Appeal's decision addressed only the conflict of interest claim raised in Flynn's

briefs, determining that this claim would be "more properly raised by an application

for post-conviction relief in the district court, where a full evidentiary hearing

[could] be held." (Doc. 32 (Decision of the First Circuit Court of Appeal at pp. 3–4,

June 29, 1992)). On April 12, 1993, the Louisiana Supreme Court denied Wallace's

application for a writ of certiorari.[15] *State v. Wallace*, 1992-2209 (La. 4/12/93), 616

So. 2d 679.

## C.    Wallace's May 12, 1993 State Petition for Post-Conviction Relief

On May 12, 1993, one month to the day after the Louisiana Supreme Court

denied review of his direct appeal, Mr. Wallace filed an application for post-

conviction relief ("May 12 PCRA") in the Nineteenth Judicial District Court. (SCR,

Vol. 4 (Original Application on Behalf of Herman Wallace, May 12, 1993)).

Wallace's *pro se* petition asserted four grounds for relief. Specifically, Wallace

alleged:

---

[15] While his cert petition was still pending before the Louisiana Supreme Court, it appears that Wallace filed a second PCRA in the Nineteenth Judicial District Court. (*See* Doc. 53 at p. 2; SCR, Vol. 25 (Commissioner's Recommendation, Jan. 12, 1993)). This PCRA is not located in the record, and thus it is not clear what grounds for relief Wallace asserted. In any event, Commissioner Allen Bergeron recommended denying this petition as premature because Wallace's direct appeal was still pending. (SCR, Vol. 25 (Commissioner's Recommendation at p. 1, Jan. 12, 1993)). The district court adopted this recommendation and denied the petition. (*Id.* (Order Denying Motion for Post Conviction Relief, Jan. 20, 1993). The record does not indicate whether Wallace sought appellate review of this decision.

1. The trial court "committed reversible err[or] denying his motion to quash the grand jury indictment";

2. "[T]he State failed to reveal the plea bargain agreement extended to Chester Jackson in exchange for his testimony against Herman Wallace that was relevant for purposes of cross-examination";

3. The trial court "committed reversible err[or] by instructing the jury erroneously as to the essential element of intent"; and,

4. He "was denied effective assistance of counsel due to defense counsel's representation of a State witness, Chester Jackson."

(*Id.* at p. 10).

As to his grand jury claim, Wallace reasserted the arguments that he made in his *pro se* Supplemental Brief to the First Circuit on direct appeal, contending that the district court "was in error to deny the motion to quash based on the jury selection system in West Feliciana Parish that excluded women." (*Id.* at p. 11). Wallace emphasized that "[w]hen the matter was before the district court, *La. C. Cr. P. Art. 402* precluded jury service by women, unless they filed a written declaration of their desire to be subject to jury service," and reiterated that "[i]n *Taylor v. Louisiana* . . . the United States Supreme Court held that Louisiana's exclusion of women from the jury system was unconstitutional discrimination." (*Id.*). Wallace also pointed out that "[d]uring the hearing [on his Motion to Quash], defense counsel introduced evidence that women . . . were not included on the lists from West Feliciana Parish, [from] which grand . . . juries were selected as it concerned [his] second indictment." Finally, Wallace asserted that he was entitled to the benefit of *Taylor's* reasoning "because his conviction was not yet final at the

12

time *Taylor* was decided," and noted a recent U.S. Fifth Circuit Court of Appeals decision that had applied *Taylor* to grant relief in a substantially similar federal habeas case.[16] (*Id.*). In sum, Wallace argued that the district court's denial of his

---

[16] Specifically, Wallace cited *Leichman v. Secretary, Louisiana Department of Corrections*, where a Fifth Circuit panel directed the District Court for the Western District of Louisiana to grant relief on a habeas petitioner's claim "that the Louisiana law applicable at the time of his 1973 indictment and trial systematically excluded women from [grand] jury service, thereby impairing his constitutional rights." 939 F.2d 315, 316 (5th Cir. 1991) (per curiam). In determining that the petitioner's conviction should be vacated, the panel made two moves. First it noted that "[i]n *Taylor,* the United States Supreme Court held that the Louisiana jury selection system about which the appellant now complains violated the sixth and fourteenth amendment guarantees to an impartial jury drawn from a fair cross-section of the community." *Id.* at 317. Next, it determined that the petitioner was entitled to relief under *Taylor*, despite the Supreme Court's admonishment in *Daniel v. Louisiana*, 420 U.S. 31 (1975) that *Taylor* "was entitled to prospective application only," because "[t]he law regarding retroactivity changed drastically when the court decided *Griffith v. Kentucky*, 479 U.S. 314 (1987) and *Teague v. Lane*, 489 U.S. 288 (1989)." *Id.* In sum, "[b]ecause Leichman's conviction did not become final until six days after *Taylor* was decided, he [was] entitled to the benefit of the *Taylor* decision." *Id.* (footnote omitted).

Exactly fifteen months after Wallace filed his May 12 Petition, the Fifth Circuit, sitting en banc, overruled *Leichman*, determining that the panel was incorrect to ignore *Daniel's* instruction that *Taylor* was to be applied prospectively only. *Wilkerson v. Whitley*, 28 F.3d 498, 509 (5th Cir. 1994) (en banc). However, even though *Wilkerson* overruled *Leichman*, *Wilkerson* does not control the outcome of Mr. Wallace's case for two reasons. First, the petitioners in *Leichman* and *Wilkerson* each relied on *Taylor* to argue that Louisiana's exclusion of women from their grand jury proceedings violated the Sixth Amendment's *fair cross-section* guarantee. *Wilkerson*, 28 F.3d 501–02. But, as noted by the *Wilkerson* Court, "[t]he *Taylor* Court limited its holding to petit jury selection and did not announce a rule about the exclusion of women from grand juries." *Id.* at 501. Thus, the en banc Court explained, even if *Taylor was* retroactively applicable under *Teague*, it would *not* dictate that the defendants' grand jury proceedings were unconstitutional. *Id.* at 503. Here, Mr. Wallace is arguing that his grand jury proceedings were unconstitutional under a *different* constitutional guarantee than that invoked in *Taylor* and discussed in *Wilkerson*—the Fourteenth Amendment's *equal protection clause*. (Doc. 36 at ¶ 161). Thus, *Taylor*, *Leichman*, and *Wilkerson* are not on point regarding the constitutional issue presented in Mr. Wallace's habeas petition, and his argument rises (or falls) independent of the reasoning and holdings in those cases.

Second, *Wilkerson* is only *partially* on point to the extent it rejected the petitioners' alternative argument that Supreme Court law *other* than *Taylor* "dictate[d] that Louisiana's grand jury exemption of women was unconstitutional." *Id.* at 508. This is because, as noted in *Wilkerson*, "*Teague* instructs us to apply the law prevailing at the time a conviction became *final*." *Id.* at 505–06 (emphasis added) (quotation marks omitted). But whereas the convictions at issue in *Leichman*, and *Wilkerson* became final in 1976, Mr. Wallace's conviction became final on July 12, 1993. As will be explained, *infra*, the intervening years witnessed dramatic developments in the Supreme Court's equal protection jurisprudence on the issue of gender discrimination (as well as discrimination in grand jury proceedings), such that in 1993, a state court "confronted by the same statutory scheme in use in Louisiana when Wallace was indicted" would be compelled to conclude that Mr. Wallace's proceedings violated the Fourteenth Amendment's equal protection clause. (Doc. 95 at p. 8 n.3).

13

Case 3:09-cv-01027-BAJ-SCR   Document 96   10/01/13   Page 13 of 61

Motion to Quash amounted "to a fundamental error applying the Sixth and Fourteenth Amendments." (*Id.*).

The district court assigned Wallace's petition to Commissioner Allen Bergeron, who, in turn, recommended that it be denied.[17] (Doc. 32 (Commissioner's Recommendation, Jan. 26, 1994)). The Commissioner determined that Wallace's grand jury exclusion claim failed "for two reasons." (*Id.* at p. 2).

> First, the *Taylor* decision dealt specifically with the constitutionality of the procedures used to select petit jury venires. . . . Second, the United States Supreme Court in *Daniel v. Louisiana*, 419 U.S. 31 (1975), specifically held that the *Taylor* decision is not to be applied retroactively to convictions obtained by juries impaneled prior to the date of that decision.

(*Id.*). The district court, Judge Michael Erwin, adopted the Commissioner's Report, and denied relief on March 1, 1994. (Doc. 32 (Order Denying Application for Post-Conviction Relief, Mar. 1, 1994)).

Still proceeding *pro se*, Wallace appealed the district court's decision to the Louisiana First Circuit. (Doc. 32 (Notice of Appeal, Mar. 24, 1994)). What followed is a series of sometimes conflicting orders from the First Circuit Court of Appeal, the Louisiana Supreme Court, *and* the district court regarding the proper disposition of Wallace's claims. Initially, the First Circuit vacated the district

---

Quite simply, the legal landscape fundamentally changed between when the *Wilkerson* and *Leichman* petitioners' convictions became final, and when Mr. Wallace's conviction became final.

[17] Prior to Commissioner Bergeron issuing his Recommendation on January 26, 1994, Wallace obtained a writ from the First Circuit Court of Appeal ordering the district court "to act on relator's application for post conviction relief on or before January 31, 1994." (SCR, Vol. 25 (Order Granting Application for Writ of Mandamus, Dec. 17, 1993)).

Case 3:09-cv-01027-BAJ-SCR   Document 96   10/01/13   Page 14 of 61

court's order denying Wallace's petition—stating "[t]he relator's allegations state a claim which, if established, could warrant relief"—and "remanded to the district court for appointment of counsel, a state response and an evidentiary hearing." (SCR, Vol. 25 (Order Granting Application for a Supervisory Writ, Aug. 29, 1994); Doc. 32 (same)).

On remand, Judge Erwin again assigned Wallace's petition to Commissioner Bergeron. This time, however, instead of addressing each of the four claims raised in Wallace's May 12 PCRA, the Commissioner limited his analysis to only Wallace's grand jury claim, recommending that it be rejected "[b]ecause [Wallace] was incorrect in stating that the Louisiana Supreme Court had ruled that the method utilized by the 20th Judicial District Court in selecting its grand jury venire at the time [he] was indicted for the instant offense was unconstitutional."[18] (SCR, Vol. 25 (Commissioner's Recommendation, Dec. 14, 1994)). On January 5, 1995, Judge Erwin once again denied Wallace's May 12 PCRA "for the reasons discussed in the commissioner's recommendation." (SCR, Vol. 25 (Order Denying Application for Post-Conviction Relief, Jan. 6, 1995)).

---

[18] On this point, the Commissioner's Recommendation appears to be a non sequiter, because there is nothing in the record indicating that Wallace ever made the argument that the Louisiana Supreme Court struck down the 20th Judicial District's system of grand jury selection. Perhaps the Commissioner was confused as to his assignment on remand from the First Circuit. (*See* SCR, Vol. 25 (Commissioner's Recommendation, Dec. 14, 1994 (indicating that "[e]rrors 1–4"—presumably the errors raised in Wallace's May 12, 1993 PCRA—"were handled by this Court in a prior application for post-conviction relief."))). Alternatively, it is possible that Wallace filed a new brief that is not included in the available record. (*See id.* (stating that "[in] the instant application, petitioner raises a single claim for post-conviction relief which he lists as erros [sic] 5–7.")). This Court has labored in vain to identify the source of Commissioner Bergeron's evident confusion.

15

Following this order, Wallace immediately filed a Motion for Reconsideration in the district court, pointing out, among other things, that "the 'recommendation' of the commissioner fail[ed] to address petitioner's additional claims." (SCR, Vol. 25 (Motion for Reconsideration at ¶ 4, Jan. 19, 1995)). When the district court failed to act on his Motion for Reconsideration, Wallace applied for yet another Writ of Mandamus from the Court of Appeal. (Doc. 32 (Petition for Writ of Mandamus & Petition for Finding of Constructive Contempt, Apr. 7, 1995)). The First Circuit responded with an order modifying its August 29, 1994 order "to the extent that the district court is ordered to proceed toward disposition of [Wallace's] remaining claims, including the appointment of counsel, if necessary, and an evidentiary hearing if the claims cannot be resolved on the application, other pleadings, and the record." (SCR, Vol. 25 (Order Denying Application for Writ of Mandamus, Aug. 24, 1995)).

Still more orders followed from Louisiana's courts regarding Wallace's May 12 PCRA, including:

- A December 1995 order from the Court of Appeal denying as moot Wallace's application for a writ ordering the district court to appoint counsel (SCR, Vol. 25 (Order Denying Application for Writ of Review, Dec. 15, 1995));

- A March 1996 Writ from the First Circuit ordering the district court "to act on or before March 22, 1996, upon [Wallace's October 6, 1994] petition" to compel the District Attorney to turn over records related to his case, (SCR, Vol. 25 (Order Granting Application for Writ of Mandamus, Mar. 6, 1996); *id.* (Order Granting Application for Writ of Mandamus, Mar. 6, 1996));

- A September 1996 Writ from the Louisiana Supreme Court "transferring [Wallace's] filing to the Court of Appeal, First Circuit, for enforcement of its

16

[August 24, 1995] order," (SCR, Vol. 25 (Order Granting Application for Supervisory and/or Remedial Writ, Sept. 18, 1996); Doc. 32 (Petition for Mandatory Injunction/Mandamus, Dec. 4, 1995)); and

- A September 1996 order from the district court appointing the public defender to assist Wallace, (SCR, Vol. 25 (Order Granting Defendant's Motion to Appoint Counsel, Sept. 19, 1996)).

Finally, on March 21, 1997, the First Circuit issued two Writs. The first appears to be an effort to settle the dust in Wallace's case. The Court of Appeal restated the four claims raised in Wallace's May 12 PCRA—specifically "1) the failure of the trial court to quash the grand jury indictment; 2) the failure to reveal a plea agreement with a state witness; 3) an erroneous jury instruction; and 4) the denial of effective assistance of counsel"—and then directed the district court that "[a]s to issues two and four, the court shall require the state to respond to those claims . . . [and] conduct an evidentiary hearing limited to the establishment of those claims." (SCR, Vol. 11 (Order Granting in Part and Denying in Part Application for a Writ of Mandamus, Mar. 21, 1997)). The Court of Appeal then explained that the district court need not address Wallace's jury instruction claim because it lacked merit. (*Id.*). Finally, the Court of Appeal stated, without explanation, that the district court also need not address Wallace's grand jury exclusion claim because that issue "was raised untimely." (*Id.*).[19] The Court of

---

[19] This Order further directed the district court to address Wallace's complaint that "his attorney ha[d] failed to pursue his post conviction relief claims," and held that additional issues raised by Wallace in an October 1996 Supplemental Brief for Post Conviction Relief were "not [properly] before this court and . . . not included in this order." (SCR, Vol. 11 (Order Granting in Part and Denying in Part Application for a Writ of Mandamus, Mar. 21, 1997); *id.* (Supplemental Brief for Post Conviction Relief, Oct. 1, 1996)).

17

Appeal's second Writ of March 21 simply established a May 1 deadline for "[t]he trial court . . . to dispose of the remaining issues [in Wallace's] application for post conviction relief." (SCR, Vol. 25 (Order Granting Application for Supervisory and/or Remedial Writ, Mar. 21, 1997)).

On remand, the district court first assigned new counsel for Mr. Wallace. (SCR, Vol. 25 (Order Appointing A. Hayes Town, Apr. 17, 1997); *id.* (Order Allowing Alton T. Moran to Withdraw as Counsel, Apr. 17, 1997)). Then, the district court yet again assigned Wallace's case to Commissioner Bergeron. Finally, on September 1, 1998, following several evidentiary hearings, (SCR, Vol. 10 (Transcripts of Evidentiary Hearings held Dec. 12, 1997, Mar. 27, 1998, and Apr. 28, 1998), the Commissioner issued a report recommending that Wallace's remaining claims be denied. (SCR, Vol. 11 (Commissioner's Recommendation, Sept. 1, 1998).

The district court adopted the Commissioner's Recommendation on September 30, 1998, and denied relief on Wallace's May 12 PCRA for the last time. (SCR, Vol. 11 (Order Denying Defendant's Application for Post Conviction Relief, Sept. 30, 1998). Wallace appealed to the First Circuit, which denied review in a split-decision on March 29, 1999.[20] (SCR, Vol. 11 (Order Denying Application for Supervisory Writ, Mar. 29, 1999). Wallace then sought review by the Louisiana

---

[20] Judge John Michael Guidry dissented from the denial of Wallace's application for supervisory review, stating that he "would grant the writ" because "[Wallace's] attorney should have filed a motion for a mistrial or sought other counsel for the defendants, and it appears there was a deal not disclosed to the jury." (SCR, Vol. 11 (Order Denying Application for Supervisory Writ, Mar. 29, 1999)).

18

Supreme Court, which denied his application on November 19, 1999. *State ex rel. Herman Wallace v. Louisiana*, 1999-1305 (La. 11/19/99), 749 So.2d 668.

### D. Wallace's September 18, 2000 State Petition for Post-Conviction Relief

On September 18, 2000, Mr. Wallace filed his final state PCRA in the Nineteenth Judicial District, asserting: (1) the State knowingly presented perjured testimony at his trial in violation of *United States v. Agurs*, 427 U.S. 97 (1976); and (2) the State withheld exculpatory evidence—specifically promises and favors made to the State's trial witness Hezekiah Brown—in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (SCR, Vol. 16 (Memorandum in Support of Application for Post Conviction Relief at pp. 20–21, Sept. 18, 2000). The district court denied relief on this petition on June 28, 2004, determining that there were "insufficient factual allegations to warrant a hearing or relief." (SCR, Vol. 16 (Order Denying Defendant's Application for Post Conviction Relief, June 28, 2004)). However, the First Circuit Court of Appeal vacated the district court's ruling as to Wallace's "claim alleging that the state failed to disclose information about promises of a pardon and favors made to state witness Hezekiah Brown," and remanded for an evidentiary hearing on that issue only. (Doc. 32 (Order Granting in Part and Denying in Part Application for Supervisory Writ, May 31, 2005)).

On remand, the district court referred Wallace's petition to Commissioner Rachel P. Morgan. Following an evidentiary hearing, (SCR, Vol. 7 (Transcript of Evidentiary Hearing held September 19, 2006)), Commissioner Morgan issued a

19

Report recommending "reversal of the conviction in this matter." (SCR, Vol. 17

(Commissioner's Report on *Brady* Claim Following Remand at p. 27, Nov. 7, 2006)).

Specifically, Commissioner Morgan concluded:

> While reasonable minds could differ in this case, I have considered all of the evidence submitted in the record and find that Warden Henderson did promise to help [Hezekiah] Brown with a pardon before Brown testified and that he did authorize other favors within the prison. I further find that such favors, together with the promise to help obtain a pardon, in light of the inconsistencies of Chester Jackson's testimony, should have been disclosed to the Defense before trial, as they weighed on the credibility of Hezekiah Brown. Finally, I further find that after a cumulative evaluation of all the evidence that was omitted, that failure to inform the Defense of that evidence is sufficient under the facts and circumstances of this case, to undermine the confidence in the proceedings that resulted in a verdict of guilty.

(*Id.* at pp. 26–27). Despite Commissioner Morgan's recommendation, Judge Erwin

again denied relief on Wallace's petition on October 9, 2007, stating simply: "This

Court does not agree with the Commissioner's recommendation that a valid *Brady*

claim exists." [21] (SCR, Vol. 17 (Order Denying Defendant's Application for Post

Conviction Relief/*Brady* Claim, Oct. 7, 2007)).

Wallace again petitioned the First Circuit Court of Appeal, which denied

review in a split 2-1 decision on May 12, 2008.[22] (Doc. 32 (Order Denying

---

[21] The district court's curt dismissal of Commissioner Morgan's detailed 27-page report recommending relief in Mr. Wallace's case is surprising, particularly given the U.S. Supreme Court's admonishment that the Due Process Clause protects petitioners in Wallace's position against "unfair and arbitrary judicial action." *Rogers v. Tennessee*, 532 U.S. 451, 467 (2001). However, because this Court determines that Wallace's Fourteenth Amendment equal protection claim is dispositive of his Petition, it does not address the Louisiana courts' treatment of his remaining claims, including his claim that the State knowingly used false testimony and withheld exculpatory evidence at his trial.

[22] Judge Jewel Welch dissented from the denial of the Writ, stating: "There was a reasonable likelihood that the verdict would have been different had the jury been aware of the promise and

20

Application for Supervisory Writ, May 12, 2008)).  The Louisiana Supreme Court

denied Wallace's petition for review on October 9, 2009, *State of Louisiana v.*

*Herman Wallace*, 2008-1258 (La. 10/9/09), 19 So.3d 4.  (Doc. 32 (Order Denying

Application for Supervisory and/or Remedial Writ, Oct. 9, 2009)).

### E.    Wallace's Federal Habeas Petition

On December 4, 2009, Wallace filed the counseled 28 U.S.C. § 2254 petition

that is the subject of this Order.  (Doc. 1).  In his petition, Wallace asserted six

grounds for relief:

1.    The State knowingly used false testimony and withheld exculpatory evidence;

2.    His trial counsel labored under an actual conflict of interest;

3.    His appellate counsel was ineffective;

4.    Women were systematically excluded from the grand jury that returned his indictment;

5.    The trial judge gave an erroneous jury instruction; and,

6.    There was insufficient evidence to support his conviction.

(*Id.* at ¶¶ 129–77).  In response to the State's Motion to Dismiss certain of Wallace's

claims (Doc. 24), Wallace amended his petition to abandon his ineffective assistance

of appellate counsel and sufficiency of the evidence claims.  (Docs. 26, 36).

On March 9, 2011, the Magistrate Judge issued a Report recommending that

the State's Motion to Dismiss be denied to the extent that it challenged Wallace's

---

favors to the state's witness, Hezekiah Brown. The state's failure to disclose this information
violated relator's constitutional rights, and relator should receive a new trial." (Doc. 32 (Order
Denying Application for Supervisory Writ, May 12, 2008)).

claims to systematic exclusion of women from the grand jury and the erroneous jury instruction. (Doc. 45). On June 7, 2011, Chief Judge Ralph E. Tyson adopted the Magistrate Judge's Report, noting that "no objection ha[d] been filed" by the State, and denied the State's Motion to Dismiss. (Doc. 47). Judge Tyson then "referred [the matter] back to the magistrate judge for further proceedings on the petitioner's remaining claims." (*Id.*).

On July 15, 2011, the State filed its Memorandum in Opposition to Petition for Writ of Habeas Corpus. (Doc. 53). On October 6, 2011, Wallace filed his Memorandum of Law in Support of the Petition and in Reply to the State's Answer. (Doc. 64). On September 13, 2013, the Magistrate Judge issued a Report recommending that the Court deny relief on all remaining grounds. (Doc. 91). Mr. Wallace timely filed objections to the Magistrate Judge's Report on September 30, 2013. (Doc. 95). The State did not file objections to the Magistrate Judge's Report.

For reasons to follow, the Court DECLINES to adopt the Magistrate Judge's Report. Instead, the Court GRANTS Mr. Wallace's petition, and VACATES his conviction and sentence, on the ground that systematic exclusion of women from the grand jury that indicted him violated the Fourteenth Amendment's guarantee of equal protection of the laws.

22

## II.    Applicable Law and Analysis

### A.    Standard of Review

As amended by the Antiterrorism and Effective Death Penalty Act
("AEDPA"), "28 U.S.C. § 2254 sets several limits on the power of a federal court to
grant an application for a writ of habeas corpus on behalf of a state prisoner."
*Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). The following limitations, in
particular, are relevant to this Court's analysis of Mr. Wallace's grand jury
exclusion claim. First, "[a]n application for a writ of habeas corpus on behalf of a
person in custody pursuant to the judgment of a State court shall not be granted
unless it appears that . . . the applicant has exhausted the remedies available in the
courts of the State." 28 U.S.C. § 2254(b)(1)(A). Put simply, "[e]xhaustion requires a
state prisoner to present the state courts with the same claim he urges upon the
federal courts." *Ruiz v. Quarterman*, 460 F.3d 638, 643 (5th Cir. 2006) (quotation
marks omitted).

Second, when a state court decision to deny relief rests on a state law ground
that is independent of the federal questions raised by the petitioner, and is
adequate to support the judgment, a federal court lacks jurisdiction to review the
merits of the petitioner's federal claims. *Coleman v. Thompson*, 501 U.S. 722, 729
(1991). "The independent and adequate state ground doctrine 'applies to bar federal
habeas when a state court decline[s] to address a prisoner's federal claims because

23

the prisoner ha[s] failed to meet a state procedural requirement.'" *Moore v. Roberts*, 83 F.3d 699, 701–02 (5th Cir. 1996) (quoting *Coleman*, 501 U.S. at 729–30).

Third, "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1)," *Pinholster*, 131 S. Ct. at 1400, which requires that the State adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This standard is intended to be "difficult to meet." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

As an initial matter, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398. Next, a state court decision is only "contrary to . . . clearly established Federal law" if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer v. Andrade,* 538 U.S. 63, 73 (2003); *Lafler v. Cooper*, 132 S. Ct. 1376, 1390 (2012) ("A decision is contrary to clearly established law if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases." (quotation marks and alterations omitted)).

24

A state court decision "involved an unreasonable application of . . . clearly established Federal law" when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Andrade*, 538 U.S. at 75 (quotation marks omitted). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quotation marks and citations omitted); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."). In evaluating whether a state court decision "involved an unreasonable application" of clearly established Federal law, "a habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Richter*, 131 S. Ct. at 786.

The Fifth Circuit has further instructed that in considering whether the state court's decision constituted an "unreasonable application" of clearly established federal law, "a federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc). Thus, the focus of the

25

"unreasonable application" inquiry is "on the ultimate legal conclusion that the state court reached," and "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." *Id.*

Additionally,

> Section 2254(d)(1)'s "clearly established" phrase refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision. In other words, "clearly established Federal law" under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.

*Andrade*, 538 U.S. at 71–72 (2003) (citations omitted).

Finally, under § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1).

These principles guide the court's consideration of Mr. Wallace's claim.

**B. Discussion**

    *1. Systematic Exclusion of Women from Grand Jury Service*

      a. <u>Arguments</u>

In his federal habeas petition, Mr. Wallace urges that "[t]he trial court's refusal to quash the second indictment requires reversal of [his] conviction because the systematic exclusion of female citizens from grand jury service violated the equal protection clause of the fourteenth amendment." (Doc. 36 at ¶ 161; *see also* Doc. 64 at pp. 13–20; Doc 92 at pp. 2–8).

The State responds, first, by arguing that Mr. Wallace "never presented" his grand jury exclusion claim to Louisiana's "highest court," and therefore it has not

26

been exhausted. (Doc. 53 at 60). Next, the State argues that even if Mr. Wallace's claim is exhausted, it was ultimately dismissed "pursuant to an independent and adequate state procedural bar" in state post-conviction proceedings.[23] (*Id.*). Finally, the State contends that Wallace's grand jury claim lacks merit because "[t]he law in effect at the time of the trial indicated that women had to send a request to the Clerk of Court to be included in the grand jury venire" and, thus, "the trial court's 1974 [refusal to quash the indictment was] not unreasonable based on the law in existence at the time." (*Id.* at 61).

### b.    Exhaustion

Mr. Wallace asserts in his federal habeas petition that "[t]he trial court's refusal to quash the second indictment requires reversal of [his] conviction because the systematic exclusion of female citizens from grand jury service violated the equal protection clause of the fourteenth amendment." (Doc. 36 at ¶ 161). The State's first objection is that this claim "was never presented to the state's highest court," and therefore has not been exhausted as required by § 2254(b)(1)(A). (Doc. 53 at p. 60). Specifically, the State asserts that although Wallace "objected before

---

[23] This Court previously rejected the State's exhaustion and adequate and independent state procedural bar arguments. (*See* Doc. 47 (Adopting the Magistrate Judge's Report and Recommendation and Denying the State's Motion to Dismiss). The State did not object to the Magistrate Judge's Report that recommended denying the State's Motion to Dismiss on these grounds, begging the question whether the State has abandoned at least its procedural bar argument. *See Salazar v. Dretke*, 419 F.3d 384, 396 n.20 (5th Cir. 2005); *see also Cone v. Bell*, 129 S. Ct. 1769, 1791 n.6 (2009) (Alito, J., concurring in part and dissenting in part) ("Unlike exhaustion, procedural default may be waived if it is not raised as a defense."). In any event, for the reasons articulated below, as well as those explained in the Corrected Magistrate Judge's Report, (Doc. 45), this Court is still not persuaded by the State's arguments that Mr. Wallace failed to exhaust his claim and/or that his claim is precluded by an independent and adequate state procedural bar.

27

trial and received a hearing on his claim of grand jury discrimination," he raised his

grand jury exclusion claim on direct appeal only by way of a "*pro se* brief . . . in the

First Circuit." (*Id.* at p. 59). Thus, because (1) "the First Circuit did not rule on this

question," and (2) Wallace cannot "prove that he [also] filed a *pro se* application with

the [Louisiana] Supreme Court, . . . this issue [was not presented] to the highest

court of the state." (*Id.*).

    The Fifth Circuit has recently explained § 2254(b)(1)(A)'s exhaustion

requirement in the following terms:

> A federal habeas petition filed by a state prisoner shall not be
> granted unless the prisoner exhausts available state remedies. The
> exhaustion requirement is satisfied when the substance of the federal
> claim is "fairly presented" to the highest state court on direct appeal or
> in state post-conviction proceedings, even if the state court fails to
> address the federal claim, or, if the federal claim is not fairly presented
> but the state court addresses it *sua sponte*.
>     A claim is fairly presented when the petitioner asserts the claim
> in terms so particular as to call to mind a specific right protected by
> the Constitution or alleges a pattern of facts that is well within the
> mainstream of constitutional litigation. It is not enough that all the
> facts necessary to support the federal claim were before the state
> courts or that a somewhat similar state-law claim was made. Rather,
> the petitioner must afford the state court a fair opportunity to apply
> controlling legal principles to the facts bearing upon his constitutional
> claim.

*Johnson v. Cain*, 712 F.3d 227, 231 (5th Cir. 2013) (quotation marks and citations

omitted); *see also Ruiz*, 460 F.3d at 643 ("A fair opportunity requires that all the

grounds of the claim be first and 'fairly presented' to the state courts. In other

words, in order for a claim to be exhausted, the state court system must have been

presented with the same facts and legal theory upon which the petitioner bases his

28

current assertions." (footnotes omitted)); *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003) ("To satisfy the exhaustion requirement, a habeas petitioner must have fairly presented the substance of his claim to the state courts.").

"[E]xhaustion inquiries are fact-specific." *Anderson*, 338 F.3d at 386. Here, the State's argument that Wallace failed to exhaust his grand jury exclusion claim is flatly contradicted by the evidence in the state court record. In his original Motion to Quash, filed on October 31, 1973, Wallace argued that "females were systematically excluded from the Grand Jury list and venire, and from the Grand Jury as impaneled," thus "constitut[ing] a denial of the . . . equal portection [sic] of the laws as provided for in the Constitution of the United States of America." (SCR, Vol. 1, at pp. 34–35). After a hearing at which Wallace established that no woman had ever served as a grand juror in West Feliciana Parish despite more than half the eligible Parish population being female, (*id.* at pp. 232, 239; *see generally id.* at pp. 223–250; SCR, Vol. 2, at pp. 251–66), the district court denied Wallace's request to submit a memo further explaining why systematic exclusion of women from the grand jury was an equal protection violation under *Healy v. Edwards*. (SCR, Vol. 2, at p. 267). The district court then denied Wallace's Motion to Quash outright, at which point Wallace preserved his objection for appeal. (SCR, Vol. 2, at p. 267).

29

Even if this Court assumes, *arguendo*, that Wallace failed to raise the grand jury exclusion claim in his direct appeal,[24] Mr. Wallace's *pro se* May 12 PCRA expressly presented the issue as one of "unconstitutional discrimination" and "fundamental error applying the . . . Fourteenth Amendment[]." (SCR, Vol. 4 (Original Application on Behalf of Herman Wallace at p. 11, May 12, 1993)). Wallace argued to the state post-conviction court that the trial court "was in error to deny the motion to quash based on the jury selection system in West Feliciana Parish that excluded women . . . from the Grand Jury venire." (*Id.*). He stated that "[w]hen the matter was before the district court, *La. C. Cr. P. Art. 402* precluded jury service by women, unless they filed a written declaration of their desire to be subject to jury service." (*Id.*). After that, he noted that "[i]n *Taylor v. Louisiana* . . .

---

[24] The State's assertion that Wallace failed to raise his grand jury exclusion claim on direct appeal because he raised it only by way of a *pro se* brief is dubious, at best. Since at least June 19, 1992 the Louisiana Supreme Court has recognized that "[i]f an indigent defendant . . . raise[s] and brief[s] substantial reversible errors on his own motion, . . . a [Court of Appeal's] refusal [to entertain that brief] would impair the defendant's constitutional rights to due process of law and access to courts." *State v. Smalley*, 599 So. 2d 1090 (La. 1992); *see also State ex rel. Spitz v. Court of Appeal, First Circuit*, 637 So. 2d 149 (La. 1994) ("The appellant is entitled to file a supplemental pro se brief and have the First [C]ircuit Court of Appeal consider it."). Wallace's Supplemental Pro Se Brief argued, among other things, that "Louisiana's exclusion of women from the grand jury system was an unconstitutional discrimination." (SCR, Vol. 25 (Pro Se Supplemental Brief on Behalf of Herman Wallace at p. 3, Jan. 21, 1992). Wallace filed his *pro se* brief on January 21, 1992, before the Louisiana Supreme Court decided *Smalley*. However, the First Circuit Court of Appeal did not rule in Wallace's case until June 29, 1992, ten days *after Smalley* came down. *State v. Wallace*, 610 So. 2d 1127 (La. Ct. App. 1992). Thus, contrary to the State's assertion, it appears that Wallace *did* raise his grand jury exclusion claim on direct appeal by way of his timely *pro se* brief. Further, it appears that the First Circuit Court of Appeal erred in failing to consider the claims raised in Wallace's *pro se* brief. *Smalley*, 599 So. 2d 1090. In any event, this Court need not rely on Wallace's *pro se* appellate brief to determine that he properly exhausted his grand jury exclusion claim in state court because it is beyond dispute that Wallace raised this claim in his May 12, 1993 PCRA. *See Johnson*, 712 F.3d at 231 ("The exhaustion requirement is satisfied when the substance of the federal claim is 'fairly presented' to the highest state court on direct appeal *or* in state post-conviction proceedings, even if the state court fails to address the federal claim . . . ." (emphasis added)).

30

the United States Supreme Court held that Louisiana's exclusion of women from the jury system was *unconstitutional discrimination*." (*Id.* (emphasis added)). Next, he pointed out that "[d]uring the hearing [on his Motion to Quash], defense counsel introduced evidence that women . . . were not included on the lists from West Feliciana Parish, [from] which grand . . . juries were selected as it concerned [his] second indictment." (*Id.*). Finally, Wallace insisted that "he was entitled to rely on *Taylor*, . . . because the issue relates to a fundamental error applying the Sixth *and* Fourteenth Amendments." (*Id.* (emphasis added)).

This Court finds that Wallace's *pro se* May 12 PCRA more than adequately raised the issue of whether the systematic exclusion of women from the grand jury that returned the indictment against him violated the Fourteenth Amendment's guarantee of "the equal protection of the laws." U.S. Const. amend. XIV, § 1. Wallace not only "assert[ed] the claim in terms so particular as to call to mind a specific right protected by the Constitution," he also "allege[d] a pattern of facts that is well within the mainstream of constitutional litigation"—specifically, equal protection litigation. *Johnson*, 712 F.3d at 231. Thus, Wallace satisfied § 2254's exhaustion requirement, even if the Louisiana Supreme Court never expressly weighed in on the issue. *See id.*; *see also Anderson*, 338 F.3d at 386 (determining that federal habeas petitioner had sufficiently exhausted his constitutional claim in state post conviction proceedings where petitioner's *pro se* state petition was

31

"remarkably detailed in both fact and law," and the petitioner had "argued [his claim] diligently" at every opportunity).

In sum, the State's argument that Wallace failed to exhaust his Fourteenth Amendment grand jury exclusion claim is without merit.

c.    Independent and Adequate State Procedural Bar

Next the State argues that Wallace's grand jury exclusion claim should be rejected because it was dismissed by the state courts "pursuant to an independent and adequate state procedural bar." (Doc. 53 at p. 60). Specifically, the State asserts that "the First Circuit explicitly ruled that petitioner's claim concerning the motion to quash his indictment, was raised untimely." (*Id.* at pp. 59–60).

The Fifth Circuit has instructed in no uncertain terms that "[f]or the independent and adequate state ground doctrine to apply, the state courts adjudicating a habeas petitioner's claims must explicitly rely on a state procedural rule to dismiss the petitioner's claims." *Moore*, 83 F.3d at 702. Further, although "[t]he procedural default doctrine presumes that the state court's express reliance on a procedural bar functions as an independent and adequate ground in support of the judgment," the petitioner "can rebut this presumption by establishing that the procedural rule is not strictly or regularly followed." *Id.* (quotation marks and alterations omitted); *see also Reed v. Scott*, 70 F.3d 844, 846 (5th Cir. 1995) ("A state procedural rule is adequate only if it was firmly established at the time it was applied. Moreover, it must be strictly or regularly followed by the cognizant state

32

court and strictly or regularly applied *evenhandedly to the vast majority of similar claims*." (quotation marks and footnotes omitted)).

Here, the basis for the State's argument that Wallace's grand jury exclusion claim is precluded by an independent and adequate state procedural bar is the First Circuit Court of Appeal's determination in its May 21, 1997 Order that the "claim was raised untimely." (SCR, Vol. 11 (Order Granting in Part and Denying in Part Application for a Writ of Mandamus, May 21, 1997). The State's argument fails for two reasons. First, in reaching its determination that Mr. Wallace's grand jury exclusion claim was "untimely," the Court of Appeal cited no statute or court rule upon which it relied, nor did it point to anything in the state court record by which Mr. Wallace could reasonably infer the basis for its conclusion. (*See id.*). This deficiency means that the State cannot now show that the Court of Appeal "explicitly rel[ied] on a state procedural rule to dismiss [Wallace's] claims," or demonstrate that the Court of Appeal provided Wallace sufficient information enabling him to rebut the presumption that a procedural bar was an adequate and independent ground for judgment on his claim by establishing that the procedural rule was "not strictly or regularly followed." *See Moore*, 83 F.3d at 702. Simply put, an unknown and undeterminable basis for a procedural default cannot be a procedural rule which is strictly or regularly followed. *Cf. Reed*, 70 F.3d at 846.

Second, *whatever* the basis for the First Circuit's determination that Mr. Wallace's grand jury claim was "untimely," this determination was erroneous, given

33

that Mr. Wallace pressed the issue at every stage of the state court proceedings, including on direct appeal (by way of his *pro se* brief), and there is nothing in the record to suggest that in doing so, he failed to meet state deadlines.[25]

Accordingly, the State's argument that Wallace's grand jury exclusion claim is barred by an independent and adequate state ground also fails.

### d. Merits

Finally, the State argues that, in any event, Wallace's grand jury exclusion claim fails on the merits because (1) the trial court's "findings" in regard to its denial of Wallace's Motion to Quash—specifically its findings that the grand jury

---

[25] The Court of Appeal offered absolutely no analytical justification for its determination that Mr. Wallace's grand jury claim "was raised untimely." (*See* SCR, Vol. 11 (Order Granting in Part and Denying in Part Application for a Writ of Mandamus, May 21, 1997). Nor does the State, in its Opposition, point to any evidence in the record, or cite any Louisiana law, that would substantiate the First Circuit's conclusory statement. (*See* Doc. 53 at pp. 3, 58–61). Instead, the State merely observes that "the First Circuit indicated that [Wallace's grand jury exclusion claim] was untimely (i.e., it should have been raised on appeal)." (*Id.* at p. 59).

This Court's independent investigation into the record also failed to reveal any basis for the First Circuit's conclusion that Mr. Wallace's claim was barred. On the contrary, the record shows that prior to the First Circuit's unexplained May 21 Order, none of the various courts that addressed Mr. Wallace's March 1993 PCRA—including the Court of Appeal—questioned the timeliness of (1) his petition, or (2) his grand jury claim. (*See* Doc. 32 (District Court Order Denying Application for Post-Conviction Relief, Mar. 1, 1994); SCR, Vol. 25 (First Circuit Order Granting Application for a Supervisory Writ, Aug. 29, 1994); *id.* (District Court Order Denying Application for Post-Conviction Relief, Jan. 6, 1995); *id.* (First Circuit Order Denying Application for Writ of Mandamus, Aug. 24, 1995); *id.* (First Circuit Order Denying Application for Writ of Review, Dec. 15, 1995); *id.* (First Circuit Order Granting Application for Writ of Mandamus, Mar. 6, 1996); *id.* (Supreme Court Order Granting Application for Supervisory and/or Remedial Writ, Sept. 18, 1996); *id.* (District Court Order Granting Defendant's Motion to Appoint Counsel, Sept. 19, 1996)). Indeed, by the First Circuit's reasoning (or lack thereof), if Mr. Wallace's grand jury claim was untimely, so too should have been the remaining three claims raised in his May 12 PCRA, because Wallace invariably raised all of his claims together in each of his filings. But whereas the First Circuit dismissed the grand jury claim as untimely, it denied his jury instruction claim on the merits, and *remanded* his ineffective assistance of counsel and *Brady* claims for further proceedings. (SCR, Vol. 11 (Order Granting in Part and Denying in Part Application for a Writ of Mandamus, Mar. 21, 1997)). Without any explanation for why the Court of Appeal treated Mr. Wallace's various claims so differently, this Court simply cannot comprehend how his grand jury claim was untimely, but his other claims were not.

34

selection process "was entirely random and did not internationally [sic] exclude any

. . . sex from the process"—"are entitled to deference"; and, thus, (2) "the trial court's

1974 conclusion is not unreasonably based on the law in existence at the time."

(Doc. 53 at p. 60–61).

<em>i.     Applicability of 28 U.S.C. § 2254(d)(1)</em>

Before this Court can evaluate the merits of Mr. Wallace's grand jury

exclusion claim, it must decide whether to apply AEDPA's deferential standard of

review to the Louisiana courts' adjudication of the claim, under § 2254(d)(1).

Generally, when, as here, a State court erroneously dismisses a post-conviction

claim on procedural grounds without reaching the merits, the heightened standard

of review provided by § 2254(d) does not apply. *Graves v. Dretke*, 442 F.3d 334, 339

(5th Cir. 2006) ("Both of [the petitioner's] *Brady* claims were dismissed by the Texas

courts as abuses of the writ, i.e. on procedural grounds. Because these claims were

not adjudicated on the merits in State court, a prerequisite for the applicability of

28 U.S.C. 2254(d), the heightened standard of review provided by the Anti-

Terrorism and Effective Death Penalty Act ("AEDPA") does not apply."). Further,

the Fifth Circuit has instructed that when "a higher state court has ruled on a

petitioner's motion on grounds different than those of the lower court, we review the

higher court's decision alone." *Salts v. Epps*, 676 F.3d 468, 479 (5th Cir. 2012). At

the same time, however, the Fifth Circuit has stated that when "consider[ing] a

35

state court's 'decision,'" a federal court "look[s] to the 'last reasoned opinion.'" *Id.*
(quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

The Louisiana state courts' conflicting treatment of Mr. Wallace's claim
reveals a tension between these rules. Where, as here, the district court rejected
the claim on the merits in a *reasoned* opinion, and then the Court of Appeal issued
an *unreasoned* rejection of the same claim on procedural grounds, *Graves* and *Salts*
point in different directions. On one hand, each suggests that § 2254(d) does *not*
apply to the federal court's review of the claim in federal habeas because (1) the
higher court failed to address the merits of the claim, *See Graves*, 442 F.3d at 339;
and (2) a federal court reviews only the higher court's decision, *see Salts*, 676 F.3d
at 479. On the other hand, *Salts's* admonishment to "look to the last *reasoned*
opinion" suggests that § 2254(d) requires deference to the district court's initial
adjudication of Mr. Wallace's claim. *Salts*, 676 F.3d at 479 (emphasis added)
(quotation marks omitted); *cf. Steward v. Cain*, 259 F.3d 374, 377 (5th Cir. 2001)
("[W]hen determining whether subsequent action by a state court causes the
procedural bar [imposed by the lower court] to expire, we apply the following
presumption: where there has been one reasoned state judgment rejecting a federal
claim, later unexplained orders upholding that judgment or rejecting the same
claim rest upon the same ground." (quotation marks and alterations omitted)). It
does not appear as if the Fifth Circuit has addressed the precise issue of whether a
district court still "review[s] the higher court's decision alone" when the higher state

36

court dismissed on faulty procedural grounds after the lower court reviewed the merits. *Salts*, 676 F.3d at 479[26]; *cf. Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000) ("Review is *de novo* when there has been no clear adjudication on the merits."). Other Circuits that have addressed this issue have instructed that in such situations, the higher court's adjudication is the only decision reviewed, and thus AEDPA deference is not owed to the lower court decision, even where the higher court dismisses on unexplained and erroneous procedural grounds. *See Thomas v. Horn*, 570 F.3d 105, 114–15 (3d Cir. 2009); *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997).

In any event, this Court ultimately need not determine the effect of the Court of Appeal's erroneous dismissal on procedural grounds, because even if this Court assumes that § 2254(d)'s exacting standards apply to Mr. Wallace's grand jury exclusion claim, it still passes muster.

### ii.    State Court Adjudication

The district court treated Mr. Wallace's challenge to the grand jury proceedings as a "claim . . . that the Grand Jury indictment charging him with Murder should have been quashed because the West Feliciana Parish Grand Jury was not selected from a *fair cross-section of the community*." (*See* Doc. 32 (Commissioner's Recommendation, Jan. 26, 1994 (emphasis added)); *id.* Order

---

[26] Notably, in *Salts*, the lower State court *and* the appellate court each rejected the petitioner's claims on the merits, but differed on the bases. *See Salts*, 676 F.3d at 478. This is a distinguishable situation than the Court faces here, where the district court rejected Mr. Wallace's claim on the merits, only to have the Court of Appeal dismiss on an unexplained procedural ground.

37

Denying Application for Post-Conviction Relief, Mar. 1, 1994)). The district court

noted Mr. Wallace's reliance on "the opinion of the United States Supreme Court in

*Taylor v. Louisiana*," and determined that "[his] reliance on the *Taylor* decision as

authority for the proposition that the exclusion of women from the Grand Jury

venire is a violation of his *Sixth Amendment right to a jury selected from a cross-*

*section of the community* is incorrect for two reasons." (Doc. 32 (Commissioner's

Recommendation, Jan. 26, 1994 (emphasis added)).

> First, the *Taylor* decision dealt specifically with the constitutionality of
> the procedures used to select petit jury venires. In other words, the
> *Taylor* court never mentioned the applicability of its ruling to the
> procedures used to select Grand Jury venires. Second, the United
> States Supreme Court in *Daniel v. Louisiana*, 419 U.S. 31 (1975),
> specifically held that the *Taylor* decision is not to be applied
> retroactively to convictions obtained by juries impaneled prior to the
> date of that decision. The *Taylor* decision was rendered on January 21,
> 1975. The Grand Jury which indicted petitioner was impaneled no
> later than September 10, 1973 (the date on which petitioner was
> indicted for the present charge). Thus, even if this Court were to
> assume that the *Taylor* decision was meant to apply to Grand Jury
> venires as well as petit jury venires, petitioner's claim for relief would
> still be barred by the *Daniel* decision.

(*Id.*).[27]

The district court's analysis is, of course, unobjectionable to the extent it

addresses the question whether the exclusion of women from the grand jury venire

---

[27] The district court's determination on remand from the First Circuit that Wallace's grand jury exclusion claim failed because Wallace was "incorrect" in his recitation of Louisiana Supreme Court precedent regarding "the method utilized by the 20th Judicial District Court in selecting its grand jury venire at the time [he] was indicted" is irrelevant to this Court's analysis of the district court's treatment of Wallace's federal claim because an error of state law is not a basis for federal habeas relief, (SCR, Vol. 25 (Commissioner's Recommendation, Dec. 14, 1994); *id.* (Order Denying Application for Post-Conviction Relief, Jan. 6, 1995)). *See Swarthout v. Cooke*, 131 S. Ct. 859, 861 (2011) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law.") (quotation marks omitted).

38

violated the *Sixth Amendment's fair cross-section requirement.* Not only has the
Fifth Circuit subsequently affirmed the district court's position that *Taylor* is not
retroactively applicable, *see Wilkerson v. Whitley*, 28 F.3d 498, 505–06 (5th Cir.
1994), it *remains* an open question whether the Sixth Amendment's fair cross-
section requirement for petit juries *also* applies to grand jury proceedings in state
court. *See Campbell v. Louisiana*, 523 U.S. 392, 403 (1998) (declining to address the
issue of whether petitioner had standing to raise a Sixth Amendment fair cross-
section challenge to the composition of the grand jury that returned his indictment);
*see also Ford v. Kentucky*, 469 U.S. 984, 987 (1984) (Marshall, J., dissenting from
the denial of *certiorari*) (criticizing the Court for failing to grant *certiorari* to
address whether grand juries must "be fairly representative of the community in
which they sit"); *Castaneda v. Partida*, 430 U.S. 482, 509 (1977) (Powell, J.,
dissenting) ("[A] state defendant has no right to a grand jury that reflects a fair
cross-section of the community.").

The glaring error in the district court's discussion of Mr. Wallace's grand jury
exclusion claim is that it completely sidesteps the issue of whether the *systematic
exclusion* of women from the grand jury that returned Mr. Wallace's indictment
violated the Fourteenth Amendment's *equal protection clause.* As discussed with
regard to the State's exhaustion argument, this issue was fairly, squarely, and
expressly presented to the district court. Mr. Wallace's original objection was that
the exclusion of women from the grand jury proceedings violated "the equal

39

portection [sic] of the laws as provided for in the [Fourteenth Amendment to the] Constitution of the United States." (SCR, Vol. 1, at p. 34). His *pro se* May 12 PCRA recounted "unconstitutional discrimination" against women, and challenged the district court's denial of his Motion to Quash as "a fundamental error applying the . . . Fourteenth Amendment[]." (SCR, Vol. 4 (Original Application on Behalf of Herman Wallace at p. 11, May 12, 1993)). Indeed, in its analysis the May 12 PCRA, the district court articulated Mr. Wallace's grand jury claim as a question of whether "his indictment was obtained in violation of the Sixth *and* Fourteenth Amendments to the United States Constitution in that women and blacks were systematically excluded from the selection roles for the West Feliciana Parish Grand Jury." (Doc. 32 (Commissioner's Recommendation, Jan. 26, 1994 (emphasis added))). This statement of the issue clearly anticipates the necessity of a Fourteenth Amendment equal protection analysis. (*See id.*) And yet, beyond the trial court's initial determination that not "a shred of evidence" supported Mr. Wallace's equal protection challenge, (SCR, Vol. 2, at p. 267), the Louisiana courts simply failed to address Mr. Wallace's claim that the exclusion of women from the grand jury violated the Fourteenth Amendment's equal protection clause, instead focusing entirely on whether Wallace had made out a violation of the Sixth Amendment's fair cross-section requirement.[28]

---

[28] Mr. Wallace's reliance on *Taylor* to support his argument in his *pro se* May 12 PCRA should not have confused the district court as to the nature of Wallace's constitutional claim. Despite *Taylor* being a Sixth Amendment fair-cross section petit jury case, not a Fourteenth Amendment equal protection Grand Jury case, it has long been the rule that "[p]rinciples which forbid discrimination in

40

The Supreme Court has instructed that "denying relief on the basis of [an incorrect] formulation of the issue, while ignoring the fundamental principles established by [the Supreme Court's] most relevant precedents, result[s] in a decision that [is] both 'contrary to' and 'involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 258 (2007) (quoting 28 § 2254(d)). Here, the Louisiana post-conviction court clearly misidentified the constitutional basis for the relief Mr. Wallace was requesting, at least to the extent that it ignored his Fourteenth Amendment equal protection claim. Thus, whether Mr. Wallace is entitled to relief on his federal habeas petition comes down to whether, in rejecting his grand jury exclusion claim, the state post-conviction court *also* "ignor[ed] the fundamental principles established by [the Supreme Court's] most relevant precedents." *See id.* As discussed below, this Court has little trouble determining that, indeed, the Louisiana courts ignored the fundamental principles established by the Supreme Court's most relevant precedents in rejecting Mr. Wallace's grand jury exclusion claim.

> iii. *Clearly Established Federal Law Ignored by the State Court*

Assuming *arguendo* that his grand jury exclusion claim was adjudicated on the merits, Mr. Wallace argues that the State court adjudication resulted in a

---

the selection of Petit Juries also govern the selection of Grand Juries." *Pierre v. Louisiana*, 306 U.S. 354, 362 (1939). Thus, *Taylor's* reasoning was relevant and informative to Mr. Wallace's grand jury equal protection claim, even if *Taylor* itself was limited to a petit jury fair cross-section claim.

41

decision that was *both* "contrary to" *and* "involved an unreasonable application of,
clearly established Federal law, as determined by the Supreme Court of the United
States," § 2254(d)(1), because it ignored the fundamental principles established by
the Supreme Court's gender discrimination jurisprudence. (Doc. 64 at pp. 17–20;
(Doc. 95 at pp. 3, 5–8).

The State disagrees. The State concedes (1) "[Louisiana] law in effect at the
time of the trial indicated that women had to send a request to the Clerk of Court to
be included in the grand jury venire," and (2) "[t]he deputy clerk in this case clearly
indicated that to the best of her knowledge, no woman had requested to be
considered for grand jury duty," but nonetheless asserts that because "the process
was entirely random and did not internationally [sic] exclude any race or sex from
the process, the trial court's 1974 conclusion is not unreasonably based on the law
in existence at the time." (*Id.* at p. 61). Therefore, the State concludes, "[Wallace]
has failed to overcome his burden of proof, and this claim should be denied." (*Id.*).

The State's assertion that the Louisiana courts' adjudication of Mr. Wallace's
grand jury exclusion claim should be measured against federal law as it stood when
Wallace was convicted in 1974 misses the mark. Unless a defendant is seeking the
benefit of a new constitutional rule, a federal court reviewing a state court decision
on habeas review measures the decision against the legal landscape as it existed on
the date that the defendant's conviction and sentence became final. *See Teague v.
Lane*, 489 U.S. 288, 306 (1989); *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994). Here,

42

Wallace does not seek the benefit of a new rule. He only seeks the rule "compelled by existing precedent" when his conviction became final. *Caspari*, 510 U.S. at 390. And, as is true for all defendants granted out-of-time appeals by Louisiana courts, Wallace's conviction became final when "his out of time appeal was resolved." *Cockerham v. Cain*, 283 F.3d 657, 661 (5th Cir. 2002); *see Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987) ("By 'final,' we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied."). Therefore, Mr. Wallace's grand jury exclusion claim is measured against the body of Supreme Court precedent as it existed on July 12, 1993, ninety days after the Louisiana Supreme Court denied Mr. Wallace's application for a writ of certiorari on his direct appeal, *State v. Wallace*, 1992-2209 (La. 4/12/93), 616 So. 2d 679.[29] *Roberts v. Cockrell*, 319 F.3d 690, 693 (5th Cir. 2003) (stating that when a habeas petitioner has pursued relief on direct appeal through his state's highest court "a state prisoner's conviction becomes final for purposes of § 2244 ninety days after the judgment is entered, when the time to file a petition for writ of certiorari with the Supreme Court has expired."). The State is simply mistaken in its assertion that Supreme Court precedent as it existed at the time Mr. Wallace was convicted dictates the outcome of his petition.

---

[29] The Louisiana Supreme Court denied certiorari on Mr. Wallace's direct appeal on April 12, 1993. *State v. Wallace*, 1992-2209 (La. 4/12/93), 616 So. 2d 679. Mr. Wallace's conviction and sentence became final 90 days later, on July 11, 1993. 28 U.S.C. § 2244. This was a Sunday. Thus, the time period is extended to the next business day for the court, which was Monday, July 12. This one-day extension has no meaningful impact on this Court's analysis of Mr. Wallace's constitutional claim.

43

Thus, the precise question presented by Mr. Wallace's petition is this: did the

State's adjudication of Mr. Wallace's claim that systematic exclusion of women from

the grand jury venire violated the equal protection clause of the Fourteenth

Amendment result in "a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law," as had been determined by the

Supreme Court on July 12, 1993. *Cain*, 283 F.3d at 661; *Griffith*, 479 U.S. at 321

n.6; *Andrade*, 538 U.S. at 71–72 ("'[C]learly established Federal law' under

§ 2254(d)(1) is the governing legal principle or principles set forth by the Supreme

Court at the time the state court renders its decision."). A survey of Supreme Court

precedent existing on that date, but *ignored* by the Louisiana courts, compels this

Court to conclude that the Louisiana courts' adjudication of Mr. Wallace's grand

jury exclusion claim resulted in a decision that was both "contrary to," *and*

"involved an unreasonable application of, clearly established Federal law,"

§ 2254(d)(1). *See Abdul-Kabir*, 550 U.S. at 258.

*a.*     *Protection Against Discrimination in*
*Grand Jury Proceedings*

First, there is the venerable line of Supreme Court cases, extending back to

the Supreme Court's decision in *Strauder v. West Virginia*, 100 U.S. 303 (1879),

establishing "that 'it is a denial of the equal protection of the laws to try a defendant

of a particular race or color under an indictment issued by a grand jury . . . from

which all persons of his race or color have, solely because of that race or color, been

excluded by the State . . . .'" *Castaneda v. Partida*, 430 U.S. 482, 492 (1977)

44

(quoting *Hernandez v. Texas*, 347 U.S. 475, 477 (1954)). And while the Supreme Court's initial concern in the grand jury exclusion cases was the exclusion of Blacks from grand jury service, *e.g. Strauder*, 100 U.S. 303, with time the Court clarified that the Fourteenth Amendment's equal protection clause "reaches not only arbitrary class exclusions from jury service based on race or color, but also *all* other exclusions which 'single out' any class of persons 'for different treatment not based on some reasonable classification.'" *Hoyt v. Florida*, 368 U.S. 57, 59–60 (1961) (emphasis added) (quoting *Hernandez*, 347 U.S. at 478), *effectively overruled on other grounds by Taylor*, 419 U.S. at 537.

Indeed, under the equal protection clause the Supreme Court has, at various times, struck down state laws excluding from grand jury service: African Americans, *Smith v. Texas*, 311 U.S. 128, 132 (1940); Mexican Americans, *Hernandez*, 347 U.S. at 482; and persons who are not "upright and intelligent citizens," *Whitus v. Georgia*, 385 U.S. 545, 548 (1967), and dictated the same result when state law restricts grand jury service on the basis of any "race or color," *see Hale v. Kentucky*, 303 U.S. 613, 616 (1938), or ethnicity, *see Strauder*, 100 U.S. at 308 ("Nor if a law should be passed excluding all naturalized Celtic Irishmen, would there be any doubt of its inconsistency with the spirit of the amendment."). Invariably, when the Supreme Court has identified unconstitutional discrimination in grand jury proceedings, it has overturned the petitioner's conviction and required the state to proceed against the petitioner anew.

The Supreme Court's precedent on the issue of whether the equal protection clause forbids a State from systematically excluding *women* from grand jury service is limited to *Hoyt v. Florida*.[30] In *Hoyt*, the Court addressed a female criminal defendant's Fourteenth Amendment equal protection challenge to a Florida law virtually identical to Louisiana's law exempting women from grand jury and petit jury lists. 368 U.S. at 58. First, the Supreme Court clarified that "an exemption of a particular class of persons can . . . be regarded as an exclusion of that class." *Id.* at 61. Thus, "[w]here . . . an exemption of a class in the community is asserted to be in substance an exclusionary device, the relevant inquiry is whether the exemption

---

[30] On at least one other occasion, the Supreme Court noted the possibility of a cognizable equal protection challenge to a state's exemption of women from grand jury proceedings (specifically, Louisiana's), but declined to address the issue. *Alexander v. Louisiana*, 405 U.S. 625, 633–34 (1972) (avoiding the issue of whether Louisiana's exemption of women from grand jury service violated the equal protection clause because the petitioner's conviction was set aside on other grounds).

Additionally, although not directly applicable, in *Ballard v. United States*, the Supreme Court emphatically condemned the "purposeful and systematic exclusion of women" from *federal* grand jury panels. 329 U.S. 187, 193 (1946). The *Ballard* Court's criticism of the Southern District of California's intentional and systematic exclusion of women from grand jury service is noteworthy because twenty-five years before *Reed v. Reed*, 404 U.S. 71 (1971), discussed *infra*, it anticipates the Court's rejection of state laws drawing distinctions between women and men justified by administrative convenience. *See Reed*, 404 U.S. at 76–77.

> It is said, however, that an all male panel drawn from the various groups within a community will be as truly representative as if women were included. The thought is that the factors which tend to influence the action of women are the same as those which influence the action of men—personality, background, economic status—and not sex. Yet it is not enough to say that women when sitting as jurors neither act nor tend to act as a class. Men likewise do not act as a class. But if the shoe were on the other foot, who would claim that a jury was truly representative of the community if all men were intentionally and systematically excluded from the panel? The truth is that the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both; the subtle interplay of influence one on the other is among the imponderables. To insulate the courtroom from either may not in a given case make an iota of difference. Yet a flavor, a distinct quality is lost if either sex is excluded. The exclusion of one may indeed make the jury less representative of the community than would be true if an economic or racial group were excluded.

*Id.* at 193–94.

Case 3:09-cv-01027-BAJ-SCR   Document 96   10/01/13   Page 46 of 61

itself is based on some *reasonable classification* and whether the manner in which it is exercisable rests on some *rational foundation*." *Id.* at 61 (emphasis added). The Court went on to explain, however, that the petitioner's challenge failed because Florida's law was based on a "reasonable classification." *Id.* (quotation marks omitted). Specifically, the 1961 Supreme Court held:

> Despite the enlightened emancipation of women from the restrictions and protections of bygone years, and their entry into many parts of community life formerly considered to be reserved to men, *woman is still regarded as the center of home and family life*. We cannot say that it is constitutionally impermissible for a State, acting in pursuit of the general welfare, to conclude that a woman should be relieved from the civic duty of jury service unless she herself determines that such service is consistent with her own special responsibilities.

*Id.* at 61–62 (emphasis added). As will be fully demonstrated in the next section, by the time Mr. Wallace's conviction became final in 1993, the Equal Protection Clause no longer tolerated such outmoded gender generalizations, and was routinely employed to strike down state laws drawing distinctions between women and men justified on grounds that "woman is . . . the center of home and family life." *Id.* at 62.

       b.   *Protection Against Discrimination on the Basis of Gender*

  Next, there is the more recent, but no less distinguished, line of Fourteenth Amendment equal protection cases firmly establishing that "[b]y providing dissimilar treatment for men and women who are . . . similarly situated, [a state law] violates the Equal Protection Clause." *Reed v. Reed*, 404 U.S. 71, 77 (1971).

47

The line of equal protection gender discrimination cases began with *Reed*, which struck down an Idaho law giving a mandatory preference to men over women in determining who is entitled to administer the estate of one who dies intestate. *Id.* at 72. The Supreme Court held that the Idaho statute could not withstand constitutional scrutiny because "[t]o give a mandatory preference to members of either sex over members of the other, merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment." *Id.* at 76.

The Supreme Court followed *Reed* with *Frontiero v. Richardson*, 411 U.S. 677 (1973), where a plurality of the Court stated for the first time that classifications based on sex "are inherently suspect," *id.* at 682, and eight justices agreed to strike down a federal statute, justified by "administrative convenience," which denied female armed service members the right to claim spouses as dependents, but allowed male service members to make such claims, *id.* at 691–92.

Then came *Craig v. Boren*, which adopted a heightened scrutiny standard of review to evaluate distinctions on the basis of gender under the equal protection clause—requiring "that classifications by gender . . . serve important governmental objectives and . . . be substantially related to achievement of those objectives." 429 U.S. 190, 197 (1976). *Craig* struck down an Oklahoma law allowing sale of 3.2% beer to females, but not males, under 21 years of age. *Id.*

48

*Reed*, *Frontiero*, and *Craig* led to *Mississippi University for Women v. Hogan*, where the Court considered a Mississippi policy restricting admission to a state-university nursing program to women. 458 U.S. 718 (1982). In 1982, less than twenty years after *Hoyt*, and nine years before Mr. Wallace's conviction became final, the Supreme Court summarized its gender-based equal protection jurisprudence as follows:

> We begin our analysis aided by several firmly established principles. Because the challenged policy expressly discriminates among applicants on the basis of gender, it is subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment. That this statutory policy discriminates against males rather than against females does not exempt it from scrutiny or reduce the standard of review. Our decisions also establish that the party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an "exceedingly persuasive justification" for the classification. The burden is met only by showing at least that the classification serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives."

*Id.* at 723–24 (citations omitted). Applying this framework, the *Hogan* Court struck down Mississippi's policy of excluding males from Mississippi University for Women's Nursing program. *Id.* at 733.

In the time between when *Reed* was decided (November 22, 1971) and when Mr. Wallace's conviction became final (July 12, 1993), the Supreme Court employed the equal protection clause to strike down state and federal laws and provisions

49

that classified on the basis of gender no fewer than eleven times.[31]  Additionally, as

noted by Mr. Wallace in his memorandum supporting his Petition, as well as in his

objections to the Magistrate Judge's Report, the principles established in the

Supreme Court's gender-based equal protection cases also informed the Court's

decisions striking down state laws excluding women from petit juries pursuant to

the Sixth Amendment's fair cross-section requirement, including *Taylor*, and *Duren

v. Missouri*, 439 U.S. 357 (1979).  (*See* Doc. 64 at p. 9; (Doc. 95 at p. 7).  As

discussed, *Taylor* struck down Louisiana's affirmative registration statute

exempting women from jury service because "[r]estricting jury service to only

special groups or excluding identifiable segments playing major roles in the

community cannot be squared with the constitutional concept of jury trial."  *Taylor*,

419 U.S. at 530; *see also id.* ("Trial by jury presupposes a jury drawn from a pool

broadly representative of the community as well as impartial in a specific case."

(quotation marks and alterations omitted)).  In doing so, however, the Supreme

Court expressly repudiated its reasoning in *Hoyt*, where the Court determined that

Florida's jury exemption law satisfied the equal protection clause, stating "[i]f it was

---

[31] *See Reed,* 404 U.S. 71; *Frontiero,* 411 U.S. 677; *Craig,* 429 U.S. 190; *Hogan,* 458 U.S. 718; *see also Weinberger v. Weisenfeld*, 420 U.S. 636 (1975) (striking down provision of the Social Security Act providing for gender-based distinctions); *Stanton v. Stanton*, 421 U.S. 7 (1975) (striking down Utah statute under which girls attained majority at 18 years of age, but boys did not attain majority until they were 21); *Califano v. Goldfarb*, 430 U.S. 199 (1977) (invalidating gender-based distinctions in the payment of social security survivor benefits); *Orr v. Orr*, 440 U.S. 268 (1979) (striking down Alabama law requiring husbands but not wives to pay alimony upon divorce); *Califano v. Westcott*, 443 U.S. 76 (1979) (invalidating federal program providing benefits to families with unemployed fathers, but not those with unemployed mothers); *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142 (1980) (striking down Missouri law treating widows and widowers differently for purposes of receiving a spouse's work-related death benefits); *Kirchberg v. Feenstra*, 450 U.S. 455 (1981) (invalidating Louisiana law giving a husband the exclusive right to dispose of community "property).

50

ever the case that women were unqualified to sit on juries or were so situated that none of them should be required to perform jury service, that time has long since passed," and that "[t]o this extent we cannot follow the contrary implications of the prior cases, including *Hoyt v. Florida*." *Id.* at 537; *see also Payne v. Tennessee*, 501 U.S. 808, 830 n.1 (1991) (noting that *Taylor* overruled *Hoyt* "in effect"). The *Taylor* Court further admonished:

> It is untenable to suggest these days that it would be a special hardship for each and every woman to perform jury service or that society cannot spare any women from their present duties. This may be the case with many, and it may be burdensome to sort out those who should be exempted from those who should serve. But that task is performed in the case of men, and the administrative convenience in dealing with women as a class is insufficient justification for diluting the quality of community judgment represented by the jury in criminal trials.

*Id.* at 534–35 (footnote omitted).

In *Duren*, the Supreme Court took a tack similar to its approach in *Taylor*, striking down a Missouri statute granting women an "automatic exemption from jury service" upon request as violating the Sixth Amendment's fair cross-section requirement, 439 U.S. at 359–60, while noting that "exempting all women because of the preclusive domestic responsibilities of some women is insufficient justification for their disproportionate exclusion on jury venires," *id.* at 369; *see also id.* ("What we stated in *Taylor* with respect to the system there challenged under which women could 'opt in' for jury service is equally applicable to Missouri's 'opt out' exemption . . . ."). Of course, *Taylor* and *Duren* each applied a different constitutional rule (the

51

Sixth Amendment) to condemn discrimination in a different setting (the petit jury), and thus are *not* a basis for the relief Mr. Wallace seeks. However, because it has long been true that "[p]rinciples which forbid discrimination in the selection of Petit Juries also govern the selection of Grand Juries," *Pierre v. Louisiana*, 306 U.S. 354, 362 (1939), these cases are certainly among the Supreme Court's "most relevant precedents" at the time Mr. Wallace's conviction became final, *Abdul-Kabir*, 550 U.S. at 258. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 135 (1994) ("*Taylor* relied on Sixth Amendment principles, but the opinion's approach is consistent with the heightened equal protection scrutiny afforded gender-based classifications.").

                *c.*     *Third-Party Standing to Raise Equal Protection Claims*

The discussion to this point illustrates that by the time Mr. Wallace's conviction became final, Supreme Court precedent compelled two conclusions: (1) state laws which resulted in a defendant being indicted by a grand jury that excluded all members of *his* identifiable group could not be squared with the equal protection clause, *e.g. Castaneda*, 430 U.S. at 492; and (2) state laws drawing arbitrary distinctions between women and men, such as Louisiana's grand jury exemption law, also failed under the equal protection clause because they could not demonstrate a substantial relationship to the achievement of an important government objective, *e.g. Reed*, 404 U.S. at 77; *Craig*, 429 U.S. at 197; *cf. Taylor*, 419 U.S. at 534–37; *Duren*, 439 U.S. at 369.

52

Finally, drawing these two lines of Supreme Court equal protection jurisprudence together is the Supreme Court's third-party standing doctrine, which by June 1993 had established: (1) a litigant "may rely upon the equal protection objections of [members of the opposite gender] to establish [a] claim of unconstitutionality of [a] . . . sex differential," *Craig*, 429 U.S. at 192–93 (1976); and (2) "a defendant in a criminal case can raise the third-party equal protection claims of jurors excluded [on an impermissible basis]," *Powers v. Ohio*, 499 U.S. 400, 415 (1991). The key question in each instance is whether "three important criteria are satisfied:

> The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.

*Id.* at 411; *see also Craig*, 429 U.S. at 192–97.

Where, as here, a male criminal defendant is seeking to assert the third party rights of excluded female grand jurors, the Powers Court left little doubt that these criteria are met. First, there is injury because "discrimination in the selection of jurors 'casts doubt on the integrity of the judicial process,' and places the fairness of a criminal proceeding in doubt," *Powers*, 499 U.S. at 411 (quoting *Rose v. Mitchell,* 443 U.S. 545, 556 (1979)); second, "[b]oth the excluded juror and the criminal defendant have a common interest in eliminating . . . discrimination from the courtroom," *id.* at 413; and third "[t]he barriers to a suit by an excluded juror are

53

daunting" such that as a practical matter, an excluded juror "possess[es] little incentive to set in motion the arduous process needed to vindicate his own rights," *id.* at 415. *See also Peters v. Kiff*, 407 U.S. 493, 505, 507 (1972) (holding that a white defendant had standing to challenge discrimination against Blacks in the selection of the grand jury); *Fay v. New York*, 332 U.S. 261, 289 (1947) (assuming that male defendants had standing "to complain of exclusion of women from the general and special jury panels"); *cf. Taylor*, 419 U.S. at 526 (holding that male defendant had standing to challenge exclusion of women from petit juries); *Duren*, 439 U.S. at 360 (same).

      e.    Synthesis and Application to Mr. Wallace's Grand Jury Discrimination Claim

    This discussion makes clear that by 1993, when Mr. Wallace's conviction became final, existing Supreme Court law compelled the conclusion that the Fourteenth Amendment forbid the systematic exclusion of identifiable classes from grand jury service, *see Castaneda*, 430 U.S. at 492; *Hoyt*, 368 U.S. at 59–60; that women constituted an identifiable class, *see Craig*, 429 U.S. at 198; *Duren*, 439 U.S. at 364 ("*Taylor* without doubt established that women 'are sufficiently numerous and distinct from men . . . .'" (quoting *Taylor*, 419 U.S. at 531)); that laws drawing arbitrary distinctions between men and women, including laws that automatically *exempted* women from grand jury service, violated the constitutional guarantee of equal protection, *see Hogan*, 458 U.S. at 723–24; *Reed*, 404 U.S. at 77; *Craig*, 429 U.S. at 197; *cf. Taylor*, 419 U.S. at 534–37; *Duren*, 439 U.S. at 36; and that Mr.

54

Wallace had standing to challenge the systematic exclusion of women from the grand jury panel that indicted him, *see Craig*, 429 U.S. at 192–93; *Powers*, 499 U.S. at 415; *Peters*, 407 U.S. at 505, 507; *cf. Taylor*, 419 U.S. at 526.[32]

Thus, the question becomes whether, as a factual matter, Wallace provided sufficient evidence to prove his grand jury exclusion claim. The State, while conceding that Louisiana law in effect at the time of Wallace's trial required women "to send a request to the Clerk of Court to be included in the grand jury venire," nonetheless asserts that Wallace cannot prove discrimination in the selection of the grand jury that returned his indictment because "[t]he record in this case indicates that the selection process was entirely random," and "[t]he findings of the state courts in regard to [the denial of the Motion to Quash] are entitled to deference." (Doc. 53 at p. 60–61).

Again, the State's argument misses the mark, this time on the law *and* the facts. First, as a matter of law, whether a state's selection of a grand jury venire violates the Fourteenth Amendment's guarantee of equal protection is not, as the State suggests, a question of whether "the selection process was entirely random."

---

[32] The Magistrate Judge's Report rejects Mr. Wallace's grand jury exclusion claim because "[a]t the time the petitioner's conviction became final, the [Supreme] Court had not explicitly declared unconstitutional the exemption of women from grand jury pools," and, further, "a state court considering the petitioner's claim at the time his conviction became final would not have felt compelled by existing precedent to conclude that the gender-based classification which resulted in the exemption of women from *grand* jury service was required [sic] by the Constitution." (Doc. 91 at pp. 58–59). On the first point, the Magistrate Judge is certainly correct. *See Campbell*, 523 U.S. at 403. As the preceding discussion illustrates, however, Supreme Court precedent existing at the time Mr. Wallace's conviction became final *undoubtedly* compelled the conclusion that Louisiana's gender-based classification which resulted in the exemption of women from grand jury service violated the Fourteenth Amendment's guarantee of equal protection of the laws. For this reason, this Court DECLINES to adopt the findings and recommendations in the Magistrate Judge's Report (Doc. 91).

(Doc. 53 at p. 61). Instead, it is a function of whether "the procedure employed

resulted in substantial underrepresentation of . . . the identifiable group."

*Castaneda*, 430 U.S. 482, 494 (1977).

> The first step is to establish that the group is one that is a
> recognizable, distinct class, singled out for different treatment under
> the laws, as written or as applied. Next, the degree of
> underrepresentation must be proved, by comparing the proportion of
> the group in the total population to the proportion called to serve as
> grand jurors, over a significant period of time.

*Id.* (citation omitted). "Once the defendant has shown substantial

underrepresentation . . . he has made out a prima facie case of discriminatory

purpose, and the burden then shifts to the State to rebut that case." *Id.* When

substantial underrepresentation occurs as the result of a state law establishing

different treatment on the basis of gender, the State's rebuttal must prove that "the

discriminatory means employed [was] substantially related to the achievement of

[important governmental] objectives." *Hogan*, 458 U.S. at 724 (quotation marks

omitted).

Second, as a factual matter, while § 2254(e)(1) states that "a determination of

a factual issue made by a State court shall be presumed to be correct," and that this

presumption can only be rebutted "by clear and convincing evidence," 28 U.S.C.

§ 2254(e)(1), the Supreme Court has made clear that the standard imposed by

§ 2254(d)(2) and (e)(1) "is demanding but not insatiable; . . . deference does not by

definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quotation

marks omitted). Here, the record available to the state courts that adjudicated Mr.

56

Wallace's grand jury exclusion claim was more than sufficient to meet AEDPA's standards, and to rebut the trial court's finding that not "a shred of evidence [supported Mr. Wallace's claim] of discrimination." (SCR, Vol. 2, at p. 267). *See Pinholster*, 131 S. Ct. at 1398 ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). First, Wallace identified a group—women—that constitute "a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." *Castaneda*, 430 U.S. at 494; *see Craig*, 429 U.S. at 198 (compiling cases where the Court struck down laws justified by "misconceptions concerning the role of females in the home rather than in the marketplace and world of ideas" (quotation marks omitted)); *see also Duren*, 439 U.S. at 364. Second, Mr. Wallace presented unrebutted evidence that despite making up more than half of the population eligible to serve on the grand jury, no woman had *ever* served as a West Feliciana Parish grand juror, (*see* SCR, Vol. 1, at pp. 232, 239; *see generally id.* at pp. 223–250; *see generally* SCR, Vol. 2, at pp. 251–66). *Castaneda*, 430 U.S. at 494 ("[T]he degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time.").

In short, Mr. Wallace's evidence clearly and convincingly established "substantial underrepresentation," thereby making out "a prima facie case of discriminatory purpose" in the selection of his grand jury. *Id.*; 28 U.S.C.

57

§ 2254(e)(1). The State did not rebut this evidence at the hearing on Wallace's Motion to Quash, nor does it dispute the evidence now. Nor does the State even attempt to defend the Louisiana exemption on grounds that "the discriminatory means employed [was] substantially related to the achievement of [important governmental] objectives." *Hogan*, 458 U.S. at 724 (quotation marks omitted). Instead, the State baldly asserts that "[s]ince the process was entirely random and did not internationally [sic] exclude any race or sex from the process . . . . Petitioner has failed to overcome his burden of proof." This argument overlooks the evidence Mr. Wallace presented at the hearing on his Motion to Quash, as well as the entire body of Supreme Court equal protection jurisprudence, previously discussed, compelling the conclusion that laws which automatically exempt women from service on grand jury panels cannot pass muster under the Fourteenth Amendment.

In sum, the Louisiana courts not only erred when they rejected Mr. Wallace's challenge to the systematic exclusion of women from his grand jury panel, the error was *both* contrary to, *and* an unreasonable application of the Supreme Court's Fourteenth Amendment equal protection jurisprudence, thereby entitling Mr. Wallace to the relief he seeks. *See Abdul-Kabir*, 550 U.S. at 258.

### 2. Mr. Wallace's Remaining Claims

Because Mr. Wallace's grand jury claim is dispositive of his petition, this Court declines to address his remaining claims that: the State knowingly used false testimony and withheld exculpatory evidence at his trial; his trial counsel labored

58

under an actual conflict of interest; and the trial judge gave an erroneous jury instruction. (*See* Doc. 36 at pp. 45–56; Doc. 64; Doc. 95).

## III.  Conclusion

The record in this case makes clear that Mr. Wallace's grand jury was improperly chosen in violation of the Fourteenth Amendment's guarantee of "the equal protection of the laws," U.S. Const. amend. XIV, § 1, and that the Louisiana courts, when presented with the opportunity to correct this error, failed to do so.  In such instances, "'[t]he court will correct the wrong, will quash the indictment, or the panel, or, if not, the error will be corrected in a superior court,' and ultimately in [the Supreme Court] upon review." *Neal v. Delaware*, 103 U.S. 370, 394 (1880) (quoting *Virginia v. Rives*, 100 U.S. 313, 322 (1880)).  Our Constitution requires this result even where, as here, it means overturning Mr. Wallace's conviction nearly forty years after it was entered.

> A prisoner whose conviction is reversed by this Court need not go free if he is in fact guilty, for [the state] may indict and try him again by the procedure which conforms to constitutional requirements.  But no state is at liberty to impose upon one charged with crime a discrimination in its trial procedure which the Constitution, and an Act of Congress passed pursuant to the Constitution, alike forbid.  Nor is this Court at liberty to grant or withhold the benefits of equal protection, which the Constitution commands for all, merely as we may deem the defendant innocent or guilty.  It is the state's function, not ours, to assess the evidence against a defendant.  But it is our duty as well as the state's to see to it that throughout the procedure for bringing him to justice he shall enjoy the protection which the Constitution guarantees.  Where, as in this case, timely objection has laid bare a discrimination in the selection of grand jurors, the conviction cannot stand because the Constitution prohibits the procedure by which it was obtained.  Equal protection of the laws is

59

something more than an abstract right. It is a command which the state must respect, the benefits of which every person may demand. Not the least merit of our constitutional system is that its safeguards extend to all—the least deserving as well as the most virtuous.

*Hill v. Texas*, 316 U.S. 400, 406 (1942) (citation omitted).

Accordingly, this Court **DECLINES** to adopt the findings and recommendations in the **MAGISTRATE JUDGE'S REPORT (Doc. 91)**.

IT IS ORDERED that Mr. Wallace's **SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS BY PRISONER IN STATE CUSTODY (Doc. 36)** is **GRANTED.**

**IT IS FURTHER ORDERED** that the state court's grand jury indictment dated September 14, 1973 is **QUASHED** and that the jury's verdict, the state court judge's pronouncement of punishment, and the judgment dated January 10, 1974, in the state court criminal case against Mr. Wallace be, and are hereby, **VACATED.**

**IT IS FURTHER ORDERED** that the State immediately **RELEASE** Mr. Wallace from custody.

**IT IS FURTHER ORDERED** that within thirty days from the signing of this order the State shall **NOTIFY** Mr. Wallace and this court whether it intends to re-indict Mr. Wallace in this matter.

**IT IS FURTHER ORDERED** that Mr. Wallace's **MOTION FOR RELEASE PENDING THIS COURT'S CONSIDERATION OF HIS APPLICATION FOR HABEAS RELEF (Doc. 81),** and related motions

requesting leave to file additional pleadings in support of his bail request **(Docs. 88, 89)** are **DISMISSED AS MOOT.**

Baton Rouge, Louisiana, this 1st day of October, 2013.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

61